IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

| | |
|---|---|
| FREDRIC  RUSSEL  MANCE, JR. *et al.*, | |
| | |
| VS. | Civil  Action No. 4:14-CV-00539-O |
| | |
| ERIC  HOLDER,  ATTORNEY  GENERAL OF  THE  UNITED  STATES,  and B. TODD JONES,  DIRECTOR,  BUREAU  OF ALCOHOL,  TOBACCO,  FIREARMS  & EXPLOSIVES | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS,
OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .......................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ............................................. 2

FACTUAL BACKGROUND ......................................................................................... 7

STANDARD OF REVIEW ........................................................................................... 7

ARGUMENT ................................................................................................................. 8

    I.     The Court Should Dismiss Plaintiffs' Claims for Lack of Subject Matter
          Jurisdiction. ............................................................................................... 8

          A.     Any Alleged Injury-in-Fact Suffered by the Hanson Plaintiffs Is
                Not Traceable to Defendants, But to a Third Party Not Before This
                Court. ........................................................................................... 9

          B.     The Hanson Plaintiffs Fail to Show That a Favorable Decision
                Is Likely to Redress Any Alleged Injury-in-Fact. .................................... 13

          C.     Plaintiff Mance Has Not Suffered Injury-in-Fact That Is Fairly
                Traceable to the Challenged Federal Laws. ............................................ 14

          D.     The Court Should Dismiss Plaintiff CCRKBA Because It
                Has Not Shown That Any of Its Members Possess Standing. .................. 17

    II.    The Challenged Federal Laws Do Not Violate the Second Amendment. ............. 22

          A.     The Challenged Federal Laws Do Not Burden Conduct
                Protected By the Second Amendment. ..................................................... 24

          B.     Because Any Burden Imposed by the Challenged Federal Laws Is
                Minimal, No Heightened Constitutional Scrutiny Is Warranted .............. 27

          C.     Even If Plaintiffs' Suit Implicates Their Second Amendment Rights,
                the Challenged Federal Laws Are Constitutional. ................................... 30

                1.    At Most, the Court Should Apply Intermediate Scrutiny. ................. 30

                2.    The Challenged Federal Laws Satisfy Intermediate Scrutiny. ........... 32

    III.    The Challenged Federal Laws Do Not Violate the Equal Protection
          Component of the Due Process Clause ............................................................ 37

CONCLUSION .......................................................................................................... 39

CERTIFICATE OF SERVICE .................................................................................... 41

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967)..................................................................21, 22
*Advantage Media, L.L.C. v. City of Eden Prairie,*
  456 F.3d 793 (8th Cir. 2006) ...............................................................20
*Allen v. Wright,*
  468 U.S. 737 (1984)............................................................. 14, 16, 19
*Ammex, Inc. v. United States,*
  367 F.3d 530 (6th Cir. 2004) ...............................................................18
*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)........................................................................14
*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)........................................................................13
*Ass'n of Cmty. Orgs. for Reform Now v. Fowler,*
  178 F.3d 350 (5th Cir. 1999) ...............................................................24
*Bear Lodge Multiple Use Ass'n v. Babbitt,*
  175 F.3d 814 (10th Cir. 1999) .............................................................25
*Bennett v. Spear,*
  520 U.S. 154 (1997)........................................................................25
*Bolling v. Sharpe,*
  347 U.S. 497...............................................................................44
*Broadrick v. Oklahoma,*
  413 U.S. 601 (1973).......................................................................23
*Bullock v. Carter,*
  405 U.S. 134 (1972).......................................................................33
*C.  See Midwest Media Prop. L.L.C. v. Symmes Twp.,*
  503 F.3d 456 (6th Cir. 2007) ...............................................................20
*Califano v. Jobst,*
  434 U.S. 47 (1977)........................................................................34
*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010).......................................................................25
*Clapper v. Amnesty Int'l,*
  133 S. Ct. 1138 (2013)................................................................15, 22
*Colo. Outfitters Ass'n v. Hickenlooper,*
  2014 WL 3058518 (D. Colo. June 26, 2014)..............................................21
*Common Cause v. Dep't of Energy,*
  702 F.2d 245 (D.C. Cir. 1983) .............................................................26
*Cone Corp. v. Fla. Dep't of Transp.,*
  921 F.2d 1190 (11th Cir. 1991) ............................................................20
*Dearth v. Holder,*
  893 F. Supp. 2d 59 (D.D.C. 2012) .........................................................45
*Democratic Party v. Barbour,*
  529 F.3d 538 (5th Cir. 2008) ........................................................ 15, 22, 23

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ...................................................................28, 29, 31, 32
*Dominguez v. UAL Corp.,*
  666 F.3d 1359 (D.C. Cir. 2012) ...........................................................25
*Dumaguin v. Sec'y of Health & Human Servs.,*
  28 F.3d 1218 (D.C. Cir. 1994) .............................................................45
*Emerald Int'l Corp. v. United States,*
  54 Fed. Cl. 674 (2002) ........................................................................18
*Emps. Union v. U.S. Dep't of the Treasury,*
  25 F.3d 237 (5th Cir. 1994) .................................................................24
*Gonzales v. Carhart,*
  550 U.S. 124 (2007)............................................................................34
*Hastey v. Bush,*
  No. 03-88, 2003 WL 22289885 (N.D. Tex. Oct. 6, 2003) ..................27
*Heller v. Dist. of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ................................................ 33, 34, 37
*Henderson v. Stalder,*
  287 F.3d 374 (5th Cir. 2002) ...............................................................14
*Hitt v. City of Pasadena,*
  561 F.2d 606 (5th Cir. 1977) ...............................................................14
*Home Builders Ass'n of Miss. v. City of Madison,*
  143 F.3d 1006 (5th Cir. 1998) .............................................................13
*Jones v. Bush,*
  122 F. Supp. 2d 713 (N.D. Tex. 2000), ...............................................26
*Kachalsky v. Cnty. of Westchester,*
  701 F.3d 81 (2d Cir. 2012), .................................................................39
*KH Outdoor, L.L.C. v. Clay Cnty., Fla.,*
  482 F.3d 1299 (11th Cir. 2007) ...........................................................20
*KVUE, Inc. v. Moore,*
  709 F.2d 922 (5th Cir. 1983) ...............................................................22
*Kwong v. Bloomberg,*
  723 F.3d 160 (2d Cir. 2013) ................................................................36
*Kwong v. De Blasio,*
  134 S. Ct. 2696 (2014) ........................................................................36
*Lane v. Holder,*
  703 F.3d 668 (4th Cir. 2012), .......................................................16, 17
*Little v. KPMG, L.L.P.,*
  575 F.3d 533 (5th Cir. 2009) .........................................................21, 27
*Longstreet Delicatessen v. Jolly,*
  No. 06-986, 2007 WL 2815022 (E.D. Cal. Sept. 25, 2007) ................22
*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)....................................................................*passim*
*MacNutt v. Police Comm'r of Boston,*
  572 N.E.2d 577 (Mass. App. Ct. 1991) ...............................................32
*McConnell v. Fed. Election Comm'n,*
  540 U.S. 93 (2003)..............................................................................25

*McDonald v. Bd. of Elections Comm'n,*
   394 U.S. 802 (1969).................................................................................33

*Mont. Shooting Sports Ass'n v. Holder*
   No. 09-cv-147, 2010 WL 3926029 (D. Mont. Aug. 31, 2010)........................31

*Mont. Shooting Sports Ass'n v. Holder,*
   727 F.3d 975 (9th Cir. 2013)....................................................................31

*Murray v. City of Austin,*
   947 F.2d 147 (5th Cir. 1991) ....................................................................27

*Nat'l Rifle Ass'n v. Brady,*
   914 F.2d 475 (4th Cir. 1990) ....................................................................11

*Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
   700 F.3d 185 (5th Cir. 2012),..............................................................*passim*

*Navegar, Inc. v. United States,*
   192 F.3d 1050 (D.C. Cir. 1999).................................................................38

*Noatex Corp. v. King Constr. of Houston, L.L.C.,*
   732 F.3d 479 (5th Cir. 2013) ....................................................................43

*Nordyke v. King,*
   644 F.3d 776 (9th Cir. 2011) ....................................................................34

*Nordyke v. King,*
   681 F.3d 1041 (9th Cir. 2012) ..................................................................35

*Ontario Power Generation, Inc. v. United States,*
   369 F.3d 1298 (Fed. Cir. 2004) ................................................................18

*Osterweil v. Bartlett,*
   819 F. Supp. 2d 72 (N.D.N.Y. 2011) .........................................................45

*Pederson v. La. State Univ.,*
   213 F.3d 858 (5th Cir. 2000) ....................................................................27

*Peterson v. LaCabe,*
   783 F. Supp. 2d 1167 (D. Colo. 2011) .......................................................45

*Peterson v. Martinez,*
   707 F.3d 1197 (10th Cir. 2013) ................................................................45

*Pickett v. State,*
   179 S.E.2d 303 (Ga. App. 1970)...............................................................32

*Raines v. Byrd,*
   521 U.S. 811 (1997)................................................................................15

*Ramming v. United States,*
   281 F.3d 158 (5th Cir. 2001) ..............................................................13, 37

*San Diego Cnty. Gun Rights Comm. v. Reno,*
   98 F.3d 1121 (9th Cir. 1996) .........................................................17, 18, 26

*Schwanda v. Bonney,*
   418 A.2d 163 (Me. 1980) .........................................................................32

*Shooting Sports Ass'n v. Holder,*
   No. 09-cv-147, 2010 WL 3926029 (D. Mont. Aug. 31, 2010)..........................31

*Simon v. E. Ky. Welfare Rights Org.,*
   426 U.S. 26 (1976)..................................................................................16

