IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| FREDRIC RUSSELL MANCE, JR., et al., | § | Case No. 4:14-CV-00539-O |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| ERIC HOLDER, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Plaintiffs, Fredric Russell Mance, Jr., Tracey Ambeau Hanson,

Andrew Hanson, and Citizens Committee for the Right to Keep and Bear Arms, by and through

undersigned counsel, and submit their Memorandum of Points and Authorities in Support of

Plaintiffs' Motion for Summary Judgment.

Dated: October 17, 2014                    Respectfully submitted,

Alan Gura (Va. Bar No. 68842)              William B. Mateja (Texas Bar No. 13185350)
Gura & Possessky, PLLC                     Michael D. Nammar (Texas Bar No. 24091685)
105 Oronoco Street, 305                    Fish & Richardson P.C.
Alexandria, VA 22314                       1717 Main Street, Suite 5000
703.835.9085/Fax 703.997.7665             Dallas, TX 75201
                                           214.747.5070/Fax 214.747.2091

By:   /s/ Alan Gura                        By:   /s/ William B. Mateja
      Alan Gura                                   William B. Mateja

TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    The Legal Framework for Interstate Handgun Transactions. . . . . . . . . . . . . . . 2

        1.    Federal Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.    Texas Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        3.    District of Columbia Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.    The Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.    Plaintiffs' Experience Under the Federal Interstate Handgun Transfer Ban. . . . . . 7

Summary of Argument.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    I.    The Government Bears the Burden of Proving that Laws Burdening
        Second Amendment Rights Pass Heightened Scrutiny Review. . . . . . . . . . . . . 10

    II.    The Second Amendment Protects the Right of Responsible, Law-Abiding
        Adults to Purchase Handguns Throughout the United States. . . . . . . . . . . . . . . 13

        A.    The Second Amendment Protects the Right to Keep Handguns. . . . . . . . 13

        B.    Because the Second Amendment Secures a Right to Keep Handguns,
            It Necessarily Secures a Right to Acquire Handguns.. . . . . . . . . . . . . . . 15

        C.    Prohibiting the Purchase of Arms Based on Residence Is a
            Novel Practice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

i

III.   The Interstate Handgun Transfer Ban Fails Any Level of
       Means-Ends Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

       A.    The Interstate Handgun Transfer Ban Is Subject to Strict Scrutiny. . . . . . 27

       B.    Blanket Prohibition of Interstate Handgun Transfers Does Not
             Properly Fit Any Governmental Interest. . . . . . . . . . . . . . . . . . . . . . . . . . 30

IV.    The Interstate Handgun Transfer Ban Violates Plaintiffs'
       Right to Equal Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

TABLE OF AUTHORITIES

Cases

*Adamson* v. *California*,
   332 U.S. 46 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Andrews* v. *State*,
   50 Tenn. 165 (1871).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Annex Books, Inc.* v. *City of Indianapolis*,
   581 F.3d 460 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ashcroft* v. *ACLU*,
   542 U.S. 656 (2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Bolling* v. *Sharpe*,
   347 U.S. 497 (1954).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Buckley* v. *Valeo*,
   424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Califano* v. *Jobst*,
   434 U.S. 47 (1977).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Carey* v. *Population Serv., Int'l*,
   431 U.S. 678 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 28

*Citizens United* v. *FEC*,
   130 S. Ct. 876 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*District of Columbia* v. *Heller*,
   554 U.S. 570 (2008).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Ezell* v. *City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 30

*Gilbert Equip. Co.* v. *Higgins*,
   709 F. Supp. 1071 (S.D. Ala.1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Gonzales* v. *Carhart*,
   550 U.S. 124 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iii

*Griswold* v. *Connecticut*,
    381 U.S. 479 (1965)...................................................... 21

*Harrott* v. *County of Kings*,
    25 Cal.4th 1138, 25 P.3d 649 (2001) ....................................... 32

*Heller* v. *District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011)............................................ 12

*Ill. Ass'n of Firearms Retailers* v. *City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014)................................. 16, 17, 22, 27

*Malloy* v. *Hogan*,
    378 U.S. 1 (1964)....................................................... 21

*Martin* v. *Harrington & Richardson, Inc.*,
    743 F.2d 1200 (7th Cir. 1984)............................................ 15

*McDonald* v. *City of Chicago*,
    130 S. Ct. 3020 (2010) ............................................. 12, 13, 24

*Mont. Shooting Sports Ass'n* v. *Holder*, No. 09-cv-147,
    2010 U.S. Dist. LEXIS 104301 (D. Mont. Aug. 31, 2010)....................... 20

*Moore* v. *Madigan*,
    702 F.3d 933 (7th Cir. 2012) ............................................ 22

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    700 F.3d 185 (5th Cir. 2012) ....................................... passim

*Olympic Arms* v. *Magaw*,
    91 F. Supp. 2d 1061( E.D. Mich.2000)..................................... 20

*O'Reilly* v. *Bd. of Appeals*,
    942 F.2d 281 (4th Cir. 1991) ............................................ 31

*Parker* v. *District of Columbia*,
    478 F.3d 370 (D.C. Cir. 2007)............................................ 13

*Patsone* v. *Pennsylvania*,
    232 U.S. 138 (1914)..................................................... 13

iv

*Peoples Rights Org.* v. *City of Columbus*,
    152 F.3d 522 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Peruta* v. *Cnty. of San Diego*,
    742 F.3d 1144 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Reliable Consultants, Inc.* v. *Earle*,
    517 F.3d 738 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19, 21

*Richmond Newspapers* v. *Virginia*,
    448 U.S. 555 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Romer* v. *Evans*,
    517 U.S. 620 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Schad* v. *Mt. Ephraim*,
    452 U.S. 61 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Schneider* v. *State*,
    308 U.S. 147 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Silvester* v. *Harris*, No. 1:11-CV-2137,
    2014 U.S. Dist. LEXIS 118284 (E.D. Cal. Aug. 25, 2014) . . . . . . . . . . . . . . . . . . . . . 14, 15

*Springfield Armory* v. *City of Columbus*,
    29 F.3d 250 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Strickland* v. *State*,
    137 Ga. 1, 72 S.E. 260 (Ga. 1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Supreme Court of New Hampshire* v. *Piper*,
    470 U.S. 274 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Teixeira* v. *Cnty. of Alameda*, No. 12-cv-03288,
    2013 U.S. Dist. LEXIS 128435 (N.D. Cal. Sept. 9, 2013) . . . . . . . . . . . . . . . . . . . . . . 20

*United States* v. *12 200-Foot Reels of Super 8mm. Film*,
    413 U.S. 213 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States* v. *Carolene Products Co.*,
    304 U.S. 144 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Chafin,*
    423 Fed. Appx. 342 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*United States* v. *Chester,*
    628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States* v. *Chovan,*
    735 F.3d 1127 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States* v. *Cruikshank,*
    92 U.S. 542 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States* v. *Day,*
    476 F.2d 562 (6th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Decastro,*
    682 F.3d 160 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States* v. *King,*
    532 U.S. 505 (5th Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-20

*United States* v. *Marzzarella,*
    614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20, 31

*United States* v. *Masciandaro,*
    638 F.3d 458 (4th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Miller,*
    307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Virginia* v. *Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Zablocki* v. *Redhail,*
    434 U.S. 374 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## Statutes and Regulations

18 U.S.C. § 921(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 922(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 7

27 C.F.R. § 478.96(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 C.F.R. § 478.96(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

27 C.F.R. § 478.99 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.01(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C. Code § 7-2502.06(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 32

D.C. Code § 7-2505.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C.M.R. § 24-2320.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C.M.R. § 24-2320.3(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C.M.R. § 24-2320.3(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Haw. Rev. Stat. § 134-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Mich. Comp. Laws § 28.422(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

N.C. Gen. Stat. § 14-402(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

N.J. Stat. Ann. § 2C:58-3(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25


Other Authorities

 St. George Tucker, Blackstone's Commentaries (1803).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