*State v. Sima,*
   361 A.2d 58 (N.J. Super. Ct. App. Div. 1976) ............................................32

iv

*Teixeira v. Cnty. of Alameda,*
  No. 12-cv-03288, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013) ............................................31
*Trinity Indus., Inc. v. Martin,*
  963 F.2d 795 (5th Cir. 1992) ..............................................................................................23
*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994) ...............................................................................................passim
*United States v. Chafin,*
  423 F. App'x 342 (4th Cir. 2011) ..........................................................................................31
*United States v. Decastro,*
  682 F.3d 160 (2d Cir. 2012), ...........................................................................34, 35, 36
*United States v. King,*
  532 F.2d 505 (5th Cir. 1976) ...............................................................................................31
*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010) ...........................................................................................29, 35
*United States v. Salerno,*
  481 U.S. 739 (1987)........................................................................................................43, 44
*United Transp. Union v. ICC,*
  891 F.2d 908 (D.C. Cir. 1989) ...............................................................................................22
*Vacco v. Quill,*
  521 U.S. 793 (1997)..................................................................................................................44
*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,*
  454 U.S. 464 (1982) ........................................................................................................23, 28
*Webb v. Cardiothoracic Surgery Assocs. of N. Tex.,*
  139 F.3d 532 (5th Cir. 1998) ...............................................................................................14
*West Virginia Judicial Inquiry Comm'n v. Dostert,*
  271 S.E.2d 427 (W. Va. 1980)..............................................................................................33
*Zablocki v. Redhail,*
  434 U.S. 374 (1978)..................................................................................................................34

**STATUTES**
18 U.S.C. §§ 922(a)(1)-(5) ...................................................................................9, 11, 43
18 U.S.C. § 922(a)(3) ..........................................................................................19, 35, 36
18 U.S.C. § 922(b)..................................................................................................................12
18 U.S.C. § 922(b)(3)...................................................................................................*passim*
18 U.S.C. § 922(b)(3)(A)......................................................................................................41
18 U.S.C. § 923(a).....................................................................................................................8
18 U.S.C. § 926(a)...................................................................................................................11
25 Me. Rev. Stat. Ann. § 2031 .........................................................................................32
Iowa Code Ann. § 724.15 ...................................................................................................43
N.C. Gen. Stat. §§ 14-402, 14-403 (1999).....................................................................32
N.J. Stat. Ann. § 2A:151-44 ..............................................................................................32
N.Y. Penal Law § 265.05(5) (1968)................................................................................32
Neb. Rev. Stat. § 69-2401 ..................................................................................................42
U.S. Const. amend. II............................................................................................................28, 31
U.S. Const. art. III, § 2.........................................................................................................14
Va. Code Ann. § 15.2-915.2...............................................................................................42
Va. Code Ann. § 18.2-308 ..................................................................................................42

W. Va. Code § 61-7-2 ................................................................................................................33

**RULES**
Fed. R. Civ. P. 56(a) ...............................................................................................................14

**REGULATIONS**
27 C.F.R. § 478.96 ..................................................................................................................12
27 C.F.R. § 478.96(c) ..............................................................................................................12
27 C.F.R. § 478.99 ..............................................................................................................16, 18
27 C.F.R. § 478.99(a) ............................................................................................................8, 11
27 C.F.R. § 478.99(a)(1) ..........................................................................................................12
27 C.F.R. § 478.99(a)(2) ..........................................................................................................12
27 C.F.R. § 478.124(c) .............................................................................................................12
27 C.F.R. § 478.124(c)(1) .........................................................................................................12
27 C.F.R. § 478.124(d) .............................................................................................................12
27 C.F.R. § 478.124(e) .............................................................................................................12

## INTRODUCTION

Federal law prohibits federal firearms licensees from selling or transferring handguns directly to out-of-State purchasers. To ensure compliance with State restrictions on the acquisition of handguns, federal law permits eligible individuals to obtain a handgun from an out-of-State dealer by taking delivery of the handgun from a federally-licensed dealer in their State of residence. Plaintiffs—a federal firearms licensee in Texas, two residents of the District of Columbia, and the Citizens Committee for the Right to Keep and Bear Arms—allege that this statute and its implementing regulation violate the Second and Fifth Amendments of the United States Constitution. Plaintiffs do not aver that they have been unable to obtain the handguns of their choice from the dealer of their choice in any State of the Union. Rather, they claim that transaction costs associated with the transfer of handguns from an out-of-State handgun retailer to a licensed firearm dealer in the District of Columbia violate their constitutional rights. Plaintiffs' claims fail as a matter of law.

As an initial matter, this Court lacks subject matter jurisdiction over Plaintiffs' claims. Plaintiffs lack standing to challenge these laws because they allege no injury-in-fact that is traceable to the challenged laws. As the Fourth Circuit recently held in a nearly-identical case, the transfer fee that prospective handgun purchasers would allegedly incur in complying with these laws is attributable to the independent decision of a District of Columbia firearms licensee to charge a fee to transfer and deliver handguns. The fee is not required by the laws themselves. And Plaintiff Mance has offered nothing other than generalized speculation to support his claim that, but for the challenged laws, he would profit from selling handguns to customers outside of Texas. His allegations, like the allegations of the organizational plaintiff, are insufficient to state a claim of actual or imminent harm that is fairly traceable to the challenged laws.

Even if Plaintiffs' claims were not precluded on jurisdictional grounds, they would fail as a matter of law. The challenged statute and regulation are presumptively lawful conditions on the commercial sale of arms. They impose no substantial burden on anyone's constitutionally-protected right to bear arms for self-defense in the home. Even if they did, the laws readily pass constitutional muster under intermediate scrutiny—the highest applicable level of scrutiny under Fifth Circuit case law. Because there is at least a reasonable fit between the challenged federal laws and the government's important interest in protecting public safety and permitting States to regulate firearms traffic within their own borders, these laws are constitutional. Accordingly, the Court should dismiss this case, or in the alternative, enter summary judgment in favor of Defendants.

## STATUTORY AND REGULATORY BACKGROUND

Congress has enacted a vast, interconnected framework of federal laws regulating the interstate firearm market. Plaintiffs' suit challenges the constitutionality of a federal statute and regulation within that framework, 18 U.S.C. § 922(b)(3) and 27 C.F.R. § 478.99(a).

Federal law mandates that "[n]o person shall engage in the business of . . . dealing in firearms . . . until he has filed an application with and received a license to do so from the Attorney General." 18 U.S.C. § 923(a). The federal statute challenged by Plaintiffs, 18 U.S.C. § 922(b)(3), makes it "unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver –

> (3) any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located, except that this paragraph (A) shall not apply to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this

2

subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States), and (B) shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes.

18 U.S.C. § 922(b)(3). This statute works in tandem with §§ 922(a)(1)-(5) to prohibit the interstate transfer of firearms other than rifles and shotguns except through federal firearms licensees ("FFLs").

Congress enacted the Omnibus Crime Control Act following a multi-year investigation of violent crime, which revealed "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." Omnibus Crime Control and Safe Streets Act of 1968 ("Omnibus Crime Control Act"), Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. 225. Congress specifically noted "the serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." S. Rep. No. 89-1866, at 19 (1966) (attached as Exhibit 1) (App. 019). Accordingly, Congress has enacted a comprehensive framework for regulating interstate commerce in firearms. Congress later built on this regulatory framework by enacting the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, the "principal purpose" of which was "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, *reprinted in* 1968 U.S.C.C.A.N. 4410, 4411 (1968).

Congress's investigations revealed that "[n]ot only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, *primarily handguns*, to persons who are not residents of the locale in which the dealer conducts his business, affords

similar circumvention." S. Rep. No. 89-1866, at 3 (App. 003) (emphasis added). Congress established that "[c]ircumvention of the laws of the District of Columbia was easily effected by" interstate transfers of handguns and that "[t]his situation is not peculiar or confined to the Washington, D.C. area." *Id.* at 61. "[I]n the Maryland suburban area of Washington D.C.," 58% of one firearms dealer's handgun sales were to residents of the District of Columbia, and "[s]ubsequent criminal records checks on these purchasers reveal[ed] that 40 percent of them have criminal records" in the District of Columbia. *Id.* Another Maryland firearms dealer made 40% of its handgun sales to residents of the District of Columbia, 23% of whom were subsequently found to have criminal records in the District of Columbia. *Id.* In Massachusetts, the State police "traced 87 percent of the concealable firearms used in crimes in Massachusetts to out-of-State purchases." *Id.* at 54.

Congress thus found that "concealable weapons" presented a particular challenge for State and local law enforcement authorities, Pub. L. No. 90-351, Title IV, § 901(a)(2), (4), (5), (6), 82 Stat. at 225, and that "the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms." *Id.* § 901(a)(5), 82 Stat. at 225. Congress found "that only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible." *Id.* § 901(a)(3), 82 Stat. at 225.

To that end, Congress included statutory provisions in both the Omnibus Crime Control Act and the Gun Control Act "designed to prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one." H. Rep. No. 90-1577, 1968 U.S.C.C.A.N. at 4420; *see also* S. Rep. No. 90-1097, *reprinted in* 1968 U.S.C.C.A.N. 2112, 2114. These provisions include 18 U.S.C. §§ 922(a)(1)-(5), which require interstate transfers of firearms to take place through federal firearms licensees, and 18 U.S.C. § 922(b)(3), which regulates the interstate transfer of firearms by federal firearms licensees.