58 D.C. Register No. 38, at 008240-008241 (September 23, 2011),
        available at http://www.dcregs.dc.gov/Gateway/
        NoticeHome.aspx?noticeid=1742040
        (last visited October 10, 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

58 D.C. Register, No. 33, at 007572-007573 (August 19, 2011),
    available at http://www.dcregs.dc. gov/Gateway/
    NoticeHome.aspx?noticeid=1544548
    (last visited October 10, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Metropolitan Police Dept. (Washington, D.C.), Application for Firearms Registration
    Certificate, PD-219, available at http://mpdc.dc.gov/sites/default/files/dc/
    sites/mpdc/service_ content/attachments/PD-219%20Firearms%20
    Registration%20Application(Rev0613)_fillable.pdf (last visited Oct. 10, 2014). . . . . . . 4

Some Considerations on the Game Laws (1796). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

The Writings of Thomas Jefferson
    (T.J. Randolph, ed., 1830). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Memorandum of Points and Authorities in Support of
Plaintiffs' Motion for Summary Judgment

Preliminary Statement

American constitutional law simply does not permit the Government to prohibit the

exercise of a fundamental right in one place, on grounds that the right may be exercised

somewhere else. A strong, constitutionally-adequate reason must justify any law confining the

exercise of a fundamental right to one's state of residence. This Court would not hesitate to strike

down laws barring, without more, the interstate transfer of books, religious articles,

contraceptives, or any other thing that precedent imbues with constitutional protection.

Handguns should be no different. The federal government's prohibition of a national

handgun market cannot survive the Supreme Court's finding that Americans have a fundamental

individual right to keep and bear handguns. Whatever regulations might be designed to deny

handguns to dangerous people, responsible, law-abiding Americans do not become less so merely

by shopping across state lines.

Plaintiffs are fully qualified to buy and sell handguns under federal law, and they have the

blessing of their local authorities in seeking to buy and sell handguns from each other. The only

impediment to their doing so is the Government's prohibition of handgun transactions that cross

state lines, no matter the circumstances, even as the Government would not interfere with

Plaintiffs' lawful interstate rifle and shotgun transactions.

No reason, much less a constitutionally-adequate reason, exists to limit lawful handgun

acquisition to one's state of residence. That much is clearly demonstrated by the individual

1

consumer Plaintiffs, who reside in a "state" that demands police pre-approval for the acquisition of firearms from any source—and expressly welcomes interstate handgun sales.

The Government reasons that it must ban interstate handgun sales to prevent individuals from circumventing local handgun laws. But local laws also regulate long gun transactions. Provided they comply with all federal, state, and local laws, individuals are free to take possession of rifles and shotguns—but not handguns—from federally-licensed firearms dealers anywhere in the United States. If licensed firearms dealers in Texas can be trusted to demand, and honor, Washington's rifle transfer authorizations, there is no reason to bar them from processing identical certificates issued for the transfer of handguns.

Respectfully, Plaintiffs are entitled to summary judgment.

STATEMENT OF FACTS

A.    The Legal Framework for Interstate Handgun Transactions.

1.    *Federal Law*

Title 18 U.S.C. §§ 922(a)(3) and (5) forbid individuals from transporting into or receiving in their state of residence any firearm acquired outside that state since December 16, 1968, except for firearms acquired by bequest or intestate succession, or pursuant to a transfer from a federally-licensed dealer that complies with 18 U.S.C. § 922(b)(3). For purposes of these provisions, the District of Columbia is a "state." 18 U.S.C. § 921(a)(2).

Title 18, U.S.C. § 922(b)(3) and 27 C.F.R. § 478.99 bar licensed federal firearms dealers from transferring firearms to individuals who do not reside within the state in which the dealers' place of business is located. A significant exception to this prohibition allows a dealer to transfer rifles and shotguns to individuals residing out-of-state:

if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery, and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States) . . .

18 U.S.C. § 922(b)(3). Title 27 C.F.R. § 478.96(c)(1) reiterates that interstate rifle or shotgun transactions are lawful provided:

(i)     The purchaser meets with the licensee in person at the licensee's premises to accomplish the transfer, sale, and delivery of the rifle or shotgun;

(ii)    The licensed importer, licensed manufacturer, or licensed dealer complies with the provisions of § 478.102; [requiring a background check]

(iii)   The purchaser furnishes to the licensed importer, licensed manufacturer, or licensed dealer the firearms transaction record, Form 4473, required by § 478.124; and

(iv)    The sale, delivery, and receipt of the rifle or shotgun fully comply with the legal conditions of sale in both such States.

Pursuant to 27 C.F.R. § 478.96(c)(2),

[A]ny licensed manufacturer, licensed importer, or licensed dealer is presumed, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both such States.

By operation of these provisions, individuals who want to acquire handguns at retail, or from individuals in other states, may only take delivery of such handguns from a federal firearms licensee in the state wherein they reside. But individuals may purchase rifles and shotguns freely across state lines provided they do so in person, comply with local laws, fill out standard federal forms, and undergo a background check.

2.      *Texas Law*

Texas law does not forbid the sale of handguns to people residing outside of Texas.

3

3.     *District of Columbia Law*

The District of Columbia requires that all firearms be registered, D.C. Code § 7-2502.01(a), but does not prohibit the importation of firearms. It requires only that "[a]n application for a registration certificate shall be filed (and a registration certificate issued) prior to taking possession of a firearm from a licensed dealer or [other registrant],"[1] and "[i]n all other cases, an application for registration shall be filed immediately after a firearm is brought into the District" within 48 hours of providing notice to the police department. D.C. Code § 7-2502.06(a).

Accordingly, firearms dealers outside the District of Columbia may (and do) transfer rifles and shotguns to District residents upon presentation of approved registration certificates.[2] The District of Columbia utilizes a single form, PD-219, that serves as the application to register any type of firearm, without distinction between handguns and long guns, and which serves as the registration certificate when stamped "APPROVED" and labeled with a registration number.[3]

As for handgun purchases, District of Columbia law specifically allows a handgun buyer to transport handguns "from the place of purchase to his or her home." D.C. Code § 22-4505(a)(6). A handgun buyer must "[o]btain assistance necessary to complete the [registration] application by presenting the firearm registration application to a firearms dealer licensed under federal law . . . (2) [l]ocated outside the District if the firearm is purchased outside

---

[1]District law forbids individual-to-individual firearms transfers. D.C. Code § 7-2505.01.

[2]Individuals relocating to the District may import firearms they acquired as residents of other states. D.C. Code § 7-2502.06(a).

[3]*See* Metropolitan Police Dept. (Washington, D.C.), Application for Firearms Registration Certificate, PD-219, available at http://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/servicecontent/attachments/PD-219%20Firearms%20Registration%20Application(Rev0613)_fillable.pdf (last visited Oct. 10, 2014).

4

the District." D.C.M.R. § 24-2320.3(b)(2). Following approval, the handgun purchaser must

> Present the approved firearm registration application to the dealer licensed under federal
> law or, if federal law such as 18 U.S.C. § 922 prohibits the dealer from delivering the
> pistol to the applicant because the dealer is not within the District of Columbia, have that
> firearms dealer transport the pistol to a dealer located within the District, where the
> applicant will take delivery of the pistol.

D.C.M.R. § 24-2320.3(f).

Accordingly, but for the federal interstate handgun transfer ban, Washington, D.C.

residents are legally authorized to take delivery of handguns they purchase across state lines.

This was not always the case. Until 2011, District law required that all handgun sales be

processed through a D.C.-based licensed dealer. *See* D.C.M.R. § 24-2320.3(f) (2010). But on

August 19, 2011, the District of Columbia's Police Commissioner published a notice of

Emergency and Proposed Rulemaking, amending D.C.M.R. § 24-2320.3 into its present form to

"clarify" that District residents are forbidden from acquiring handguns outside the District, and

must ship any handguns purchased outside the District to an in-District dealer for final transfer,

*only* if required by federal law: "[s]hould the federal law change, then that requirement will no

longer be applicable to any District firearms registration applicant."[4]

> Emergency rulemaking is necessitated by an immediate need to preserve and promote the
> public welfare by having the amendment immediately effective so as to assist District
> residents in the exercise of their constitutional right to possess a handgun for self defense
> within their home.