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) is authorized to issue "such rules and regulations as are necessary to carry out" the provisions of Title 18 relating to firearms. 18 U.S.C. § 926(a); *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 477 (4th Cir. 1990) ("The Secretary of the Treasury was authorized to promulgate regulations to facilitate the enforcement of the Gun Control Act" and "[t]his responsibility was delegated within the Department of the Treasury to the Bureau of Alcohol, Tobacco and Firearms (BATF).").[1]

ATF's implementing regulations include 27 C.F.R. § 478.99(a), which closely tracks Congress's limitations on interstate transfers of firearms by federal firearms licensees, 18 U.S.C. § 922(b)(3).[2] ATF has also provided that federal firearms licensees "shall not sell or otherwise

---

[1] The Homeland Security Act of 2002 divided the Bureau of Alcohol, Tobacco and Firearms into two separate agencies, the Bureau of Alcohol, Tobacco, Firearms and Explosives within the Department of Justice, and the Tax and Trade Bureau within the Department of Treasury. Homeland Security Act of 2002, Pub. L. No. 107-296, § 1111, 116 Stat. 2135, 2274. The Act transferred the Bureau's authority under the Gun Control Act to the new ATF in the Department of Justice and amended the Gun Control Act by replacing references to the Secretary of the Treasury with references to the Attorney General. *Id.*

[2] The regulation at 27 C.F.R. § 478.99(a) provides that a federally-licensed importer, manufacturer, dealer, or collector "shall not sell or deliver any firearm to any person not licensed under this part and who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business or activity is located." *Id.* The regulation does not "apply to the sale or delivery of a rifle or shotgun" if ATF's requirements for mail order

dispose, temporarily or permanently, of any firearm to any [unlicensed transferee], unless the licensee records the transaction on a firearms transaction record, Form 4473." 27 C.F.R. § 478.124(a); *see also* 27 C.F.R. § 478.96 (imposing same restrictions with respect to mail order sales). The Form 4473 establishes the transferee's identity as well as his or her eligibility to possess a firearm by documenting "the transferee's name, sex, residence address," "date and place of birth," "height, weight and race," "country of citizenship," "*State of residence*," and the transferee's certification that he or she "is not prohibited by the Act from transporting or shipping a firearm in interstate or foreign commerce or receiving a firearm which has been shipped or transported in interstate or foreign commerce or possessing a firearm in or affecting commerce." 27 C.F.R. § 478.124(c)(1) (emphasis added).[3]

Under this regulatory framework, a person who is eligible to possess a handgun may purchase a handgun through an in-State FFL or obtain a handgun from an out-of-State source, by arranging for the handgun to be delivered to an in-State federally-licensed firearms dealer, from whom the purchaser may retrieve the handgun directly. 18 U.S.C. § 922(b) (providing that "[p]aragraphs (1), (2), (3), and (4) of this subsection shall not apply to transactions between" federal firearms licensees).

---

sales, *id.* § 478.96(c), "are fully met." *Id.* § 478.99(a)(1). The regulation also does not "apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes." *Id.* § 478.99(a)(2).

[3] *See also* 27 C.F.R. § 478.124(d) (requiring completion of a Form 4473 prior to "an over-the-counter transfer of a shotgun or rifle . . . to a nonlicensee who is not a resident of the State in which the licensee's business premises is located"); *id.* § 478.124(e) (same, with respect to "transfer of a firearm to any nonlicensee who is not a resident of the State in which the licensee's business premises is located, . . . [but] is acquiring the firearm by loan or rental from the licensee for temporary use for lawful sporting purposes"); *id.* § 478.124(c) (same, for an "over-the-counter transfer of a firearm to a nonlicensee who is a resident of the State in which the licensee's business premises is located").

## FACTUAL BACKGROUND

Plaintiffs allege the following facts, which are taken as true solely for purposes of this motion.  Plaintiff Frederic Russell Mance, Jr. is a Texas resident and a federal firearms licensee who retails firearms at his business in Arlington, Texas. First Am. Compl. ¶¶ 1, 24.  Plaintiffs Andrew Hanson and Tracey Ambeau Hanson, a husband and wife, reside in the District of Columbia.  *Id.* ¶¶ 2, 3.  On June 21, 2014, the Hansons visited Mance's place of business in Arlington, Texas, and each identified a handgun they wished to purchase.  *Id.* ¶¶ 27, 28.  The Hansons and Mance decided not to complete the purchase and sale of these handguns, as doing so would incur a transfer fee of $125 per handgun imposed by the federally-licensed firearm dealer in the District of Columbia, as well as shipping costs.  *Id.* ¶¶ 29-33.  Instead, Plaintiffs filed this lawsuit.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) and 12(b)(6).  A court dismisses a case under Rule 12(b)(1) for lack of subject matter jurisdiction if it lacks the statutory or constitutional power to adjudicate the case.  *Home Builders Ass'n of Miss. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted).  The burden of proof on a Rule 12(b)(1) motion to dismiss rests with the party asserting jurisdiction.  The Court should "consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  A complaint does not suffice "if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal citation and alteration omitted).  When a complaint could be

dismissed for both lack of jurisdiction and failure to state a claim, "the court should dismiss only on the jurisdictional ground under [Rule] 12(b)(1), without reaching the question of failure to state a claim under [Rule] 12(b)(6)." *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).

Defendants move in the alternative for summary judgment. A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmovant, the nonmoving party must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Tex.*, 139 F.3d 532, 536 (5th Cir. 1998) (citations omitted).

## ARGUMENT

### I.     The Court Should Dismiss Plaintiffs' Claims for Lack of Subject Matter Jurisdiction.

Article III of the Constitution confines the federal courts to deciding actual "cases" and "controversies." U.S. Const. art. III, § 2. *Allen v. Wright*, 468 U.S. 737, 750 (1984). "Of the doctrines that have evolved under Article III, . . . , the requirement that the litigant have standing is perhaps the most important." *Henderson v. Stalder*, 287 F.3d 374, 378 (5th Cir. 2002) (citing *Allen*, 468 U.S. at 750). "[O]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper v. Amnesty Int'l*, 133 S. Ct. 1138, 1147 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)).

To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (citation omitted). An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal punctuation omitted). Additionally, "a causal connection between the injury and the conduct complained of" must exist. *Id.* That is, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal punctuation omitted). Last, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal punctuation omitted).

The only cognizable injury-in-fact alleged by Plaintiffs—namely, a $125 transfer fee—results from the independent action of a firearms dealer not before the Court, not any action by Defendants. Moreover, it is not clear that a favorable decision by this Court would redress this alleged injury. Consequently, Plaintiffs lack standing to sue.

### A.   Any Alleged Injury-in-Fact Suffered by the Hanson Plaintiffs Is Not Traceable to Defendants, But to a Third Party Not Before This Court.

The Hanson Plaintiffs contend that, in the District of Columbia, only one licensed firearms dealer, Charles Sykes, is currently in the business of transferring handguns purchased at retail to District residents. First Am. Compl. ¶ 31. The Hanson Plaintiffs claim that they have suffered injury because Mr. Sykes "charges $125 per transfer for handguns received from other dealers." *Id.*

9

This added cost, however, results from a fee imposed by Mr. Sykes, an independent third-party firearms dealer, not from Section 922(b)(3).  It is well settled that where the existence of a third party not before the Court breaks the chain of causation, a plaintiff lacks standing to sue. *See, e.g.*, *Allen*, 468 U.S. at 759 (African-American parents lacked standing to challenge absence of IRS standards governing the denial of tax-exempt status to discriminatory private schools, where any injury derived from their children's inability to attend desegregated public schools depended on the decisions of third-party private schools and white parents); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976) (holding that indigent hospital patients lacked standing to challenge an IRS revenue ruling that they claimed encouraged hospitals to deny hospital services to indigent people, because it was "purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications").

In a case directly on point, the Fourth Circuit recently dismissed a similar lawsuit for lack of standing, holding that even if persons who wished to buy handguns from an out-of-State dealer had shown injury-in-fact, they failed to satisfy the traceability requirement of Article III standing.  *Lane v. Holder*, 703 F.3d 668, 673-74 (4th Cir. 2012), *cert. denied*, 134 S. Ct. 1273 (2014).  The plaintiffs in *Lane*, like Plaintiffs here, were District of Columbia residents who wished to acquire handguns from a dealer in another State (Virginia), without having the handguns transferred to a District of Columbia dealer.  *Id.* at 670.  The *Lane* plaintiffs challenged 18 U.S.C. § 922(b)(3) and 27 C.F.R. § 478.99 under the Second Amendment, *id.*, and alleged that "their injury stems from an inability to obtain their firearms from a store in Virginia, which inhibits them from obtaining the handguns they want in the manner they desire." *Id.* at 673.  The plaintiffs argued that "the associated burden and expense [was] a direct consequence of the

challenged laws." *Id.* The Fourth Circuit disagreed, explaining that "the costs the plaintiffs complain of are not traceable to the laws they challenge, but to the FFLs that charge transfer fees." *Id.* at 674. Consequently, "[b]ecause any harm to the plaintiffs result[ed] from the actions of third parties not before this court," the Fourth Circuit determined that the plaintiffs were "unable to demonstrate traceability." *Id.* The same factual situation is presented here, and the same result should occur.