*Id.* This amendment was made permanent on September 23, 2011.[5]

---

[4] *See* 58 D.C. Register, No. 33, at 007572-007573 (August 19, 2011), available at
http://www.dcregs.dc.gov/Gateway/NoticeHome.aspx?noticeid=1544548 (last visited October
10, 2014).

[5] *See* 58 D.C. Register No. 38, at 008240-008241 (September 23, 2011), available at
http://www.dcregs.dc.gov/Gateway/NoticeHome.aspx?noticeid=1742040 (last visited October

B.        The Plaintiffs.

Plaintiff Frederic Mance holds a Federal Firearms License ("FFL"), pursuant to which he

retails handguns in Arlington, Texas. Appendix ("Appx") at 1. Plaintiffs Tracey and Andrew

Hanson, a married couple, reside in Washington, D.C. *Id.* at 4, 5, 7, 8. All three are members of

Plaintiff Citizens Committee for the Right to Keep and Bear Arms ("the Committee"), a non-

profit membership association dedicated to promoting the benefits of the right to bear arms.,

whose members buy and sell handguns throughout the United States. *Id.* at 10.

Tracey and Andrew Hanson are each over the age of 21, are not under indictment, have

never been convicted of a felony or misdemeanor crime of domestic violence, are not fugitives

from justice, are not unlawful users of or addicted to any controlled substance, have not been

adjudicated mental defectives or committed to a mental institution, have not been discharged

from the Armed Forces under dishonorable conditions, have never renounced their citizenship,

and have never been the subject of a restraining order relating to a child or an intimate partner.

*Id.* at 4, 7.

Apart from the individual Plaintiffs, the Committee's members include law-abiding,

responsible Americans throughout the United States who desire to, and do, purchase handguns

for traditional lawful purposes, including self-defense. Some of the Committee's members reside

in states that, like the District of Columbia, do not prohibit purchasing handguns out of state.

Some of the Committee's members also reside in states that, like the District of Columbia,

require a license or pre-registration to purchase handguns. The Committee's other members also

include law-abiding, responsible Americans throughout the United States who desire to, and do,

_____

10, 2014).

6

sell handguns for traditional lawful purposes, including self-defense. Some of these Committee members sell handguns in states that do not forbid the sale of handguns to non-residents. App. 10-11.

     C.     Plaintiffs' Experience Under the Federal Interstate Handgun Transfer Ban

     Mance would sell handguns directly to consumers residing in other states, and in the District of Columbia, to the extent lawful under state and District law, but refrains from doing so because that conduct is prohibited by the federal interstate handgun transfer ban, 18 U.S.C. § 922(b)(3). Appx. at 1. Mance reasonably fears arrest, prosecution, incarceration, and fine were he to violate the law. Accordingly, when handgun consumers residing outside Texas approach Mance about purchasing handguns, he declines to engage in those sales, and instead, offers only to ship the consumers' desired handguns to dealers in their states or the District of Columbia for transfer there. Compliance with the federal interstate handgun transfer ban thus makes Mance's handguns more expensive for these out-of-state consumers, to say nothing of the delay inherent in completing such transactions. The federal interstate handgun ban has and continues to cost Mance sales. *Id.*

     The Hansons would shop for and buy handguns directly from federally-licensed dealers outside of Washington, D.C., to the extent lawful under state and District law, but refrain from doing so because that conduct is prohibited by the federal interstate handgun transfer ban, 18 U.S.C. § 922(b)(3). *Id.* at 4, 7. The Hansons fear arrest, prosecution, incarceration, and fine were they to violate the law. Because they cannot directly access the national handgun market outside of Washington, D.C., the Hansons face higher costs in purchasing handguns. Any handgun that they would purchase outside of Washington, D.C. would have to be shipped, at their expense, to

an "in state" federal licensee, assuming the seller is even willing to effect such shipments. The receiving federal licensee would then charge them a fee to complete the transfer. This insulates any D.C.-based firearms retailer from competition and severely limits the Hansons' choice as consumers. Indeed, there are no federally-licensed firearms retailers in Washington, D.C., and the only licensee willing to effect a transfer charges $125. *Id.* at 4, 5, 7, 8.

Because District of Columbia law allows the Hansons to purchase handguns directly out-of-state, and there are various states that do not prohibit the Hansons, as D.C. residents, from acquiring handguns, it is only the federal interstate handgun transfer ban that causes them to sustain shipping and transfer fees when buying handguns. *Id.* at 5, 8.

On June 21, 2014, the Hansons visited Mance at his place of business in Arlington, Texas, as they were each in the market for the purchase of handguns for self-defense. The Hansons each identified a handgun in Mance's inventory that is legal for them to possess in Washington, D.C., and which they would have purchased from Mance directly, and which he would have sold them directly, if only it were legal to do so. *Id.* at 2, 5, 8.

Because the Hansons do not reside in Texas, and do not wish to violate federal law, they would not take delivery of a handgun from Mance, nor would they bring a handgun purchased directly outside of Washington, D.C. to their home. Nor would the Hansons make any false statement on a Form 4473. Mance would not transfer any handgun to the Hansons, because doing so would violate the federal interstate handgun transfer ban. *Id.*

Rather than violate the law, or have the handguns shipped at the Hansons' expense for transfer through a District of Columbia-based federal firearms licensee, Mance and the Hansons agreed to refrain from completing any handgun transfers unless it became legal for the Hansons

8

to take delivery of the handgun from Mance. The three memorialized that intent by completing, in each other's presence as required by District of Columbia law, the District of Columbia's PD-219 form. Mance verified that the Hansons' credit card would be valid to complete the purchase, but no money, or firearms, changed hands. *Id.* at 2, 5, 6, 8, 9.

But for the federal interstate handgun transfer ban, the Hansons would directly purchase the handgun from Mance. The Hansons would also shop for, and purchase, handguns from other dealers outside of Washington, D.C., *Id.* at 6, 9, and Mance would sell handguns to other consumers throughout the country, *Id.* at 2. Other Committee members would likewise buy and sell handguns across state lines, but for the interstate handgun transfer ban. *Id.* at 10, 11.

## SUMMARY OF ARGUMENT

The interstate handgun transfer ban easily fails the Fifth Circuit's two-step analytical approach to Second Amendment cases. First, the act of purchasing handguns is obviously within the scope of the Second Amendment's protection. As there is a right to keep and carry handguns, there is, plainly, the right to sell and acquire them. The Government's contrary arguments simply defy credulity, as does the Government's argument that longstanding tradition accepts the prohibition of gun sales to residents of other states. The sources purportedly justifying that assertion simply do not hold up to scrutiny.

Because barring non-state residents from trading in handguns is unknown to the Second Amendment's tradition, this Court must apply heightened scrutiny to the interstate handgun transfer ban. The proper standard of review would be strict scrutiny, but in the end, the precise standard of review is unimportant. Even under intermediate scrutiny, the Government cannot show that this law is properly tailored to advancing any important regulatory interests. Accepting

9

fully that the Government has an anti-circumvention interest in ensuring that people comply with their local jurisdiction's firearm laws, federal law already demonstrates the proper way to advance that interest: require FFLs to follow the law, as is already the case when Americans go shopping for rifles and shotguns outside their home states.

Indeed, the interstate handgun transfer ban works to *defeat* the interests of those states and localities, such as Texas and Washington, D.C., whose laws allow and even encourage the interstate handgun trade.

Respectfully, Plaintiffs are entitled to summary judgment.