In another similar case, the Ninth Circuit held that the plaintiffs lacked standing to claim that the Crime Control Act, which banned certain firearms (but "grandfathered" in others), purportedly caused the price of banned devices and grandfathered arms to increase, thus violating the plaintiffs' constitutional rights. *See San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121 (9th Cir. 1996).[4] As the court explained, a "fatal flaw with plaintiffs' economic injury theory is that it is third-party weapon dealers and manufacturers—not the government defendants—who have raised the prices of assault weapons." *Id.* at 1130. Thus, because "nothing in the Act directs manufacturers or dealers to raise the price of regulated weapons," the plaintiffs' alleged injury "does not satisfy the requirements of Article III because it is 'th[e] result [of] the independent action of some third party not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). The Court thus recognized that the independent decisions of gun dealers broke the chain of causation between the alleged injury and the challenged federal law. *See also Ammex, Inc. v. United States*, 367 F.3d 530, 534 (6th Cir. 2004) (duty-free store lacked standing to challenge imposition of excise tax imposed on suppliers where, because "[i]t was in the

---

[4] The Ninth Circuit's decision in *San Diego County Gun Rights Committee* predates the Supreme Court's recognition that the Second Amendment protects "an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), but the Ninth Circuit's conclusion that the plaintiffs' alleged economic injuries were not "fairly traceable" to the challenged federal law, 98 F.3d at 1130, is unaffected by *Heller*'s analysis.

discretion of Ammex's suppliers to charge Ammex for the challenged tax amount, . . . any alleged injury suffered by Plaintiff in the form of increased fuel costs was not occasioned by the Government"); *Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1300, 1303 (Fed. Cir. 2004) (coal exporter lacked standing to sue United States for imposing excise tax on coal suppliers, who included amount equal to the tax in the price they charged to the exporter, because the suppliers "made an independent decision to include the amount of the taxes and fees in the price of coal sold to [exporter]"); *Emerald Int'l Corp. v. United States*, 54 Fed. Cl. 674, 675-76, 681-82 (2002) (dismissing, for lack of standing, similar claim brought by coal exporter; "[T]he determination whether such a tax will be passed on involves the independent judgment of a third party - the seller/producer - made by reference to a whole range of facts. For standing purposes, the *mere existence of such discretion*, no matter how it is exercised in a particular situation, *breaks the requisite chain of causation* between the imposition of the tax and any economic harm in the form of higher costs suffered by the purchaser thereof.") (emphasis added).[5]

The economic injury claimed by the Hanson Plaintiffs is similarly attributable to the independent actions of a third-party firearms dealer (Mr. Sykes), not to the challenged federal provisions. Neither 18 U.S.C. § 922(b)(3) nor 27 C.F.R. § 478.99 direct firearm dealers to charge transfer fees. The dealer—like the firearms dealer in *Lane*, the firearms dealers and manufacturers in *San Diego County*, and the store operator in *Ammex*—has discretion as to whether to charge these fees. Accordingly, Plaintiffs' alleged injury is not fairly traceable to the actions of Defendants. Moreover, even if Plaintiffs' alleged injury were *redressable* through the extraordinary step of enjoining the challenged laws—*but see infra* I.B.—that would not

---

[5] Although it is an Article I court, the U.S. Court of Federal Claims applies the same standing requirements that are enforced by Article III courts. *See Emerald*, 54 Fed. Cl. at 677.

demonstrate that the alleged injury is *fairly traceable* to these laws. *See Allen*, 468 U.S. at 753 n.19 (distinguishing between traceability, which focuses on "the causal connection between the assertedly unlawful conduct and the alleged injury," and redressability, which "examines the causal connection between the alleged injury and the judicial relief requested"). As the Supreme Court explained in *Allen*, even if the injury might have been substantially diminished by the relief the plaintiffs in that case sought, it still would not have been traceable to the challenged conduct. *See id.*

The Hanson Plaintiffs cannot therefore rely on these transfer fees to establish the causation element of standing. Because the independent decision of a third party breaks the chain of causation between the injury the Hanson Plaintiffs allege and the challenged law, Plaintiffs fail to satisfy the causation requirement of standing.

**B.    The Hanson Plaintiffs Fail to Show That a Favorable Decision Is Likely to Redress Any Alleged Injury-in-Fact.**

To satisfy the redressability element of standing, a plaintiff must show that it is "likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal punctuation omitted). The Hanson Plaintiffs fail to make such a showing because a different federal statute, not challenged by Plaintiffs, prohibits them from purchasing handguns from Mance and transporting them to their residence in the District of Columbia. 18 U.S.C. § 922(a)(3) provides, in relevant part, that it is unlawful "for any person . . . to transport into . . . in the State where he resides . . . any firearm purchased . . . outside that State." But because Plaintiffs do not challenge Section 922(a)(3), even a favorable ruling would not be likely to redress the Hanson Plaintiffs' alleged injuries; Section 922(a)(3) would still prohibit them from transporting a firearm purchased in Texas into Washington, D.C. *See Midwest Media Prop. L.L.C. v. Symmes Twp.*, 503 F.3d 456, 461-63 (6th Cir. 2007) (finding that

13

plaintiffs failed to establish redressability when they challenged township's zoning regulations prohibiting off-premises signs, because plaintiffs' rejected applications for off-premises signs had been, or could have been, rejected for violations of township's height/size restrictions and plaintiffs had not challenged those restrictions); *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801-02 (8th Cir. 2006) (similar); *KH Outdoor, L.L.C. v. Clay Cnty., Fla.*, 482 F.3d 1299, 1303 (11th Cir. 2007) (similar). Thus, the Hanson Plaintiffs have failed to satisfy the redressability requirement of standing.

**C.    Plaintiff Mance Has Not Suffered Injury-in-Fact That Is Fairly Traceable to the Challenged Federal Laws.**

Though Plaintiffs allege that the Hanson Plaintiffs "each identified a handgun in [Plaintiff] Mance's inventory" that they wished to buy, Plaintiff Mance alleges that he "agreed to refrain from completing any handgun transfers" to the Hanson Plaintiffs rather than "hav[ing] the handguns shipped at their expense for transfer, at their expense, through [dealer Charles] Sykes." First Am. Compl. ¶¶ 28, 32. Thus, as explained above, any allegation that Plaintiff Mance suffered injury-in-fact because of a lost sale is directly traceable to Mr. Sykes' independent decision to charge $125 to transfer handguns, and Plaintiffs' decision not to consummate the sale, not to Defendants. Accordingly, to the extent that Plaintiff Mance alleges this lost sale to be an injury-in-fact, he fails to establish the causation element of standing.[6]

---

[6] Initially, there is some doubt that Plaintiff Mance has sufficiently alleged injury-in-fact. An injury-in-fact is "an invasion of a legally protected interest." *Lujan*, 504 U.S. at 560 (1992). Unless a plaintiff has shown that he or she has sustained an invasion of an interest that is legally cognizable—in other words, that is protected by statute or is otherwise recognized by law to exist—no injury in fact exists. *See Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1204 (11th Cir. 1991) ("If the plaintiff is prosecuting a constitutional claim, moreover, the injury must be the deprivation of a constitutional right."). Thus, to establish standing to sue, Plaintiff Mance must identify the invasion of a right that is established and recognized by law to exist. However, as explained below, several courts have concluded that the Second Amendment does not protect the right to sell firearms. *See infra* part II.A. Based on this case law, at least one court has

Nor has Plaintiff Mance alleged any other cognizable injury-in-fact. Mance alleges economic harm, claiming that but for Section 922(b)(3), he would profit from selling handguns to (unspecified) consumers residing outside of Texas. First. Am. Compl. ¶¶ 24-25. Characterizing this injury as economic harm, however, does not change the speculative nature of this harm. Though recognized as a legally protected interest, economic harm, like any harm, must still be "concrete and particularized" for standing purposes, and "a possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action." *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967); *see also Little v. KPMG, L.L.P.*, 575 F.3d 533, 540-41 (5th Cir. 2009) (competitor's claimed injury of lost business arising from public-accounting firm's alleged fraudulent procurement of Texas license and registration was too speculative to confer Article III standing to bring action against firm).

Here, other than his alleged lost sales to the Hansons, Plaintiff Mance does not specify any particular sale that he was unable to transact with any particular potential customer. Plaintiff Mance provides no details as to the number of alleged potential out-of-State customers who would purchase handguns from him, or the number of handguns such unidentified customers would purchase. Plaintiff Mance has also failed to describe the pricing for the handguns that he allegedly desires to sell to these unidentified customers, and has provided no details regarding the cost of purchasing and receiving these handguns from manufacturers. Plaintiff Mance has thus failed to allege an injury that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal punctuation omitted); *see also Clapper*, 133 S. Ct. at 1147 (even "objectively reasonable likelihood" of future injury is insufficient to establish standing). Courts

---

expressed "some doubt" that a firearms seller "can have standing to bring a Second Amendment challenge." *Colo. Outfitters Ass'n v. Hickenlooper*, __ F. Supp. 2d __, 2014 WL 3058518, at *8 (D. Colo. June 26, 2014).

have repeatedly dismissed claims for lack of standing in analogous circumstances. *See*

*Longstreet Delicatessen v. Jolly*, No. 06-986, 2007 WL 2815022, at *18 (E.D. Cal. Sept. 25,

2007) (dismissing for lack of standing where plaintiff "made allegations of economic harm but

has offered no evidence of actual harm suffered other than by potential lost sales"); *see also*

*United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989) ("When considering any chain

of allegations for standing purposes, we may reject as overly speculative those links which are

predictions of future events (especially future actions to be taken by third parties) . . . ").

Plaintiff Mance's speculative allegations of "possible financial loss" do not suffice to establish

standing. *Abbott Labs.*, 387 U.S. at 153.

     Nor does Plaintiff Mance satisfy the standing requirements for pre-enforcement review of

Section 922(b)(3). *See* First Am. Compl. ¶ 25. Though Plaintiff Mance alleges that he

"reasonably fears arrest, prosecution, incarceration, and fine *were* he to violate the law," *id.*

(emphasis added), he does not allege that he has any actual, concrete plans to do so. As the

Supreme Court has explained, "'some day' intentions—without any description of concrete

plans, or indeed even any specification of *when* the someday will be—do not support a finding of

the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564 (emphasis in

original); *see also KVUE, Inc. v. Moore*, 709 F.2d 922, 928 (5th Cir. 1983) (plaintiff cannot

"challenge the constitutionality of a state criminal statute merely because he desires to wipe it off

the books or even because he may some day wish to act in a fashion that violates it"); *Barbour*,

529 F.3d at 545 (to establish standing to assert constitutional injury, a plaintiff "must produce

evidence of an intention to engage in a course of conduct arguably affected with a constitutional

interest, but proscribed by statute") (internal punctuation omitted); *id.* at 545-47 (dismissing

challenge to statute prohibiting closed primaries for lack of standing; plaintiff could not "show

that it *intends* to hold closed primaries," having neither sought pre-clearance with the Justice Department nor adopted any policy to exclude non-party members from the primary) (emphasis in original); *Trinity Indus., Inc. v. Martin*, 963 F.2d 795, 799 (5th Cir. 1992) ("Allegations of possible future injury do not satisfy the requirement of Art. III."). If a bare allegation of unspecified future conduct were enough to establish Article III standing, federal courts would be inundated with challenges to every governmental policy brought by plaintiffs stating only that someday, they might want to engage in conduct implicating that policy, without needing to show they have any concrete plans to do so. This is precisely the result the Article III standing requirements are intended to avoid.