ARGUMENT

I.   THE GOVERNMENT BEARS THE BURDEN OF PROVING THAT LAWS BURDENING SECOND AMENDMENT RIGHTS PASS HEIGHTENED SCRUTINY REVIEW.

The Second Amendment functions as a normal constitutional right. As the Supreme Court demonstated, some laws will be struck down for conflicting with the right's core guarantee, without further analysis. *District of Columbia* v. *Heller*, 554 U.S. 570 (2008). In *Heller*, once it was determined that the Second Amendment secures a right to have handguns for self-defense, city ordinances banning handguns and the keeping of functional firearms simply could not survive. "The Court invalidated the laws because they violated the central right that the Second Amendment was intended to protect . . . ." *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 193 (5th Cir. 2012) ("*NRA*"). Other cases lend themselves to different constitutional tests, *e.g.*, gun licensing laws affording unbridled discretion could be viewed as prior restraints, and disarmed individuals may raise as-applied challenges based on their personal circumstances.

10

But in large part, when Second Amendment claims arise,

> [a] two-step inquiry has emerged as the prevailing approach: the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*NRA*, 700 F.3d at 194 (citations omitted). The Fifth Circuit follows this approach in appropriate cases, *Id.*, and this case appears to be well-suited to this approach.

"To determine whether a law impinges on the Second Amendment right, we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Id.* (citations omitted). "If the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster. If the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-ends scrutiny." *Id.* at 195 (citations omitted).

"[T]he appropriate level of scrutiny depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *NRA*, 700 F.3d at 195 (citations omitted). But at least in the Fifth Circuit, rational basis review is unavailable. Means-ends scrutiny in Second Amendment cases must always be heightened scrutiny—strict or intermediate:

> A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny. A less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing. This more lenient level of scrutiny could be called "intermediate" scrutiny, but regardless of the label, this level requires the government to demonstrate a "reasonable fit" between the challenged regulation and an "important" government objective. This "intermediate" scrutiny test must be more rigorous than rational basis review, which *Heller* held "could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right" such as "the right to keep and bear arms."

11

*Id.* (citations omitted).

Other circuits are in accord. As the Seventh Circuit put it, "we know that *Heller*'s reference to 'any standard of scrutiny' means any *heightened* standard of scrutiny; the Court specifically excluded rational-basis review." *Ezell* v. *City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011) (citation omitted). "[W]e reject rational basis review and conclude that some sort of heightened scrutiny must apply." *United States* v. *Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013). "[T]he [Supreme] Court would apply some form of heightened constitutional scrutiny if a historical evaluation did not end the matter." *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir. 2010).

Unfortunately, the Government is able to cite to the minority position of two other circuits, allowing for the application of rational basis review where the court determines that the imposition is insubstantial. *See* Gov't Br., Dkt. 16, at 28 (citing *United States* v. *Decastro*, 682 F.3d 160 (2d Cir. 2012); *Heller* v. *District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011)). But these decisions contradict the Supreme Court's instructions that the Fifth Circuit ably cited, *supra*, as well as the Supreme Court's admonition that courts lack "the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634; *cf. McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 3050 (2010) (applying Second Amendment does not "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise").

As this case is controlled by Supreme Court and Fifth Circuit precedent, this Court need not further consider the Government's rational basis arguments. If the interstate handgun transfer

ban implicates conduct secured by the Second Amendment—and assuredly, it does—the

Government bears a heightened scrutiny burden.[6]

II.   THE SECOND AMENDMENT PROTECTS THE RIGHT OF RESPONSIBLE, LAW-ABIDING
      ADULTS TO PURCHASE HANDGUNS THROUGHOUT THE UNITED STATES.

      A.      The Second Amendment Protects the Right to Keep Handguns.

      There is no question that the Second Amendment secures a right to possess handguns.

*Heller*, *supra*, 554 U.S. 570; *McDonald*, 130 S. Ct. 3020; *see also Patsone* v. *Pennsylvania*, 232

U.S. 138, 143 (1914) ("pistols . . . may be supposed to be needed occasionally for self-defence.").

      The fact that other firearms may be available under terms less onerous than the ones

demanded for the acquisition of handguns is irrelevant. The D.C. Circuit dismissed as "frivolous"

the notion that handguns can be banned merely because other firearms are available. *Parker* v.

*District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom Heller*. "It could be

similarly contended that all firearms may be banned so long as sabers were permitted. Once it is

determined – as we have done – that handguns are 'Arms' referred to in the Second Amendment,

---

[6]The Government asserts that "[t]he Court has frequently declined to employ elevated
constitutional scrutiny when analyzing regulations that do not impose a 'substantial' or
'significant' burden on a constitutional right." Gov't Br., Dkt. 16, at 27 (citing *Zablocki* v.
*Redhail*, 434 U.S. 374, 386 (1978); *Califano* v. *Jobst*, 434 U.S. 47, 48, 57 (1977); and *Gonzales*
v. *Carhart*, 550 U.S. 124, 157-58 (2007)). The statement is true—as far as it goes. These cases
did not overrule the requirement of heightened review when "legislation appears on its face to be
within a specific prohibition of the Constitution, as those of the first ten amendments . . ." *Heller*,
554 U.S. at 628 n.27 (quoting *United States* v. *Carolene Products Co.*, 304 U.S. 144, 152 n.4
(1938)). The quoted passages discussed laws that might only *tangentially* impact a right. *See*,
*e.g.*, *Zablocki*, 434 U.S. at 386 (no strict scrutiny for "every state regulation which relates in any
way to the incidents of or prerequisites for marriage"); *Carhart*, 550 U.S. at 157-58 (law "not
designed to strike at the right itself" and has "incidental effect" on right). The interstate handgun
transfer ban does not have an incidental, indirect, unintended impact on the right to arms—it
directly, *on its face*, targets and restricts the right.

it is not open to the District to ban them." *Id.* (citation omitted).

The Supreme Court agreed:

It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon.

*Heller*, 554 U.S. at 629. The Supreme Court then listed various reasons why a handgun might be more suitable for home self-defense than a long arm, and concluded, "[w]hatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.*

Similarly, the right to have a handgun is not diminished by the fact that one keeps, or has access to, *other* handguns. Just as the First Amendment does not allow the rationing of books or deities, the Second Amendment, without more, does not permit the rationing of handguns. This much the Eastern District of California recently made clear, in striking down the application of handgun purchase waiting periods to individuals who already possessed handguns. The state argued that waiting periods did not burden the Second Amendment rights of those who already had handguns, but the court held otherwise:

[T]hat [Plaintiffs] have been able to exercise their Second Amendment right with respect to at least one firearm does not mean that they have diminished rights under the Second Amendment. The Second Amendment applies to "arms" and its language does not limit its full protections to a single firearm. Some firearms are better suited for particular lawful purposes than others.

*Silvester* v. *Harris*, No. 1:11-CV-2137, 2014 U.S. Dist. LEXIS 118284, at 75 n.33 (E.D. Cal. Aug. 25, 2014).

14

B.    Because the Second Amendment Secures a Right to Keep Handguns,
      It Necessarily Secures a Right to Acquire Handguns.

"[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980). The Second Amendment does not merely protect the right to possess the handguns that someone might manufacture from raw materials.[7] Because there is a right to possess handguns, there is, necessarily, a right to acquire them. After all, "restricting the ability to purchase an item is tantamount to restricting that item's use." *Reliable Consultants, Inc.* v. *Earle*, 517 F.3d 738, 743 (5th Cir. 2008) (footnote omitted); accord *Carey* v. *Population Serv., Int'l*, 431 U.S. 678, 687-88 (1977) ("A total prohibition against the sale of contraceptives . . . would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use.").

Courts have long applied the Fifth Circuit's *Reliable Consultants* logic, reflecting *Carey*'s basic rule, to the right to keep and bear arms. "The right to keep and bear arms, necessarily involves the right to purchase them . . ." *Andrews* v. *State*, 50 Tenn. 165, 178 (1871). "One cannot exercise the right to keep and bear arms without actually possessing a firearm." *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *74 (citing *Andrews*). Although the "acquisition right is far from absolute," the Second Amendment "right must also include the right to *acquire* a firearm . .