Finally, Plaintiff Mance cannot challenge Section 922(b)(3) "on behalf of" unspecified third parties (alleged potential out-of-State handgun customers). First Am. Compl. ¶ 25. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 474 (1982) (a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties") (internal quotation marks omitted); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously.") (citations omitted).

In short, because Plaintiff Mance has failed to plead a cognizable injury-in-fact, he lacks standing to sue.

### D.    The Court Should Dismiss Plaintiff CCRKBA Because It Has Not Shown That Any of Its Members Possess Standing.

To establish standing to sue as the representative of its members, an association must

"show that its members, or any one of them, would have standing individually." *Nat'l Treasury Emps. Union v. U.S. Dep't of the Treasury*, 25 F.3d 237, 241 (5th Cir. 1994). Plaintiff Citizens Committee for the Right to Keep and Bear Arms ("CCRKBA") alleges that its members include (i) individuals who wish to purchase handguns from dealers located outside their State of residence without using an intermediary dealer, and (ii) licensed dealers who wish to sell handguns to purchasers who reside outside the dealer's place of business without using an intermediary dealer. First Am. Compl. ¶¶ 22, 23. Neither group has standing to sue.

1.    <u>Individual Members</u>

As explained above, individuals in this first category of members lack standing to sue because any alleged injury results from a transfer fee charged by an intermediary dealer and is not caused by Defendants. *See supra* I.A.[7] Also, to the extent that any of CCRKBA's members allege injury in the form of "frustrated sales" resulting from decisions not to purchase handguns from dealers outside their State of residence because of the existence of the challenged federal laws, First Am. Compl. ¶ 22, any such allegedly frustrated sales are traceable to the alleged decisions of these members not to engage in these sales, not to Defendants. *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (a plaintiff "cannot obtain standing to sue in its own right as a result of self-inflicted injuries, i.e., those that are not 'fairly traceable to the actions of the defendant'") (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 228 (2003) (plaintiffs' alleged "competitive injury" in fundraising against candidates willing to accept larger campaign contributions was not

---

[7] To the extent that Plaintiffs challenge the federal laws "as applied in the context of handgun sales that do not violate any state or local laws" and "as applied in the context of handgun sales where state or local laws require a license, pre-registration, or other form of state or local governmental approval to proceed with the handgun sale," and First Am. Compl. ¶ 36, any alleged injury resulting from compliance with these State or local requirements is likewise not caused by Defendants.

fairly traceable to statute increasing hard-money limits; plaintiffs' "alleged inability to compete stems not from the operation of [the statute], but from their own personal 'wish' not to solicit or accept large contributions, *i.e.*, their own personal choice"), *overruled on other grounds, Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010); *Bear Lodge Multiple Use Ass'n v. Babbitt*, 175 F.3d 814, 821-22 (10th Cir. 1999) (rock climbers lacked standing to assert Establishment Clause challenge to National Park Service plan requesting that climbers voluntarily refrain from climbing national monument during June out of respect for religious practices of American Indians; even if members chose not to climb in June, "that decision is one of several choices available under the plan and is not an injury conferring standing").

Nor, finally, can CCRKBA premise standing on its allegation that "[t]o the extent that [its] members do purchase handguns," the challenged laws purportedly limit those members' choices as consumers, harms market competition, and raises prices. First Am. Compl. ¶ 22. First, the allegation that the challenged laws harm market competition does not constitute injury-in-fact because it is "speculative at best." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1363 (D.C. Cir. 2012) (citation omitted); *see also id.* at 1362-64 (consumer lacked standing to maintain claim that airline's ban on reselling tickets prevented him from buying a less expensive ticket by foreclosing emergence of secondary market; such alleged injury was too speculative to constitute injury-in-fact). Second, a nebulous allegation of reduced consumer choice does not assert an injury that is "concrete and particularized, and . . . actual or imminent," rather than "conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Plaintiffs fail to identify any specific members whose choices of handgun purchase have allegedly been limited because, when they chose to buy from an out-of-State dealer, that dealer transferred the handgun to a dealer in the purchaser's State of residence. Third, "where injury is alleged to occur within a market context, the concepts of

causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses." *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983). This is the case here. Plaintiffs have neither shown that the challenged laws cause increased handgun prices, nor that if the challenged laws were struck down, the market price of handguns would decrease. Fourth, courts have routinely rejected such a generalized grievance of a particular class of citizens as establishing an injury for standing purposes. In *San Diego County*, two associations and three individuals brought suit alleging that they "wish and intend to engage in activities prohibited by" the provision of the Gun Control Act prohibiting the transfer or possession of semiautomatic assault weapons. 98 F.3d at 1124, 1127. The court dismissed for lack of standing, observing that "plaintiffs' allegations of threatened prosecution and increased prices affect not only the named plaintiffs, but also anyone desiring to possess semiautomatic assault weapons." *Id.* at 1131. The Court therefore concluded that "[p]laintiffs' alleged harms amount to no more than a generalized grievance shared in substantially equal measure by a large class of citizens, and thus do not warrant the exercise of jurisdiction." *Id.* at 1131-32 (citation and internal punctuation omitted). Similarly, here, CCRKBA is alleging only that certain unidentified members "wish and intend to engage in activities" prohibited by a different provision of the Act, and the injury they allege consists of an interest shared in equal measure "by a large class of citizens."[8]

---

[8] "A general interest in seeing that the government abides by the Constitution is not sufficiently individuated or palpable to constitute [an injury in fact]." *Jones v. Bush*, 122 F. Supp. 2d 713, 717 (N.D. Tex. 2000), *aff'd*, 244 F.3d 134 (5th Cir. 2000). "In deciding whether standing exists, a court should carefully consider . . . 'whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches.'" *Hastey v. Bush*, No. 03-88, 2003 WL 22289885, at *4 (N.D. Tex. Oct. 6, 2003) (quoting *Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991)). Where a "[p]laintiff's claims amount to nothing more than 'abstract questions amounting to generalized grievances,' a court "will not attempt to 'create its own jurisdiction by embellishing otherwise deficient allegations.'" *Id.* at

2.   Licensed Dealers

As to the second category of members, licensed firearms dealers, Plaintiffs also fail to establish standing.  Their allegation of intended sales allegedly frustrated because of the challenged laws fails because it is not "concrete and particularized."  *Lujan*, 504 U.S. at 560. With the exception of Plaintiff Mance—who voluntarily agreed not to sell the Hanson plaintiffs a particular handgun because of the existence of the challenged laws—Plaintiffs fail to specify any member who was allegedly frustrated from selling any particular handgun to any person.  And to the extent that Plaintiffs claim economic injury on behalf of dealer-members resulting from allegedly "less competitive" sales of handguns, First Am. Compl. ¶ 23, it represents an "allegation[] of injury that is merely conjectural and hypothetical [and] do[es] not suffice to confer standing."  *Little*, 575 F.3d at 540.

In *Little*, competitor accounting firms sued KPMG—one partner of which did not have a valid Texas license—alleging economic injury in the form of lost business.  *Id.* at 535.  The plaintiffs claimed that if KPMG's Texas registration had been revoked, KPMG's Texas clients would have replaced KPMG with its competitors, and would have paid for the competitors' accounting services as they paid KPMG.  *Id.* at 540.  The Fifth Circuit affirmed the dismissal of the competitors' action under Rule 12(b)(1), explaining that the claim of injury "depends on several layers of decisions by third parties. . . and is too speculative to confer Article III standing."  *Id.* at 541.  Here, CCRKBA's claim of present economic injury on behalf of dealer-members is conclusory only and similarly speculative, and depends on decisions by third parties not before the Court.  CCRKBA does not identify any members who are adversely affected or provide any financial information to support its bare claim of economic injury.  And it is

---

*5; *see also Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000) ("[C]ourts have refused to adjudicate cases that raise only generalized grievances.").

speculation that any potential buyer who presently wishes to obtain a handgun from a dealer in another State would refuse to buy from that dealer unless he or she could buy the handgun without the participation of a dealer in his or her State of residence. Speculative assertions cannot establish an Article III injury-in-fact. Thus, Plaintiff CCRKBA has failed to show that any of its members possess standing.[9] The Court should thus dismiss this case for lack of subject matter jurisdiction.

## II. The Challenged Federal Laws Do Not Violate the Second Amendment.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, after determining that the Second Amendment conferred an individual right to keep and bear arms, 554 U.S. 570, 595 (2008), the Supreme Court held that "the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635. The Court emphasized that the "right secured by the Second Amendment is not unlimited." *Id.* at 626. Although the Court did not purport to define the full scope of the Second Amendment right in *Heller*, the Court did make clear that laws imposing conditions and qualifications on the commercial sale of arms, along with other regulatory restrictions on the possession of firearms, are presumed not to violate the Constitution. The Court explained: "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws

---

[9] Moreover, CCKRBA cannot assert claims on behalf of dealers who, in turn, seek to "assert . . . the rights of their customers throughout the United States." First Am. Compl. ¶ 23. *See Valley Forge*, 454 U.S. at 474 (a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties") (internal quotation marks omitted).

forbidding the carrying of firearms in sensitive places such as schools and government buildings, *or laws imposing conditions and qualifications on the commercial sale of arms.*" *Id.* at 626-27 (emphasis added). And the Court specifically noted that those "presumptively lawful regulatory measures" were merely examples, and that the list "does not purport to be exhaustive." *Id.* at 626-27 n.26. The Court also emphasized that the "Second Amendment's central right" is "the right to defend oneself in one's home." *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012), *cert. denied*, 134 S. Ct. 1364 (2014).