---

[7]Surely, the Second Amendment secures the right to make the arms that might then be kept or carried. As the Seventh Circuit acknowledged, adopting tort doctrines "which would in practice drive [handgun] manufacturers out of business, would produce a handgun ban by judicial fiat in the face of" a constitutional right to handgun possession. *Martin* v. *Harrington & Richardson, Inc.*, 743 F.2d 1200, 1204 (7th Cir. 1984).

. .” *Ill. Ass'n of Firearms Retailers* v. *City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014).

"Our citizens have always been free to make, vend and export arms. It is the constant occupation

and livelihood of some of them." 3 THE WRITINGS OF THOMAS JEFFERSON 230 (T.J. Randolph,

ed., 1830).

Indeed, the Supreme Court recognized, albeit in passing, the right to purchase arms.

"What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from

mounting his Gun on his Chimney Piece . . .?" *Heller*, 554 U.S. at 583 n.7 (quoting SOME

CONSIDERATIONS ON THE GAME LAWS 54 (1796)).

Some confusion may nonetheless arise from *Heller*'s cautionary statement, that

> [a]lthough we do not undertake an exhaustive historical analysis today of the full scope of
> the Second Amendment, nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms by felons and the mentally ill, or
> laws forbidding the carrying of firearms in sensitive places such as schools and
> government buildings, or laws imposing conditions and qualifications on the commercial
> sale of arms.

*Heller*, 554 U.S. at 626-27. In a footnote, the Court offered that such laws are "presumptively

lawful." *Id.* at 627 n.26.

But it would not be a serious argument to claim that because *some* "laws imposing

conditions and qualifications on the commercial sale of arms" are "presumptively lawful,"

*Heller*, 554 U.S. at 626-27 & n.26, *all* such regulations are constitutional. Some limiting

principles must apply. As the Third Circuit explained,

> Commercial regulations on the sale of firearms do not fall outside the scope of the
> Second Amendment . . . In order to uphold the constitutionality of a law imposing a
> condition on the commercial sale of firearms, a court necessarily must examine the nature
> and extent of the imposed condition. If there were somehow a categorical exception for
> these restrictions, it would follow that there would be no constitutional defect in

16

prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.

*United States* v. *Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). Indeed, the Northern District of Illinois had no trouble striking down Chicago's prohibition on the commercial sale of firearms, especially as the city could not show that banning gun sales was historically acceptable. *Ill. Retailers*, 968 F. Supp. 2d at 937.

The Fifth Circuit is in accord. In *NRA*, the Fifth Circuit considered the constitutionality of federal laws banning FFL handgun sales to adults ages 18-20—plainly, in *Heller*'s phrasing, "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. Referencing *Heller*'s class of "presumptively lawful" laws, the Fifth Circuit expressed confusion as to whether the Supreme Court meant that such laws are presumptively lawful because they fall outside the Second Amendment's scope, or presumptively lawful because they satisfy means-ends scrutiny. *NRA*, 700 F.3d at 196. The Fifth Circuit settled on the former explanation. "For now, we state that a longstanding, presumptively lawful regulatory measure . . . would likely fall outside the ambit of the Second Amendment." *Id.* The Court should note that in so doing, the Fifth Circuit read "longstanding" as an element of a presumptively lawful regulation, thus "necessarily . . . examin[ing] the nature and extent of the imposed condition." *Marzzarella*, 614 F.3d at 92 n.8.

And indeed, the Fifth Circuit did not end its opinion there, upholding the law merely because the law regulates gun sales. Rather, the Court proceeded to examine the historical pedigree of that specific type of restriction, *a restriction based on age*, on Second Amendment

17

rights. If all commercial restrictions on the sale of arms were presumptively constitutional, *NRA* would have been a much different, much shorter opinion.

Nor did the Fifth Circuit end its *NRA* discussion with a citation to its pre-*Heller* decision in *United States* v. *King*, 532 U.S. 505 (5th Cir. 1976). The Government erroneously asserts that *King* "dr[ew] a sharp distinction between 'right to keep and bear arms' and 'dealing in firearms.'" Gov't Br., Dkt. 16, at 25 (citing *King* without pinpoint). Were that true, perhaps *NRA* could have been a much shorter opinion, or at least, would have offered some discussion of why *King* did not resolve it.

But *King* contains no such holding. The Government seriously misquotes, and thus over-reads, that case. *King* does not hold that "dealing in firearms" is unprotected by the Second Amendment. Rather, *King* provides that the defendant "was neither charged with nor convicted of keeping and bearing arms. He was charged with and convicted of engaging, *without a license*, in the business of dealing in firearms and *of conspiring with others* so to do." *King*, 532 F.2d at 510 (emphasis added) (citation omitted). Plaintiffs would agree that the Second Amendment is not inherently offended by laws licensing gun dealers. Neither, for that matter, is the Second Amendment necessarily violated by laws licensing the keeping and bearing of arms. It is the implementation, not the concept, of licensing that is typically litigated under the Second Amendment in appropriate cases.

*King*'s perfunctory endorsement of licensing as not-inconsistent with the Second Amendment cited two cases: *United States* v. *Miller*, 307 U.S. 174 (1939), which until *Heller* was widely misunderstood to limit the Second Amendment to a militia purpose; and *United States* v. *Day*, 476 F.2d 562 (6th Cir. 1973), which did not discuss the Second Amendment

18

beyond citing *Miller* for the unremarkable proposition that Second Amendment rights are not absolute. *King* simply cannot be read to endorse the breathtaking proposition that there is no right to acquire arms.

Of course, it bears repeating that not long ago, the Fifth Circuit struck down a ban on the sale of sex toys, because the possession and use of sex toys is protected by the Fourteenth Amendment right of intimate relations. *Reliable Consultants*. It would be strange indeed for the Fifth Circuit to hold that the enumerated right to have handguns does not likewise secure the corollary right to sell and buy arms, especially as the acquisition of arms, unlike the acquisition of sex toys, is a necessary and complete predicate to exercising the relevant constitutional right.

Undaunted, the Government draws upon the Fourth Circuit's unpublished opinion in *United States* v. *Chafin*, 423 Fed. Appx. 342 (4th Cir. 2011). In that case, the defendant asserted that the Second Amendment protects "the sale of a firearm *to an unlawful user of drugs*,"—very far from the issues here—and he did "not point[] this court to any authority" for the proposition that there exists a right to sell firearms, again, unlike the instant brief. *Id*. at 344 (emphasis added). To the extent the Fourth Circuit did not locate such authority itself, *Id.*, respectfully, that court missed a few sources, *see supra*. Indeed, the only authority that the Fourth Circuit cited for its proposition that there is no right to firearms commerce was a case holding that there is no First Amendment right to distribute obscenity. *See Chafin*, 423 Fed. Appx. 344 (citing *United States* v. *12 200-Foot Reels of Super 8mm. Film*, 413 U.S. 213 (1973)). But obscenity is unprotected by the First Amendment; handguns *are* protected by the Second Amendment. And the Supreme Court's law for the right to sell constitutionally-protected articles is quite different, as is binding Fifth Circuit precedent.

For the same reasons, the Court cannot rely upon *Teixeira* v. *Cnty. of Alameda*, No. 12-cv-03288, 2013 U.S. Dist. LEXIS 128435 (N.D. Cal. Sept. 9, 2013), *appeal pending*, No. 13-17132 (9th Cir. filed October 23, 2013), which did little more than recite *Chafin*'s perfunctory reasoning, and then misstate the Third Circuit's holding in *Marzzarella* as having declared that there is no right to purchase handguns. As shown *supra*, *Marzzarella* came to the exact opposite conclusion. 614 F.3d at 92 n.8.