The Fifth Circuit, like other Courts of Appeals, has adopted a two-step framework for analyzing firearms restrictions challenged on Second Amendment grounds:

> [T]he first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*Id.* at 194 (citing decisions from numerous other Courts of Appeals setting forth similar framework). "To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citing *Heller*, 554 U.S. at 577-628). "If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster." *Id.* at 195 (citing *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)). "If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-end scrutiny." *Id.*

In *National Rifle Association*, the court applied this framework to reject a Second Amendment challenge to another condition on the commercial sale of arms: the restriction on 18-to-20-year-olds' ability to purchase handguns from FFLs. The court found "considerable

evidence that burdening the conduct at issue—the ability of 18-to-20-year-olds to purchase handguns from FFLs—is consistent with a longstanding, historical tradition," suggesting that the conduct affected by the challenged laws "falls outside the Second Amendment's protection." *Id.* at 203. While the court was "inclined to uphold the challenged federal laws at step one of [its] analytical framework," it proceeded to step two "in an abundance of caution." *Id.* at 204. The court determined that the challenged laws "[u]nquestionably . . . trigger nothing more than 'intermediate' scrutiny," *id.* at 205, and held that the laws satisfied that standard. *Id.* at 208-09. Examining the legislative record, the court found that "Congress sought to manage an important public safety problem: the ease with which young persons—including 18-to-20-year-olds—were getting their hands on handguns through FFLs," *id.* at 207, and that Congress "reasonably tailored" a solution to this particular problem. *Id.* at 209.

Here, the Court's inquiry can end at Step One because the challenged federal laws do not impose any burden, let alone a substantial burden, on conduct historically protected by the Second Amendment. But even if the Court were to analyze the challenged laws under heightened constitutional scrutiny in an abundance of caution, these laws readily pass muster under intermediate scrutiny, the appropriate level of review. Accordingly, the Court should dismiss Plaintiffs' claims or enter summary judgment for Defendants.

### A.      The Challenged Federal Laws Do Not Burden Conduct Protected By the Second Amendment.

The federal laws challenged by Plaintiffs are precisely the type of "laws imposing conditions and qualifications on the commercial sale of arms" that the Supreme Court has deemed "presumptively lawful." *Heller*, 554 U.S. at 626-27. As laws placing geographical restrictions on the sale and transfer of firearms by federally-licensed firearms dealers, they regulate conduct falling outside the scope of the Second Amendment. As noted above, the Fifth

Circuit has explained that such longstanding, presumptively lawful regulations on the commercial sale of arms "likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." *Nat'l Rifle Ass'n*, 700 F.3d at 196 (citation omitted). The Second Amendment does not address the ability to sell or purchase firearms in any particular forum but provides instead that the "right of the people to keep and bear Arms, shall not be infringed," U.S. Const. amend. II. *See United States v. King*, 532 F.2d 505 (5th Cir. 1976) (drawing sharp distinction between "right to keep and bear arms" and "dealing in firearms"); *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) (finding no authority "that remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm") (emphasis in original); *see also Mont. Shooting Sports Ass'n v. Holder*, No. 09-cv-147, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010) ("*Heller* said nothing about extending Second Amendment protection to firearm manufacturers or dealers."), *aff'd on other grounds*, 727 F.3d 975 (9th Cir. 2013); *Teixeira v. Cnty. of Alameda,* No. 12-cv-03288, 2013 WL 4804756, at *6 (N.D. Cal. Sept. 9, 2013) (neither the Supreme Court nor other courts have "extended the protections of the Second Amendment to the sale or purchase of guns").

As the Supreme Court and the Fifth Circuit have recognized, "the right to keep and bear arms has never been unlimited." *Nat'l Rifle Ass'n*, 700 F.3d at 200 (quoting *Heller*, 554 U.S. at 626). "Since even before the Revolution, gun use and gun control have been inextricably intertwined—

> The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books; these included safety laws regulating the storage of gun powder, laws keeping track of who in the community had guns, laws administering gun use in the context of militia service (including laws requiring militia members to attend "musters," public gatherings where officials would

> inspect and account for guns), laws prohibiting the use of firearms on certain occasions and in certain places, and laws disarming certain groups and restricting sales to certain groups.

*Id.* (citations omitted). Reviewing evidence of founding-era gun regulations, the Court of Appeals concluded that, when the Second Amendment was ratified, "an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee." *Id.*

Longstanding State restrictions on the purchase or possession of firearms by non-residents demonstrate that the particular federal laws challenged here are "firmly historically rooted." *Nat'l Rifle Ass'n*, 700 F.3d at 204. Between 1909 and 1939, at least 11 States enacted laws restricting the acquisition, possession, or carrying of one or more types of firearms to State residents. *See* Exhibit 2 (Compilation of State Residency Restrictions on the Purchase or Possession of Firearms) (App. 102-108).[10] These States continued to require State residency until at least 1968, when the federal Gun Control Act established a State residency requirement nationwide.[11] "*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *Nat'l Rifle Ass'n*, 700 F.3d at 196 (citations

---

[10] West Virginia (1909); Georgia (1910), New York (1913), Illinois, Montana, and North Carolina (1919); Missouri (1921), Massachusetts (1922); New Jersey (1924); Michigan (1927); and Maine (1939).

[11] *See Pickett v. State*, 179 S.E.2d 303, 304 (Ga. App. 1970) (citing 1970 text of Ga. Code Ann. § 26-2903); *Schwanda v. Bonney*, 418 A.2d 163, 164 (Me. 1980) (quoting 1980 text of 25 Me. Rev. Stat. Ann. § 2031); *MacNutt v. Police Comm'r of Boston*, 572 N.E.2d 577, 579 (Mass. App. Ct. 1991) (quoting 1972 text of Mass. Gen. Laws ch.140, § 131); Act of July 1, 1968, 1968 Mich. Pub. Acts 511, 512; Act of June 18, 1967, 1967 Mo. Laws 675; Mont. Crim. Code §§ 94-8-210(1), 94-8-214(4) (1973); *State v. Sima*, 361 A.2d 58, 60 (N.J. Super. Ct. App. Div. 1976) (quoting 1976 text of N.J. Stat. Ann. § 2A:151-44); N.Y. Penal Law § 265.05(5) (1968); N.C. Gen. Stat. §§ 14-402, 14-403 (1999); Act of May 21, 1975, 1975 R.I. Pub. Laws 738, 741, 744-45; *West Virginia Judicial Inquiry Comm'n v. Dostert*, 271 S.E.2d 427, 430 n.5 (W. Va. 1980) (quoting 1980 text of W. Va. Code § 61-7-2). In 1925, Illinois replaced its licensing statute—including its requirement of State residency for a license to carry a concealed firearm—with a statute banning (with limited exceptions) all concealed carrying of firearms. Act of July 3, 1925, §§ 4, 9, 1925 Ill. Laws 339, 340-41.

omitted);  *see also Heller v. Dist. of Columbia*, 670 F.3d 1244, 1253-54 (D.C. Cir. 2011) ("*Heller II*") (relying on early 20th-century State statutes to show that D.C. handgun registration requirement was "longstanding" and did not "impinge upon the right protected by the Second Amendment"), *quoted in Nat'l Rifle Ass'n*, 700 F.3d at 196.  Thus, these century-old State laws conditioning purchase or possession of firearms on residence in a particular State are longstanding and confirm that the "activities covered" by Section 922(b)(3) "are presumptively not protected from regulation by the Second Amendment."  *Nat'l Rifle Ass'n*, 700 F.3d at 196 (quoting *Heller II*, 670 F.3d at 1253).

### B. Because Any Burden Imposed by the Challenged Federal Laws Is Minimal, No Heightened Constitutional Scrutiny Is Warranted.

Even if the Court were to find that the challenged laws burden constitutionally-protected conduct, it need not engage in heightened constitutional scrutiny because any such burden is *de minimis*.  "[N]ot every limitation or incidental burden on the exercise of" a constitutionally protected right "is subject to a stringent standard of review."  *Bullock v. Carter*, 405 U.S. 134, 143 (1972) (citing *McDonald v. Bd. of Elections Comm'n*, 394 U.S. 802 (1969)).  As the Supreme Court has explained, "it is essential to examine in a realistic light the extent and nature of" the restriction at issue.  *Id.*  The Court has frequently declined to employ elevated constitutional scrutiny when analyzing regulations that do not impose a "substantial" or "significant" burden on a constitutional right.  *See, e.g., Zablocki v. Redhail*, 434 U.S. 374, 386 (1978) ("[R]easonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed."); *Califano v. Jobst*, 434 U.S. 47, 48, 57 (1977) (using minimal rationality standard of review to uphold Social Security law that did not "significantly discourage[], let alone ma[k]e practically impossible" the right to marry), *quoted in Zablocki*, 434 U.S. at 386; *Gonzales v. Carhart*, 550 U.S. 124, 157-58 (2007) ("The fact that a

27

law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to [exercise a constitutional right] cannot be enough to invalidate it.").

Several federal Courts of Appeals have declined to impose heightened constitutional scrutiny to regulations like the laws challenged here that do not substantially burden the exercise of the Second Amendment right. As the Second Circuit recently explained in rejecting a Second Amendment challenge to a parallel provision of the Gun Control Act, "[g]iven *Heller*'s emphasis on the weight of the burden imposed by the D.C. gun laws, we do not read the case to mandate that any marginal, incremental or even appreciable restraint on the right to keep and bear arms be subject to heightened scrutiny." *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012), *cert. denied.*, 133 S. Ct. 838 (2013). "Rather, heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *Id. Accord Heller II*, 670 F.3d at 1253, 1260 (laws that have only a "*de minimis*" effect on the right to bear arms or that do not "meaningfully affect individual self-defense" do not impinge on the Second Amendment right and therefore do not warrant heightened scrutiny); *Nordyke v. King*, 644 F.3d 776, 786, 787-88 (9th Cir. 2011) (holding that "only regulations which substantially burden the right to keep and to bear arms trigger heightened scrutiny under the Second Amendment" and noting that "a law does not substantially burden a constitutional right simply because it makes the right more expensive or more difficult to exercise"), *superseded by* 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc) (finding ordinance "permissible" under the Second Amendment because it "regulates the sale of firearms at Plaintiffs' gun shows only minimally, and only on County property"); *Marzzarella*,

614 F.3d at 94-95 (suggesting that a "*de minimis*" burden on the right to keep arms for self-defense might not warrant heightened scrutiny).