Finally on this point, the Government raises the District of Montana's passing observation that "*Heller* said nothing about extending Second Amendment protection to firearm manufacturers or dealers." *Mont. Shooting Sports Ass'n* v. *Holder*, No. 09-cv-147, 2010 U.S. Dist. LEXIS 104301, at *67 (D. Mont. Aug. 31, 2010), *aff'd on other grounds*, 727 F.3d 975 (9th Cir. 2013). "But since [*Heller*] represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field, any more than our first in-depth Free Exercise Clause case left that area in a state of utter certainty." *Heller*, 554 U.S. at 635 (citation and internal punctuation omitted). Moreover, the Government's quotation of *Montana Shooting* is incomplete. The opinion continues: "*Heller* recognized that firearms manufacturers and dealers are properly subject to regulation by the federal government under existing federal firearms laws." *Montana*, at *67. Again, that much is undisputed here. Yet the Montana court added a footnote citing *King*, discussed *supra*; one pre-*Heller* case decided under the erroneous "collective rights" regime, *Olympic Arms* v. *Magaw*, 91 F. Supp. 2d 1061, 1071( E.D. Mich. 2000), and another case upholding the prohibition of arms not suitable for sporting purposes, *Gilbert Equip. Co.* v. *Higgins*, 709 F. Supp. 1071, 1081 (S.D. Ala.1989), a dubious outcome today in light of *Heller*'s holding that the Second Amendment's core interest is self-defense.

The Government can no more ban the sale of protected guns than it can ban the sale of protected books, *Virginia* v. *Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); contraceptives, *Carey, supra*, 431 U.S. 678; *Griswold* v. *Connecticut*, 381 U.S. 479 (1965), or (in this circuit) sex toys, *Reliable Consultants, supra*, 517 F.3d 738. The argument that, although there is a right to keep and bear handguns, there is no right to acquire handguns, lacks merit.

C.      Prohibiting the Purchase of Arms Based on Residence Is a Novel Practice.

*Heller* instructed that the Second Amendment must be understood according to its original public meaning. "In interpreting this text, we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *Heller*, 554 U.S. at 576 (quotation omitted). "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id.* at 634-35.

Whatever its language might signify to modern eyes, "an amendment to the Constitution should be read in a 'sense most obvious to the common understanding at the time of its adoption, . . . For it was for public adoption that it was proposed.'" *Adamson* v. *California*, 332 U.S. 46, 63 (1947) (Frankfurter, J., concurring) (citation omitted), *overruled on other grounds by Malloy* v. *Hogan*, 378 U.S. 1 (1964). The rule is especially salient when interpreting the Bill of Rights. "A bill of rights may be considered, not only as intended to give law, and assign limits to government . . . , but as giving information to the people [so that] every man of the meanest

21

capacity and understanding may learn his own rights, and know when they are violated. . . ." 1 St. George Tucker, Blackstone's Commentaries, app. 308 (1803).

The Supreme Court further advised that "longstanding" laws can inform the "scope" of the right that the Framers ratified, *Id.*, at 626-27; *NRA*, 700 F.3d at 196, because the fact that the right's ratification did not disturb certain practices may be evidence that the Framers or those who followed soon after did not view such practices as inconsistent with the right. And "*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *NRA*, 700 F.3d at 196.

But "1791, the year the Second Amendment was ratified—[is] the critical year for determining the amendment's historical meaning." *Moore* v. *Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (citing *McDonald*, 130 S. Ct. at 3035 & n.14). "[T]he relevant time period for the first-step historical analysis is 1791." *Firearms Retailers*, 961 F. Supp.2d at 935. And with respect to the impact of "longstanding" laws, *Heller* and *McDonald* "made clear that the scope of the Second Amendment right depends not on post-twentieth century developments, but instead on the understanding of the right that predominated from the time of ratification through the nineteenth century." *Peruta* v. *Cnty. of San Diego*, 742 F.3d 1144, 1175 n.21 (9th Cir. 2014).

The concept of "longstanding" regulation consistent with the right must be tied in some meaningful way to the Framing Era, for if a *modern* enactment is viewed as thereby limiting a constitutional right's scope, the right is effectively erased. Everything and anything that a legislature enacts is thereby automatically self-constitutionalizing. But *Heller* was careful to confirm that "future legislatures" could not override "the scope [rights] were understood to have when the people adopted them," *Heller*, 554 U.S. at 634.

Thus, as the Fifth Circuit put it, "we look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *NRA*, 700 F.3d at 194. "[A] longstanding measure that harmonizes with the history and tradition of arms regulation in this country would not threaten the core of the Second Amendment guarantee." *Id.* at 196. To carve the interstate acquisition of handguns out from the Second Amendment right to acquire handguns, the Government must show, if not an on-point 1791 enactment, at least some evidence that the Framers would have accepted such a restriction.

This, the Government cannot do. The interstate handgun transfer prohibition is not "longstanding." It dates only to 1968—far from the Founding Era and the post-ratification period. And contrary to the Government's arguments, it does not "harmonize with the history and tradition of arms regulation in this country" in a manner that might inform the scope of Second Amendment rights. *Id.*

The Government claims that "[b]etween 1909 and 1939, at least 11 States enacted laws restricting the acquisition, possession, or carrying of one or more types of firearms to State residents." Gov't Br., Dkt. 16, at 26 (citing Gov't Exh. 2, Dkt. 17-1, at App. 102-08). Even were the statement true—and it is demonstrably untrue (*see* discussion *infra*)—it would not support the Government's legal assertions about the longstanding nature of an interstate handgun transfer ban.

*First*, the Court will note that all of the Government's cited provisions are state enactments. It cannot be said that state legislatures acting from 1909 through 1939 reflected compliance with the Second Amendment's requirements, because those legislatures were on notice that they were not bound to respect Second Amendment rights at all. *See United States* v.

23

*Cruikshank*, 92 U.S. 542 (1876) (holding the Fourteenth Amendment does not apply the Second Amendment as against the States), *overruled*, *McDonald* v. *City of Chicago*, *supra*, 130 S. Ct. 3020.

*Second*, the years 1909 through 1939 all fall within the twentieth century. While "a precise founding-era analogue" is not required, *NRA*, 700 F.3d at 196, at a minimum there must be some effort to show that a modern enactment echoes a type of restriction known to the Framers. The Fifth Circuit upheld a ban on FFL handgun sales to adults ages 18-20 because (1) it reasoned that the Framers tolerated the disarmament of "particular groups for public safety reasons," *Id.* at 200, (2) that minors lacked the civic virtue viewed as a prerequisite to exercising the right to arms, *Id.* at 201, and (3) that 21 was indeed the age of majority at common law, at the Framing Era and until the 1970s. *Id.* at 201-02. In contrast, there is nothing to show that during the Framing Era (or, indeed, ever), non-residents were viewed as a dangerous class of people lacking the necessary civic virtue to exercise the right to arms. Notably, the interstate handgun transfer ban was enacted barely three years before the ratification of the Twenty-Sixth Amendment, reducing the age of majority for voting purposes from 21 to 18.

*Third*, eight of the Government's eleven twentieth-century state laws relate only to the carrying of handguns, not the sale or purchase of handguns. This case has nothing to do with the carrying of firearms, an issue that raises very different regulatory concerns. And even as to the laws regulating the carrying of handguns, not all of these limited handgun carrying to state residents.

The Government's cited laws of West Virginia, Georgia, Montana, New York, Illinois, Massachusetts, New Jersey, and Maine have nothing to do with the purchase or sale of handguns.

24

Indeed, Georgia's Supreme Court found that the state's carry license law, advanced here by the

Government to justify a sales prohibition, had no application to commerce. In the course of

dismissing various hyper-literal statutory constructions leading to absurd results, that court

offered:

> It is lawful to sell pistols. But a similar construction might make it impossible for the
> carrier to deliver them to the dealer, or the dealer to deliver them to the customer. We will
> not anticipate that any such construction will be given, but one which will carry out the
> legislative purpose.