The Second Circuit's analysis in *Decastro* is particularly relevant here, as it addressed an analogous provision of the Gun Control Act. While Section 922(b)(3) challenged by Plaintiffs prohibits FFLs from selling or delivering a firearm to an out-of-State resident, Section 922(a)(3), challenged in *Decastro*, prohibits anyone other than an FFL from *transporting* into his State of residence a firearm purchased or obtained outside that State, absent limited exceptions. *Decastro*, 682 F.3d at 162 (citing 18 U.S.C. § 922(a)(3)). Analyzing the burden imposed by Section 922(a)(3), the court observed that, while the statute prohibits the transportation into an individual's State of residence firearms he or she purchased outside the State, it does nothing to keep someone from purchasing a firearm in her home State, "which is presumptively the most convenient place to buy anything." *Id.* at 168. Moreover, the "evident purpose" of the statute is to "stop circumvention of state laws regulating gun possession . . . by requiring state residents to comply with conditions of sale and similar requirements in their home state." *Id.* The statute also "does not bar purchases from an out-of-state supplier if the gun is first transferred to a licensed dealer in the purchaser's home state." *Id.* Thus, in light of the "ample alternative means of acquiring firearms for self-defense purposes," the court held that Section 922(a)(3) "does not impose a substantial burden on the exercise of [appellant's] Second Amendment rights," and declined to apply heightened scrutiny in upholding the appellant's conviction under that statute. *Id.* The court also rejected the notion that the increased costs of acquiring a firearm associated with a lack of interstate competition or increased transportation costs constitutes a "constitutional defect." *Id.* at 168 n.6. *See also Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013) (finding it "difficult to say that the [city's handgun] licensing fee, which amounts to just over

$100 per year, is anything more than a marginal, incremental or even appreciable restraint on one's Second Amendment rights" and emphasizing that "the fact that the licensing regime makes the exercise of one's Second Amendment rights more expensive does not necessarily mean that it substantially burdens that right") (citations and internal punctuation omitted), *cert. denied*, 134 S. Ct. 2696 (2014).

This Court should reach the same conclusion as the court in *Decastro*. Plaintiffs do not allege that the challenged laws prohibit them from purchasing the firearm of their choice from the dealer of their choice anywhere in the United States. Rather, they complain that they would incur shipping costs and a $125 transfer fee in complying with the laws. Because the challenged laws, like Section 922(a)(3), impose at most an incidental burden on Plaintiffs' claimed Second Amendment right, the Court need not engage in heightened scrutiny to reject their constitutional challenge. Rather, the Court should reject Plaintiffs' claim as a matter of law on the ground that the *de minimis* effect of the challenged laws on Plaintiffs' ability to keep and bear arms does not give rise to a viable constitutional claim.

### C.      Even If Plaintiffs' Suit Implicates Their Second Amendment Rights, the Challenged Federal Laws Are Constitutional.

Even if the Court concludes that Plaintiffs' claims implicate conduct protected by the Second Amendment, the Court should reject Plaintiffs' constitutional challenge. As explained below, the challenged provisions readily withstand intermediate scrutiny.[12]

### 1.   At Most, the Court Should Apply Intermediate Scrutiny.

The Fifth Circuit has explained that "the appropriate level of scrutiny depends on the

---

[12] While no more than intermediate scrutiny is appropriate, as explained below, the challenged federal laws would also satisfy strict scrutiny for the reasons set forth below and because they are "presumptively lawful." *Heller*, 554 U.S. at 527 n.26.

nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Nat'l Rifle Ass'n*, 700 F.3d at 195 (citation omitted).  While "a severe burden on the core Second Amendment right of armed self-defense should require a strong justification," a less severe regulation "requires a less demanding means-end showing." *Id*. (citations omitted).  In *National Rifle Association*, the Fifth Circuit applied intermediate scrutiny to the federal laws that prohibit FFLs from selling handguns to persons under the age of 21, because the laws "do not severely burden" the Second Amendment rights even of 18-to-20-year-olds, but rather impose a qualification on commercial firearms sales. *Id*. at 206.  As the court explained, even laws that "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home" do not warrant strict scrutiny if they "do not prevent an individual from possessing a firearm in his home or elsewhere." *Id*. at 206 (citing *Heller II*, 670 F.3d at 1255-58).

The federal laws challenged here do not impose a "severe burden" on the Second Amendment right because they do not prevent a "law-aiding, responsible adult" from "possess[ing] and us[ing] a handgun to defend his or her home and family." *Id*. at 195 (citations omitted).  "Far from a total prohibition on handgun possession and use," Section 922(b)(3) is merely a "presumptively lawful" statute "imposing conditions and qualifications on the commercial sale of arms." *Id*. at 206.  Section 922(b)(3) does not prohibit any individuals from acquiring or possessing handguns, and Congress plainly did not intend Section 922(b)(3) to have that effect. As Congress explicitly declared, "it is not the purpose of this [law] to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity," and the law "is not intended to

discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." Pub. L. No. 90-618, § 101, 82 Stat. at 1213-14, *see also* Pub. L. No. 90-351, § 901(b), 82 Stat. at 226. Rather, Congress's "principal purpose" was "to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, 1968 U.S.C.C.A.N. at 4411; *see also Navegar, Inc. v. United States*, 192 F.3d 1050, 1063 (D.C. Cir. 1999) (recognizing this Congressional purpose). Consequently, even if the Court deems it necessary to apply a constitutional means-end analysis here, it should apply no more than intermediate scrutiny.

## 2. The Challenged Federal Laws Satisfy Intermediate Scrutiny.

In applying intermediate scrutiny, the relevant inquiry is "whether there is a reasonable fit between the law and an important government objective." *Nat'l Rifle Ass'n*, 700 F.3d at 207. The government must show that the law is "reasonably adapted to an important government interest." *Id.* (citations omitted). "In the context of firearm regulation," as in other policy areas, "substantial deference to the predictive judgments of the legislature is warranted," as "the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 655 (1994) (internal quotation marks omitted)). Here, because there is at least a "reasonable fit" between the challenged federal laws and the government's important interest in protecting public safety and permitting States to regulate firearms traffic within their own borders, the federal laws are constitutional.

The challenged federal laws are part of a comprehensive scheme regulating commerce in firearms. Based on a multi-year investigation into violent crime, Congress found "that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." Pub. L. No. 90-351, Title IV, § 901(a)(1), 82 Stat. at 225. Congress accordingly enacted the Omnibus Crime Control Act, Pub. L. No. 90-351, 82 Stat. 225, and the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213.

Congress specifically found "that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms." Pub. L. No. 90-351, Title IV, § 901(a)(5), 82 Stat. at 225. Congress' investigations revealed a "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." S. Rep. No. 89-1866, at 19 (App. 019). The investigation established that "[n]ot only is mail order a means of circumventing State and local law, but the over-the-counter sale of firearms, primarily handguns, to persons who are not residents of the locale in which the dealer conducts his business, affords similar circumvention." *Id.* at 3. Congress therefore concluded that "only through adequate Federal control over interstate and foreign commerce in these weapons, and over all persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local

regulation of this traffic be made possible." Pub. L. No. 90-351, Title IV, § 901(a)(3), 82 Stat. at 225.

To that end, Congress included, in both the Omnibus Crime Control Act and the Gun Control Act, statutory provisions "designed to prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one." H. Rep. No. 90-1577, 1968 U.S.C.C.A.N. at 4420; *see also* S. Rep. No. 90-1097, 1968 U.S.C.C.A.N. at 2113-14. In enacting these provisions, Congress declined to "indiscriminately place further restrictions on the acquisition of all types of firearms." S. Rep. No. 89-1866, at 4 (App. 004). "Rather, in seeking to reduce the criminal use of firearms," Congress "especially concern[ed] itself with the particular type of weapon that is predominately used by the criminal." *Id*. The handgun's "size, weight, and compactness make it easy to carry, to conceal, to dispose of, or to transport," and "[a]ll these factors make it the weapon most susceptible to criminal use." *Id*. "The evidence before" Congress, moreover, "overwhelmingly demonstrated that the handgun is the type of firearm that is principally used in the commission of serious crime." *Id*. at 7. For example, the FBI reported that "handguns were used in 70 percent of the murders committed with firearms" during the preceding year, *id*. at 5, and in 78 percent of the firearm-related homicides of police officers killed in the line of duty, *see* Federal Firearms Act: Hearings Before the Subcomm. to Investigate Juvenile Delinquency of the S. Comm. on the Judiciary, 90th Cong. 873 (1967) ("1967 Hearings").[13] The Vice-President of the National Rifle Association

---

[13]Available at:
http://congressional.proquest.com/congressional/result/pqpresultpage.gispdfhitspanel.pdflink/http%3A$2f$2fprod.cosmos.dc4.bowker-dmz.com$2fapp-bin$2fgis-hearing$2fb$2f9$2fc$2fc$2fhrg-1967-sjs-0031_from_1_to_1190.pdf/entitlementkeys=1234%7Capp-gis%7Chearing%7Chrg-1967-sjs-0031 (last visited Sept. 23, 2014).

confirmed that, "generally speaking, the handgun has been the principal problem of crime in America," and "therefore, we felt that this is the proper place to regulate." 1967 Hearings at 560 (statement of Franklin Orth, Vice-President, National Rifle Association of America).[14]

Congress determined "that the lawmakers of each State are best able to determine the conditions and needs within their own borders and to pass appropriate legislation in regard to the use of handguns." S. Rep. No. 89-1866, at 5 (App. 005). Accordingly, Congress "endeavored to draft legislation which would give State and local officials notice of the flow of handguns into their jurisdictions so as to enable them to regulate their use as dictated by applicable local laws." *Id.* A licensee may sell or deliver "any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States." *Id.* § 922(b)(3)(A). But the licensee may not transfer a handgun to a non-licenseholder whom "the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located." *Id.* § 922(b)(3).