*Strickland* v. *State*, 137 Ga. 1, 12, 72 S.E. 260, 265 (Ga. 1911).

Moreover, to the extent these states required a license to carry a handgun, three of them—

Illinois, New Jersey, and Maine—required a license only to carry a handgun in a concealed

manner. Non-resident handgun carriers openly carrying handguns were left undisturbed. The

Government's reliance upon New Jersey law is particularly inapt, because that state has long

required a permit to purchase handguns that is made available to non-residents. *See* N.J. Stat.

Ann. § 2C:58-3(d).

And to the extent that residence was required to obtain carry permits, the laws made fairly

clear that the reason for doing so was to ensure that the only people carrying, or carrying

concealed, were known to and deemed safe by local authorities. This much was also reflected by

two of the Government's eight carry law examples, which expressly authorized the licensing of

non-residents maintaining business in the state. Apart from the carry license available to

residents, New York allowed handguns to be possessed by householders, storekeepers,

merchants, and messengers. Gov't Exh. 2, Dkt. 17-1, App. 104. Massachusetts offered concealed

carry licenses to "any person residing *or having a place of business* within the jurisdiction of the person issuing the license." *Id.* at App. 106 (emphasis added).

The 1919 North Carolina law cited by the Government, requiring a permit to purchase a handgun, required only that a permit be issued by "the clerk of the Superior Court of the county in which such purchase, sale or transfer is intended to be made." *Id.* at App. 105. Permits were available to "any person . . . in any such county," and were not expressly limited to state residents. *Id.* The Government infers a residence requirement from the permit form, in which the applicant's residence address might be presupposed to be within the state, but the alternative options for describing the address leave even this much unclear. *Id.* at App. 105-06. It appears that North Carolina's residence requirement dates only to 1979, with the adoption of S.B. 213, "An Act to Require that Weapons Permits be Obtained from the County of Residence of the Purchaser," N.C. Laws 1979, c. 895.

That leaves the Government with only Missouri and Michigan's laws, from 1921 and 1927, respectively, as limiting handgun purchases to residents who have obtained permission from their local sheriff or other police official. In Missouri, the Sheriff was to "be satisfied that the person applying for the same is of good moral character and of lawful age and that the granting of the same will not endanger to public safety." Gov't Exh. 2, Dkt. 17-1, at App. 106. Michigan presupposed that the police would ensure that the purchaser had not "been convicted of a felony or adjudged insane in this state or elsewhere." *Id.* at App. 107.

Before the Internet age, legislatures might have viewed transients as being less susceptible to effective background checks than established residents. If the Sheriff's personal familiarity with an individual might be disqualifying, it might have been deemed impossible to

26

review the background of a traveling stranger. But no state generally disarmed visitors, and it cannot be said that non-residents were deemed dangerous in the same sense as were minors, lunatics, and felons. But even so, two state laws from period 1921 through 1927, far removed from the Framing Era, enacted by legislatures operating under the Supreme Court's license to ignore the Second Amendment, *see Cruikshank*, cannot establish a "longstanding" exemption from the normal understanding that there must be a fundamental right to acquire arms. "[C]itation to a few isolated statutes—even to those from the appropriate time period—fall[] far short of establishing that gun sales and transfers were historically unprotected by the Second Amendment." *Illinois Retailers*, 961 F. Supp. 2d at 937 (citation omitted). The Government has shown much less here.

The Court must proceed to the second step of the analysis, and measure the constitutional right against the regulatory interest.

III.   THE INTERSTATE HANDGUN TRANSFER BAN FAILS ANY LEVEL OF MEANS-ENDS SCRUTINY.

A.     The Interstate Handgun Transfer Ban Is Subject to Strict Scrutiny.

The interstate handgun transfer ban is very much "a salient outlier in the historical landscape of gun control." *NRA*, 700 F.3d at 205. Laws of this nature were virtually unknown prior to its late twentieth-century enactment. And banning handgun sales to all law-abiding, responsible adults, outside their home state, plainly threatens the Second Amendment right at its core. The law is not "analogous to longstanding, presumptively lawful bans on possession by felons and the mentally ill," *Id.* at 206, nor does it target "a discrete category" of adults, *Id.* at 205; it targets everyone. *All* handgun consumers are severely impacted by being denied a national

27

market for handguns. Our national union presupposes something of a free trade zone among its core benefits. A law confining to the borders of one's state all trade in an article to which the people have an enumerated, fundamental right cannot be the subject of reduced scrutiny.

It bears repeating: "A regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." *NRA*, 700 F.3d at 195; *see also United States* v. *Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny"). The interstate handgun transfer ban squarely fits this description.

Likewise on-point is the Supreme Court's decision in *Carey*, *supra*, 431 U.S. 678, striking down a New York law barring all but licensed pharmacists from selling contraceptives under strict scrutiny. The Court began by noting that "[t]he burden is, of course, not as great as that under a total ban on distribution." *Id.* at 689.

> Nevertheless, the restriction of distribution channels to a small fraction of the total number of possible retail outlets renders contraceptive devices considerably less accessible to the public, reduces the opportunity for privacy of selection and purchase, and lessens the possibility of price competition.

*Id.*; cf. *Annex Books, Inc.* v. *City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2010) ("laws requiring the closure of bookstores at night and on Sunday are likely to curtail sales, the public benefits of the restrictions must be established by evidence, and not just asserted").

Admittedly, the Fifth Circuit applied only intermediate scrutiny to test the prohibition on FFL sales to 18-20 year olds, "to the extent that these laws resemble presumptively lawful

28

regulatory measures . . ." *NRA*, 700 F.3d at 206. But the Fifth Circuit also explained that its "two-step" methodology for resolving Second Amendment cases draws heavily upon First Amendment doctrine. *Id.* at 197. The Fifth Circuit further explained that First Amendment law would further guide the selection of a standard of review at the second step.

> In harmony with well-developed principles that have guided our interpretation of the First Amendment, we believe that a law impinging upon the Second Amendment right must be reviewed under a properly tuned level of scrutiny—i.e., a level that is proportionate to the severity of the burden that the law imposes on the right.

*Id.* at 198.

Had the Government banned the interstate sale of books—perhaps because local bookstores were better able to police community standards for obscenity— the Government could be expected to make the same arguments seen here: consumers remain free to purchase any book so long as their local store would stock it, and booksellers may sell any book that is legal to possess in their jurisdiction, so long as purchaser was a local resident less likely to smuggle the books across state lines into more restrictive jurisdictions. But it would be very difficult to imagine the Fifth Circuit applying only "intermediate" scrutiny to such a law, even if it could be said to be content-neutral.

Indeed, the other two factors leading to intermediate scrutiny in *NRA* are not presented here. The 18-20 year olds ban was "sufficiently bounded" in large part because handguns were still available on the unregulated private market, or through family transfers. *Id.* at 207. The restriction here is more pervasive, applying to *all* handguns, however acquired, if they are acquired beyond the borders of one's state. And unlike the age qualification, the interstate

handgun transfer ban does not have a "temporary effect." *Id.* Wherever one lives, one is denied the right to directly acquire handguns in the rest of the United States.

But in the final analysis, the exact level of scrutiny is unimportant. The interstate handgun transfer ban fails all the same.

B.      Blanket Prohibition of Interstate Handgun Transfers Does Not Properly Fit
        Any Governmental Interest.

Americans are ordinarily entitled to exercise their constitutional rights throughout the territory of the United States. For example, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schad* v. *Mt. Ephraim*, 452 U.S. 61, 76-77 (1981) (quoting *Schneider* v. *State*, 308 U.S. 147, 163 (1939)). In *Ezell*, the district court denied a motion to preliminarily enjoin Chicago's gun range ban, theorizing that plaintiffs who sought to use gun ranges were only harmed by the added expense of traveling outside the city to do so. The Seventh Circuit reversed. "This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption." *Ezell*, 651 F.3d at 697.