Congress enacted different requirements for the transfer of handguns, as opposed to rifles and shotguns, because it found that "concealable weapons" presented a particular challenge for

---

[14] Recent FBI homicide statistics confirm the disproportionate threat that handguns continue to pose to public safety. From 2008-2012, at least 71 percent of those murdered by firearms across the country were killed by handguns. *See* Federal Bureau of Investigation, Uniform Crime Reports ("FBI Crime Reports"), table 8, available at: http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/offenses-known-to-law-enforcement/expanded-homicide/expanded_homicide_data_table_8_murder_victims_by_weapon_2008-2012.xls (last visited Sept. 23, 2014). Handguns were used in 73 percent of the 493 firearm-related felony homicides of law enforcement officers killed in the line of duty from 2003-2012. *See* FBI Crime Reports, table 27, available at: http://www.fbi.gov/about-us/cjis/ucr/leoka/2012/tables/table_27_leos_fk_type_of_weapon_2003-2012.xls (last visited Sept. 23, 2014).

State and local law enforcement authorities, Pub. L. No. 90-351, Title IV, § 901(a)(2), (4), (5), (6), 82 Stat. at 225, and that "the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms," *Id.* § 902(a)(5), 82 Stat. at 225. As Congress's investigations revealed, there is a "much greater extent of control over handguns by the States" and substantial variation in the types of handgun controls imposed by different States. *See, e.g.,* S. Rep. No. 89-1866, at 4-5 (App. 004-005).[15]

Thus it cannot be presumed that "licensees will be able to familiarize themselves with the often complex laws of other states and jurisdictions." H.R. Rep. No. 99-495 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1335. "A State could not have any ability to prosecute dealers whose sales are made out of State and which violate that State's law—the burden of such enforcement would

---

[15] State controls on handguns continue to differ substantially from State to State, and continue to be more extensive than State controls on shotguns and rifles. For example, in Maryland, handguns are considered "regulated firearms" subject to extensive controls, but most long guns are not. *See* Md. Code Ann. Pub. Safety, § 5-101(r) (defining "regulated firearms"); *id.* § 5-123(a) (7-day waiting period); *id.* § 5-128(b) (one gun per month restriction); *id.* § 5-132(c) (restrictions on sale/transfer without safety devices); *id.* § 5-133(d) (restrictions on possession by those under 21). There are far fewer restrictions on the possession of most long guns. *See id.* § 5-204 (purchase of out-of-State rifles and shotguns limited to adjacent States). Virginia regulates handguns differently than Maryland, but more extensively than Virginia regulates long guns. *Compare* Va. Code Ann. § 18.2-308 (regulating the carrying of pistols and revolvers), *id.* § 18.2-308.7 (prohibiting those under 18 from possessing handguns), and *id.* § 18.2-309 (making it unlawful to transfer a handgun to a minor) *with* Va. Code Ann. § 15.2-915.2 (making it unlawful to transport a loaded shotgun or rifle in any vehicle on a public street, road, highway unless a person "reasonably believes that a loaded rifle or shotgun is necessary for his personal safety in the course of his employment or business"). *See also, e.g.,* Neb. Rev. St. § 69-2401 ("The Legislature hereby finds and declares that the state has a valid interest in the regulation of the purchase, lease, rental, and transfer of handguns and that requiring a certificate prior to the purchase, lease, rental, or transfer of a handgun serves a valid public purpose."); Iowa Code Ann. § 724.15 ("Any person who desires to acquire ownership of any pistol or revolver shall first obtain an annual permit.").

be solely upon the Federal government." *Id.* And although "[s]ales which do not fully comply with applicable state and local law would violate Federal law," if the failure to comply "was due to a mistake of law or fact or due to negligence on the part of the licensee, the violation of the law most likely would not be punishable." *Id.* Congress's requirement that handgun transfers take place through in-State licensed dealers, 18 U.S.C. §§ 922(a)(1)-(5), 922(b)(3), accordingly limits circumvention of State handgun controls by ensuring that transfers are made only by dealers who are well-acquainted with and required to follow a State's handgun laws, allowing States to monitor more effectively the enforcement of State gun laws by focusing on dealer compliance.

There is thus at least "a reasonable fit," *Nat'l Rifle Ass'n*, 700 F.3d at 207, between the challenged federal laws and the government's interest in public safety, which the Supreme Court has recognized as "compelling." *United States v. Salerno*, 481 U.S. 739, 750 (1987). Accordingly, Section 922(b)(3) and 27 C.F.R. § 478.99 plainly pass muster under intermediate scrutiny, and the Court should dismiss Plaintiffs' claims or enter summary judgment for Defendants.[16]

## III.    The Challenged Federal Laws Do Not Violate the Equal Protection Component of the Due Process Clause.

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Although this clause expressly applies only to the States, the Supreme Court has found that its protections are encompassed by the Due Process Clause of the Fifth

---

[16] Because Plaintiffs' as-applied challenge fails, their facial challenge necessarily fails as well. *See Noatex Corp. v. King Constr. of Houston, L.L.C.*, 732 F.3d 479, 484 (5th Cir. 2013) ("In a facial challenge to the constitutionality of a statute, 'the challenger must establish that no set of circumstances exists under which the Act would be valid.'") (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Amendment and therefore applicable to the federal government. *Bolling v. Sharpe*, 347 U.S. 497 (1954). Congress is presumed to act within its powers when it passes legislation, however, and federal statutes challenged for denial of equal protection are entitled to deferential review as long as the "legislative classification or distinction 'neither burdens a fundamental right nor targets a suspect class.'" *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)).

Plaintiffs' second claim for relief challenges 18 U.S.C. § 922(b)(3) and its implementing regulation under the equal protection component of the Due Process Clause, First Am. Compl. ¶¶ 38-39, but this challenge is also without merit. First, persons who seek to purchase handguns from a dealer in their State of residence are not similarly situated to persons outside that State because residents are subject to their State's laws regulating firearms possession, and because it cannot be presumed that "licensees will be able to familiarize themselves with the often complex laws of other states and jurisdictions." H.R. Rep. No. 99-495, *reprinted in* 1986 U.S.C.C.A.N. 1327, 1335. Consequently, the Hanson Plaintiffs fail to demonstrate that they are similarly situated to Texas residents who wish to purchase handguns from dealers in Texas. Similarly, Plaintiff Mance is not similarly situated to FFLs in the District of Columbia, where the Hanson Plaintiffs reside, because he is not subject to the District's laws regarding sales of firearms, and cannot be presumed to possess the same familiarity with the District's laws as District FFLs. *See Peterson v. LaCabe*, 783 F. Supp. 2d 1167, 1178 (D. Colo. 2011) (concluding that non-State residents were not similarly situated to State residents with respect to firearms permit and licensing laws in terms of the State's ability to obtain information about and monitor potential recipients' eligibility for permit or license), *aff'd on other grounds*, 707 F.3d 1197 (10th Cir. 2013); *Osterweil v. Bartlett*, 819 F. Supp. 2d 72, 86-87 (N.D.N.Y. 2011) (same), *vacated on*

*other grounds*, 738 F.3d 520 (2d Cir. 2013); *cf. Dearth v. Holder*, 893 F. Supp. 2d 59, 73-74 (D.D.C. 2012) (expatriate U.S. citizens were not similarly situated to resident U.S. citizens for purposes of 18 U.S.C. § 922(b)(3)), *appeal docketed*, No. 12-5305 (D.C. Cir.).

Second, the challenged laws survive rational basis review, which applies to classifications that do not target a suspect class, including legislation that distinguishes on the basis of residence. *See Nat'l Rifle Ass'n*, 700 F.3d at 212 (applying rational basis review to age restriction on purchase of handguns); *see also Dumaguin v. Sec'y of Health & Human Servs.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994) ("Courts have uniformly applied rational basis review to other residency requirements the SSA has applied to adopted children who are United States citizens.") (citing cases). As explained above, the challenged laws satisfy the requirements of intermediate scrutiny. *See supra* part II.C.2. Thus, they necessarily also satisfy the more relaxed standards of rational basis review.

Accordingly, Plaintiffs' equal protection claim has no merit, and the Court should dismiss this claim or enter summary judgment on this claim for Defendants.

## CONCLUSION

This Court lacks subject matter jurisdiction over Plaintiffs' claims because Plaintiffs have failed to allege a concrete injury-in-fact that is traceable to the challenged laws. Furthermore, these laws do not impose a substantial burden on conduct that is protected by the Second Amendment and would pass constitutional muster in any event. Accordingly, the Court should dismiss this case or enter summary judgment for Defendants.

Dated: September 23, 2014                    Respectfully submitted,

                                             JOYCE R. BRANDA
                                             Acting Assistant Attorney General

                                             SARAH R. SALDAÑA

United States Attorney

  /s/ Lesley Farby                                
DIANE KELLEHER
Assistant Branch Director
DANIEL RIESS
LESLEY FARBY
Trial Attorneys
U.S. Department of Justice
Civil Division, Rm. 7220
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone: (202) 514-3481
Fax: (202) 616-8470
Email: lesley.farby@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

On September 23, 2014, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) or the local rules.


 /s/ Lesley Farby
Lesley Farby