Invoking the rule of *Schad* and *Schneider*, the Seventh Circuit explained:

The same principle applies here. It's hard to imagine anyone suggesting that Chicago may prohibit the exercise of a free-speech or religious-liberty right within its borders on the rationale that those rights may be freely enjoyed in the suburbs. That sort of argument should be no less unimaginable in the Second Amendment context.

*Id.* Instead, the city was required to justify its restriction under "a more rigorous showing" than intermediate, "if not quite 'strict scrutiny,'" *Id.* at 708, something it could not do.

Neither can the Government here meet its burden, under strict or intermediate scrutiny, of justifying a stifling residential restriction of Second Amendment rights. Under strict scrutiny, the Government carries the burden of proving the law "furthers a compelling interest and is narrowly tailored to achieve that interest," *Citizens United* v. *FEC*, 130 S. Ct. 876, 898 (2010) (citation omitted), a burden that cannot be met where less restrictive alternatives are available. *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004). Intermediate scrutiny "requires the government to demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective." *NRA*, 700 F.3d at 195. "The regulation need not be the least restrictive means of serving the interest, but may not burden more [conduct] than is reasonably necessary." *Marzzarella*, 614 F.3d at 98.

It is unclear what is so compelling, or important, about ensuring that handgun transfers go through a local middleman who does absolutely nothing that the initial federal firearms licensee cannot do as well. The out-of-state dealer, and the local middleman, hold the same federal license, with identical responsibilities. Federal law already charges FFLs selling rifles and shotguns with adherence to the laws of other jurisdictions when selling firearms to out-of-state residents. If Mance can follow an out-of-state rifle law, he can follow an out-of-state handgun law. Courts are rightfully skeptical of state residency restrictions based on the concept that the people of one state cannot gain sufficient knowledge of laws or conditions in another state. Cf. *O'Reilly* v. *Bd. of Appeals*, 942 F.2d 281 (4th Cir. 1991) (non-resident taxi driver can prove familiarity with out-of-state geography). Attorneys, for example, are required to know and uphold the laws of the various jurisdictions in which they are barred, yet that does not allow

states to restrict bar membership to in-state residents. *Supreme Court of New Hampshire* v. *Piper*, 470 U.S. 274, 285 (1985).

The notion that local handgun laws are necessarily more complicated, to the point of being unknowable by out-of-state firearms dealers, is specious. Few laws have vexed courts as much as regulations seeking to ban particular rifles as "assault weapons." *See, e.g. Peoples Rights Org.* v. *City of Columbus*, 152 F.3d 522 (6th Cir. 1998) (striking down five definitions of "assault weapon" as unconstitutionally vague); *Springfield Armory* v. *City of Columbus*, 29 F.3d 250, 252 (6th Cir. 1994) (rifle "ordinance is fundamentally irrational and impossible to apply consistently by the buying public, the sportsman, the law enforcement officer, the prosecutor or the judge"); *Harrott* v. *County of Kings*, 25 Cal.4th 1138, 1153, 25 P.3d 649, 659 (2001) (adopting saving construction of California Assault Weapons Control Act provisions raising "serious and doubtful constitutional questions as applied to ordinary citizens"). And yet as a matter of federal law, licensed firearms dealers are entrusted to sell long arms in compliance with all state and local laws throughout the United States, to the residents of any American city.

In any event, many jurisdictions—including the one in which the Hansons reside—remove all hypothetical guesswork from handgun transactions by requiring police pre-approval of any handgun transfer. D.C. Code § 7-2502.06(a); *see also, e.g.,* Haw. Rev. Stat. § 134-2; Mich. Comp. Laws § 28.422(1); N.C. Gen. Stat. § 14-402(a). If the District has satisfied itself that an individual may acquire and bring home a handgun, following its famously rigorous handgun registration procedures, it should not matter—and to the District government, it no longer matters—whether a dealer delivers the handgun inside or outside the District. As the Government can accept Mance honoring an approved rifle registration certificate from the

32

District of Columbia's Metropolitan Police Department, it is illogical for it to resist allowing him to honor identical District Police certificates issued for handguns.

However compelling might be the Government's interests in assuring that handgun consumers comply with their local firearms laws, that interest is adequately satisfied in the same manner that the Government satisfies its interest in promoting compliance with local long gun laws: by mandating that licensed firearms dealers follow local laws. And the Government has no valid independent regulatory interest, compelling or otherwise, in assuring compliance with local firearms laws where the consumers' local authorities pre-approve handgun transactions.

Given licensed dealers' ability to follow the law, the feasability of adequate background check systems, and the existence of local pre-transfer approval procedures which the Government already accepts with respect to other firearms, prohibiting all interstate handgun transfers is obviously not a narrowly-tailored solution to any problem. To the extent the evasion of local handgun laws may be a problem, far less restrictive yet no less effective alternatives are already in place. Even if there is something about local handgun laws that make them inscrutable to out-of-state FFLs, in a manner different than long gun laws, the Government could at a minimum authorize interstate transfers to residents of localities, such as Washington, D.C., whose strict pre-transfer licensing requirements make circumvention impossible.

IV.  THE INTERSTATE HANDGUN TRANSFER BAN VIOLATES PLAINTIFFS' RIGHT TO
     EQUAL PROTECTION.

The Fifth Amendment's Due Process Clause has long been understood to bind the federal government to standards of equal protection. *Bolling* v. *Sharpe*, 347 U.S. 497, 499 (1954). "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth

33

Amendment." *Buckley* v. *Valeo*, 424 U.S. 1, 93 (1976) (citations omitted). Equal protection analysis demands that heightened scrutiny be applied in cases which burden fundamental rights or target suspect classes. *Romer* v. *Evans*, 517 U.S. 620, 621 (1996).

Plaintiffs do not contend that non-state residents constitute a suspect class for purposes of equal protection analysis. However, it is plainly clear that the interstate handgun transfer ban burdens the Second Amendment right to keep and bear arms. Responsible, law abiding Americans who are otherwise identically situated are classified differently in their exercise of the right to acquire a handgun only on account of their residence. And licensed gun dealers are unable to sell handguns to some customers solely on account of their location outside the putative customers' home state.

Plaintiffs acknowledge that equal protection analysis may not be reached where specific, substantive rights analysis is available. However, the Government takes the position that no substantive rights are implicated, which would leave equal protection principles in play. Even in the absence of a fundamental right or suspect class, the interstate handgun transfer ban fails rational basis review. It is not rational to prohibit a handgun transaction, on a non-circumvention rationale, when there are no local laws to circumvent because the transaction is fully legal in both the buyer and seller's home jurisdiction. It is also not rational to prohibit a handgun transaction, on a non-circumvention rationale, where the same FFL and the same consumer are allowed to engage in long gun transactions—both as a general matter, because there is no distinction between one's ability to understand and follow handgun, as opposed to long gun, law; and especially, where local laws treat handgun and long gun transactions identically.

Plaintiffs submit, preferring to err on the side of caution, that the irrational and arbitrary classifications detailed here would violate the Fifth Amendment's equal protection principles even were the Government correct (and it is not) about the absence of a fundamental right.

CONCLUSION

Plaintiffs' motion for summary judgment should be granted.

Dated: October 17, 2014                    Respectfully submitted,

Alan Gura (Va. Bar No. 68842)              William B. Mateja (Texas Bar No. 13185350)
Gura & Possessky, PLLC                     Michael D. Nammar (Texas Bar No. 24091685)
105 Oronoco Street, 305                    Fish & Richardson P.C.
Alexandria, VA 22314                       1717 Main Street, Suite 5000
703.835.9085/Fax 703.997.7665             Dallas, TX 75201
                                           214.747.5070/Fax 214.747.2091

By:   /s/ Alan Gura                        By:   /s/ William B. Mateja
      Alan Gura                                  William B. Mateja

35

Certificate of Service

On October 17, 2014, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) or the local rules

/s/ Alan Gura
Alan Gura