IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

_____

| | |
|---|---|
| FREDRIC RUSSEL MANCE, JR. *et al.*, | |
| VS. | Civil Action No. 4:14-CV-00539-O |
| ERIC HOLDER, ATTORNEY GENERAL OF THE UNITED STATES, and B. TODD JONES, DIRECTOR, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES | |

**BRIEF IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

**Table of Contents**

SUMMARY ......................................................................................................... 1

I.    The Court Should Dismiss Plaintiffs' Claims for Lack of Subject Matter
      Jurisdiction Because Plaintiffs Lack Standing to Sue.......................................... 2

      A.    The Hanson Plaintiffs Fail to Establish Causation or Redressability With
            Respect to the Only Cognizable Injury They Allege. ............................................. 3

            1.    The Hanson Plaintiffs Lack Causation as to the Only Cognizable Injury
                  They Allege............................................................................................... 4

            2.    The Hanson Plaintiffs Assert No Cognizable Injuries Other Than the
                  Transfer Fee Caused By an Independent Actor Not Before the Court. .... 10

            3.    The Hanson Plaintiffs Fail to Distinguish Case Law on Point Showing
                  That They Lack Standing.......................................................................... 11

            4.    The Hanson Plaintiffs Cannot Show That a Favorable Decision Is Likely
                  to Redress Any Alleged Injury-in-Fact..................................................... 14

      B.    Plaintiff Mance Has Not Suffered an Injury-in-Fact That Is Fairly
            Traceable to the Challenged Federal Laws........................................................... 16

            1.    Plaintiff Mance Asserts No Cognizable Injury-in-Fact Other Than the Lost
                  Sale to the Hanson Plaintiffs, Which Is Fairly Traceable to the Actions of
                  a Third Party Not Before the Court and to Plaintiffs' Decision Not to
                  Finalize the Sale....................................................................................... 17

            2.    Prudential Standing Requirements Bar Plaintiff Mance From Asserting the
                  Rights of Third Parties. ............................................................................ 19

      C.    Plaintiff CCRKBA Lacks Standing to Sue. ........................................................ 21

            1.    CCRKBA Members Who Wish to Buy Handguns from Dealers Located
                  Outside Their State of Residence Without Using an Intermediary Dealer
                  Lack Standing. .......................................................................................... 21

            2.    Licensed CCRKBA Members Who Wish to Sell Handguns to Buyers
                  Residing Outside the State Where Their Businesses Are Located Without
                  Using an Intermediary Dealer Also Lack Standing. ................................. 24

II.   The Challenged Laws Do Not Violate the Second Amendment. ...................................... 25

      A.    The Challenged Laws Do Not Burden Conduct Protected by the Second
            Amendment........................................................................................................... 25

1.      Plaintiffs Neither Cite Any Decisions Holding That the Second Amendment Includes an Unconditional Right to Buy or Sell Firearms, Nor Present Any Evidence That the Second Amendment Was Ever Understood to Protect Such a Right. .......................................................................... 27

2.      The Challenged Laws Fall Outside the Scope of the Second Amendment Because Laws Restricting the Acquisition, Possession, or Carrying of Firearms to State Residents Are Longstanding in American Law............ 35

B.      Because Any Burden Imposed by the Challenged Laws Is Minimal, No Heightened Scrutiny Is Warranted. ....................................................................... 39

C.      Even If Plaintiffs' Suit Implicates Their Second Amendment Rights, the Challenged Federal Laws Are Constitutional. ...................................................... 43

1.      The Court Should Apply No More Than Intermediate Scrutiny. ............. 43

2.      The Fit Between the Challenged Laws and the Important Government Objective of Ensuring Compliance With State Handgun Laws Is Reasonable. ........................................................................................... 46

III.    The Challenged Laws Do Not Violate the Equal Protection Component of the Due Process Clause. ............................................................................................................. 50

CONCLUSION ............................................................................................................. 50

## Table of Authorities

**FEDERAL CASES**

*Abbot Labs. v. Gardner*,
387 U.S. 136 (1967) ........................................................................................................ 18

*Allen v. Wright*,
468 U.S. 737 (1984) ........................................................................................................ 14

*Andrews v. State*,
50 Tenn. 165, 1871 WL 3579 (1871) ............................................................................ 31

*Ashwander v. TVA*,
297 U.S. 288 (1936) .................................................................................................. 28, 29

*Bridenbaugh v. Freeman-Wilson*,
227 F.3d 848 (7th Cir. 2000) ........................................................................................... 9

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ......................................................................................................... 8

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................................................................... 48

*Carey v. Population Services Int'l*,
431 U.S. 678 (1977) ............................................................................................. 4, 30, 31

*Christian Legal Soc'y v. Martinez*,
561 U.S. 661 (2010) ....................................................................................................... 41

*Clapper v. Amnesty International USA*,
133 S. Ct. 1138 (2013) ................................................................................................... 18

*Colorado Outfitters Ass'n v. Hickenlooper*,
__ F. Supp. 2d __, 2014 WL 3058518 (D. Colo. June 26, 2014) ................................. 17

*Common Cause v. Dep't of Energy*,
702 F.2d 245 (D.C. Cir. 1983) ....................................................................................... 23

*Cone Corp. v. Fla. Dep't of Transp.*,
921 F.2d 1190 (11th Cir. 1991) ..................................................................................... 17

*Cooksey v. Futrell*,
721 F.3d 226 (4th Cir. 2013) ........................................................................................... 8

*Crowell v. Benson*,
285 U.S. 22 (1932) .................................................................................................... 36, 43

*Cutrera v. Bd. of Supervisors of La. State Univ.*,
429 F.3d 108 (5th Cir. 2005) ......................................................................................... 16

*Dearth v. Holder*,
641 F.3d 499 (D.C. Cir. 2011) ..................................................................................... 5, 6

*Democratic Party v. Barbour*,
529 F.3d 538 (5th Cir. 2008) ........................................................................................... 2

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................................................ passim

*Doe v. Bolton*,
410 U.S. 179 (1973) ..................................................................................................... 4, 5

*Dominguez v. UAL Corp.*,
666 F.3d 1359 (D.C. Cir. 2012) ..................................................................................... 23

*Drake v. Filko,*
  724 F.3d 426 (3d Cir. 2013)……………………………………………………………...45
*Dronenburg v. Zech,*
  741 F.2d 1388 (D.C. Cir. 1984) ................................................................... 29
*Eisenstadt v. Baird,*
  405 U.S. 438 (1972)..................................................................................... 8
*Employment Div. v. Smith,*
  494 U.S. 872 (1990)..................................................................................... 41
*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ........................................................... 17, 18, 22
*Freeman v. Corzine,*
  629 F.3d 146 (3d Cir. 2010)......................................................................... 9
*Gonzales v. Carhart,*
  550 U.S. 124 (2007)..................................................................................... 41
*Griswold v. Connecticut,*
  381 U.S. 479 (1965)..................................................................................... 30
*Haile v. Town of Addison,*
  264 F. Supp. 2d 464 (N.D. Tex. 2003) ........................................................ 14
*Harold H. Huggins Realty, Inc. v. FNC, Inc.,*
  634 F.3d 787 (5th Cir. 2011) ....................................................................... 20
*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ....................................................... 26, 35, 39, 44
*Hightower v. City of Boston,*
  693 F.3d 61 (1st Cir. 2012)........................................................................... 45
*Human Life of Wash. Inc. v. Brumsickle,*
  624 F.3d 990 (9th Cir. 2010) ....................................................................... 9
*Illinois Ass'n of Firearms Retailers v. City of Chicago,*
  961 F. Supp. 2d 928 (N.D. Ill. 2014)................................................. 20, 31, 32
*Jackson v. City & Cnty. of San Francisco,*
  829 F. Supp. 2d 867 (N.D. Cal. 2011) ......................................................... 13
*Jackson Women's Health Org. v. Currier,*
  760 F.3d 448 (5th Cir. 2014) ....................................................................... 40
*Kachalsky v. Cacace,*
  817 F. Supp. 2d 235 (S.D.N.Y. 2011)................................................. 22, 45
*Kachalsky v. Cnty. of Westchester,*
  701 F.3d 81 (2d Cir. 2012)........................................................................... 23
*Kowalski v. Tesmer,*
  543 U.S. 125 (2004)..................................................................................... 19
*KVUE, Inc. v. Moore,*
  709 F.2d 922 (5th Cir. 1983) ....................................................................... 11
*Lane v. Holder,*
  703 F.3d 668 (4th Cir. 2012), ............................................................. passim
*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992)............................................................................. passim
*Margaret S. v. Edwards,*
  794 F.2d 994 (5th Cir. 1986) ....................................................................... 5

*Martin v. Harrington & Richardson, Inc.*,
  743 F.2d 1200 (7th Cir. 1984) .......................................................... 28
*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ............................................................ 7
*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)............................................................... 27, 28
*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007).......................................................................... 13
*Montana Shooting Sports Association v. Holder*,
  No. 09-147, 2010 WL 3926029 (D. Mont. Aug. 31, 2010)................................ 33, 34
*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013)................................................................ 8
*Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
  700 F.3d 185 (5th Cir. 2012),........................................................ passim
*Nat'l Rifle Ass'n, Inc. v. Reno*,
  216 F.3d 122 (D.C. Cir. 2005)............................................................ 46
*Nat'l Treasury Emps. Union v. U.S. Dep't of the Treasury*,
  25 F.3d 237 (5th Cir. 1994) .............................................................. 21
*Nordyke v. King*,
  644 F.3d 776 (9th Cir. 2011) ........................................................ 39, 40
*Nordyke v. King*,
  681 F.3d 1041(9th Cir. 2012)............................................................. 39
*Owen v. State*,
  31 Ala. 387 (1858) ...................................................................... 40
*Planned Parenthood Arizona, Inc. v. Humble*,
  753 F.3d 905 (9th Cir. 2014) ............................................................ 40
*Planned Parenthood of Se. Pennsylvania v. Casey,*
  505 U.S. 833 (1992)...................................................................... 40
*Powers v. Ohio*,
  499 U.S. 400 (1991)...................................................................... 19
*Reliable Consultants v. Earle*,
  517 F.3d 738 (5th Cir. 2008) ........................................................ 20, 30
*Richmond Newspapers v. Virginia*,
  448 U.S. 555 (1980)...................................................................... 29
*San Diego County Gun Rights Committee v. Reno*,
  98 F.3d 1121 (9th Cir. 1996) ..................................................... 12, 13, 23
*Silvester v. Harris*,
  __ F. Supp. 2d __, 2014 WL 4209563 (E.D. Cal. Aug. 25, 2014)......................... 31
*Simon v. E. Ky. Welfare Rts. Org.*,
  426 U.S. 26 (1976)....................................................................... 14
*Teixeira v. County of Alameda*,
  No. 12-3288, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013)................................ 34
*United States v. Booker*,
  644 F.3d 12 (1st Cir. 2011) ............................................................. 35
*United States v. Carter*,
  695 F.3d 690 (7th Cir. 2012) ............................................................ 48

*United States v. Chafin,*
   423 F. App'x 342 (4th Cir. 2011) ................................................................ 33
*United States v. Chester,*
   628 F.3d 673 (4th Cir. 2010) ..................................................................... 45
*United States v. Coil,*
   442 F.3d 912 (5th Cir. 2006) ..................................................................... 21
*United States v. Decastro,*
   682 F.3d 160 (2d Cir. 2012),.......................................................... 39, 41, 42
*United States v. King,*
   532 F.2d 505 (5th Cir. 1976) ................................................................ 32, 33
*United States v. Marzzarella,*
   595 F. Supp. 2d 596 (W.D. Pa. 2009) ....................................................... 39
*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010) ........................................................................ 40
*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) ................................................................ 35, 36
*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
   454 U.S. 464 (1982) .................................................................................. 19
*Vernonia Sch. Dist. 47J v. Acton,*
   515 U.S. 646 (1995) .................................................................................. 41
*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,*
   425 U.S. 748 (1976) .................................................................................... 7
*Waisbord v. United States,*
   183 F.2d 34 (5th Cir. 1950) ....................................................................... 32
*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) .................................................................................. 41
*Warth v. Seldin,*
   422 U.S. 490 (1975) .................................................................................. 19
*Washington v. Glucksberg,*
   521 U.S. 702 (1997) .................................................................................. 30
*Zablocki v. Redhail,*
   434 U.S. 374 (1978) .................................................................................. 41

## FEDERAL STATUTES

18 U.S.C. § 922(a)(1) ....................................................................................... 33
18 U.S.C. § 922(a)(3) ........................................................................... 3, 14, 41
18 U.S.C. § 922(b) ........................................................................................ 6, 17
18 U.S.C. § 922(b)(1) ....................................................................................... 38
18 U.S.C. § 922(b)(3) .............................................................................. passim
18 U.S.C. § 922(b)(3)(A) ................................................................................. 47
18 U.S.C. § 922(d)(3) ....................................................................................... 33
18 U.S.C. § 922(g)(1) ....................................................................................... 35
18 U.S.C. § 922(g)(4)..................................................................................... 36
Pub. L. No. 90-351, Title IV, § 901(a)(5)......................................................46
Pub. L. No. 103-159, § 103(b)........................................................................46

United States Constitution

U.S. Const. amend. II.................................................................................................... 27

## FEDERAL REGULATIONS

27 C.F.R. § 478.88 ........................................................................................................ 3

27 C.F.R. § 478.99 ...................................................................................................... 12

28 C.F.R. § 25.6(d) ..................................................................................................... 47

## LEGISLATIVE MATERIAL

S. Rep. No. 89-1866 (1966) …………..………………………………………...…46, 47, 48

H. Rep. No. 90-1577…………………... …………………………………………………..49

H. Rep. No. 99-495…………………………... …………………………………………50

## MISCELLANEOUS

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*,
    56 UCLA L. Rev. 1443 (2009) ................................................................................. 41

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*,
    60 Hastings L.J. 1371 (2009).................................................................................. 35

Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*,
    11 Tex. Rev. L. & Pol. 191 (2006) ......................................................................... 37

**SUMMARY**

In the years preceding enactment of the Gun Control Act of 1968, Congress found that concealable weapons (*i.e.*, handguns) presented a grave challenge for law enforcement. Congress was particularly concerned about the ease with which individuals could evade handgun laws in their own States simply by crossing State lines to procure handguns which they could not lawfully obtain in their home State. To help alleviate this problem and allow States to effectively control the traffic of handguns within their own borders, Congress enacted 18 U.S.C. § 922(b)(3) as part of a framework of federal laws regulating the interstate firearm market. Under Congress's regulatory framework, an eligible individual may purchase a handgun through an in-State federal firearms licensee (FFL) or obtain a handgun from an out-of-State source, by arranging for the handgun to be delivered to an in-State FFL, from whom the purchaser may retrieve the handgun directly. Contrary to Plaintiffs' repeated assertions, the challenged laws do not ban the interstate sale of handguns. Rather, interstate sales of handguns remain legal, provided that the purchaser takes delivery from a federally-licensed dealer in his or her home State. This is a *de minimis* condition on the commercial sale of arms, a category of regulation that the Supreme Court has deemed "presumptively lawful." At bottom, Plaintiffs' motion for summary judgment is premised on fundamentally inaccurate characterization of the laws they challenge.

This Court need not even reach the question of how to review the challenged laws on the merits, however, because Plaintiffs have failed to allege an injury-in-fact that is traceable to the challenged laws. Plaintiffs have offered this Court no sound basis for departing from the reasoning of the Fourth Circuit, which dismissed a nearly-identical challenge to the same laws for lack of standing. The addition of an FFL as a named Plaintiff does not confer standing

1

because his alleged foregone sales are the direct result of Plaintiffs' own decisions and/or entirely speculative.

Even if Plaintiffs' claims were not precluded on jurisdictional grounds, they fail as a matter of law. The challenged laws impose no substantial burden on a constitutionally-protected right, as the Second Circuit recently held – and, again, Plaintiffs have provided this Court with no sound basis for departing from that Court's reasoning. But even if the Court were to proceed to apply heightened constitutional scrutiny, the laws easily pass muster. Plaintiffs offer no valid basis for applying strict scrutiny in contrast to the approach of the Fifth Circuit in a similar case, and, because the laws are substantially related to the important government purpose of assisting States in enforcing their own handgun laws, they readily survive intermediate scrutiny. Accordingly, consistent with this wealth of case law, the Court should dismiss this case or enter summary judgment in favor of Defendants.

I.      **The Court Should Dismiss Plaintiffs' Claims for Lack of Subject Matter Jurisdiction Because Plaintiffs Lack Standing to Sue.**

To establish standing, "a plaintiff must show: (1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 544 (5th Cir. 2008) (citation omitted). An injury-in-fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal punctuation omitted). Additionally, "a causal connection between the injury and the conduct complained of" must exist. *Id.* That is, the injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (internal punctuation omitted).

2

Last, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal punctuation omitted).

Defendants' opening brief explained that Plaintiffs have failed to show that they have standing to sue. Br. Supp. Def. Mot. to Dismiss or, in the Alternative, for Summ. J. ("Def. Mot.") at 8-22 [ECF No. 16]. Though Plaintiffs have challenged this conclusion, their arguments lack persuasive force. Mem. Opp. Def. Mot. ("Pl. Opp.") at 1-21 [ECF No. 24].

**A.     The Hanson Plaintiffs Fail to Establish Causation or Redressability With Respect to the Only Cognizable Injury They Allege.**

As Defendants' opening brief noted, the only cognizable injury alleged by the Hanson Plaintiffs – namely, a $125 transfer fee – results from the independent action of a firearms dealer not before the Court, and not from any action by Defendants. Def. Mot. at 9-13. Furthermore, the Hanson Plaintiffs lack redressability because 18 U.S.C. § 922(a)(3) – a provision not challenged by Plaintiffs – would independently prohibit them from purchasing a handgun from Plaintiff Mance without the involvement of a licensed District of Columbia FFL. *Id.* at 13-14. Plaintiffs' response to these conclusions fails to establish the Hansons' standing. Pl. Opp. at 5-9, 12-19.

The Hanson Plaintiffs allege that, in the District of Columbia, only one FFL, Charles Sykes, is currently in the business of transferring handguns purchased at retail to District residents, and that they have suffered injury because Mr. Sykes "charges $125 per transfer for handguns received from other dealers." First Am. Compl. ¶ 31 [ECF No. 4]. However, as Defendants' opening brief showed, this additional cost results from a fee independently imposed by Mr. Sykes – a third party not before the Court – and is not mandated by Section 922(b)(3). *See* Def. Mot. at 10-13. Neither Section 922(b)(3) nor 27 C.F.R. § 478.88 directs FFLs to charge transfer fees. Because it is well established that the existence of a third party not before the

3

Court breaks the chain of causation, the Hanson Plaintiffs fail to establish causation. *See id.* at

10-12 (citing cases). Indeed, as Defendants have explained, the Fourth Circuit recently

dismissed for lack of standing, a complaint alleging facts that are virtually indistinguishable from

those asserted by the Hanson Plaintiffs. *Id.* at 10-11 (citing *Lane v. Holder*, 703 F.3d 668, 673-

74 (4th Cir. 2012), *cert. denied*, 134 S. Ct. 1273 (2014)).

In response, Plaintiffs argue (1) they have cited case law showing that the Hanson

Plaintiffs have standing, (2) the Hanson Plaintiffs have asserted cognizable injuries other than the

$125 transfer fee, and (3) the case law cited by Defendants is inapposite. Pl. Opp. at 5-9, 12-19.

None of these arguments has merit.

> ## 1. The Hanson Plaintiffs Lack Causation as to the Only Cognizable Injury They Allege.

Plaintiffs have misplaced their reliance on cases that (they contend) support their

assertion that the Hanson Plaintiffs have standing to sue. Pl. Opp. at 5-9, 12-13, 15-17. For

example, neither *Carey v. Population Services International*, 431 U.S. 678 (1977), nor *Doe v.*

*Bolton*, 410 U.S. 179 (1973), is apposite here, as the Fourth Circuit found in rejecting plaintiffs'

identical standing argument in *Lane*. The excerpt from *Carey* relied on by Plaintiffs to support

the Hanson Plaintiffs' standing is taken from the section of that decision exploring the merits of

the plaintiffs' claim, rather than plaintiffs' standing to sue. In *Carey*, the Supreme Court decided

that a mail-order retailer had standing, on economic grounds, to challenge a statute barring it

from selling contraceptives to individuals over 16. *See* 431 U.S. at 682-83. Only then did the

Court move on to discuss the merits of the retailer's claim – the portion of the opinion quoted by

Plaintiffs to support their standing argument. *See* Pl. Opp. at 5, 8 (quoting and citing *Carey*, 431

U.S. at 689); *see also Lane*, 703 F.3d at 672 (distinguishing *Carey* on ground that "[t]he

plaintiffs in this case are in a fundamentally different situation, as the laws and regulations they

challenge do not apply to them but rather to the FFLs from whom they would buy handguns.  It is the absence of a direct effect that distinguishes the facts before us from those in decisions on which plaintiffs seek to rely.").  And in *Doe*, a pregnant woman challenging a state criminal law had standing to sue, having established that, "[b]ecause her application [for an abortion] was denied, she was forced either to relinquish her right to decide when and how many children she will bear or to seek an abortion that was illegal under the [challenged law]."  410 U.S. at 185-86 (internal quotation marks omitted).  The Hanson Plaintiffs have not established that they face any comparable choice.  The Fourth Circuit specifically distinguished *Doe* in *Lane*.  703 F.3d at 673 n.3 (explaining that *Doe*, "which the plaintiffs cite in arguing that a restriction in distribution channels constitutes an injury in fact, is distinguishable" because "the challenged law in *Doe* prevented the plaintiff from exercising a constitutional right").  In any event, the Fifth Circuit has recognized that, at least in the 1970s, the Supreme Court had "visibly relaxed its traditional standing principles in deciding abortion cases," *Margaret S. v. Edwards*, 794 F.2d 994, 997 (5th Cir. 1986) (citing, *inter alia*, *Doe*, 410 U.S. at 187-89), making the applicability of *Doe* beyond its specific constitutional context problematic at best.

Additionally, neither *National Rifle Association ("NRA") v. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")*, 700 F.3d 185 (5th Cir. 2012), *cert. denied*, 134 S. Ct. 1364 (2014), nor *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011), supports the Hanson Plaintiffs' contention that they have standing.  Pl. Opp. at 3-4, 6-7, 8, 12, 13.  "Only injury-in-fact [was] at issue" in *NRA*'s discussion of standing, 700 F.3d at 191, and the injury alleged by the individual plaintiffs – 18-to-20 year olds – was the complete inability to purchase handguns from any FFL in the United States.  *See id.* at 191-92 ("[B]y prohibiting FFLs from selling handguns to 18-to-20 year-olds, the [challenged] laws cause those persons a concrete, particularized injury – i.e.,

the injury of not being able to purchase handguns from FFLs.").  But the Hanson Plaintiffs – like

the plaintiffs in *Lane*, who asserted virtually identical claims – "do not allege such an injury."

*Lane*, 703 F.3d at 673.  Unlike the *NRA* plaintiffs, the Hanson Plaintiffs can purchase handguns

from FFLs.  They can purchase handguns from Plaintiff Mance or any other FFL doing business

outside their State of residence by arranging for the handguns to be delivered to a Washington,

D.C. FFL, from whom they may retrieve the handguns directly.  *See* 18 U.S.C. § 922(b)(3).

Thus, Plaintiffs' characterization of their injury as the same as that alleged by the plaintiffs in

*NRA – viz*., "the injury of not being able to purchase handguns from FFLs," is simply not correct.

Pl. Opp. at 13 (quoting *NRA*, 700 F.3d at 192).[1]

Similarly, the injury alleged by the individual plaintiff in *Dearth*, a U.S. citizen residing

in Canada, was the "deni[al] [of] the ability to purchase a firearm" from any FFL in the United

States.  641 F.3d at 502.  The Hanson Plaintiffs do not allege that they are unable to purchase any

firearm from any FFL.  *See Lane*, 703 F.3d at 674 n.5 ("the plaintiffs' attempts to analyze this

case to *Dearth* . . . are unavailing" because "[i]n that case, the law at issue precluded the plaintiff

from purchasing a firearm altogether").  Unlike the individual plaintiff in *Dearth*, the Hanson

Plaintiffs may purchase long guns directly from any FFL in the United States, provided they

meet the requirements of Section 922(b)(3)(A), and may purchase handguns, provided that the

---

[1] Similarly, to the extent that Plaintiffs rely on the unpublished decision in *Jennings v. ATF*, No.
5:10-cv-00140-C (N.D. Tex. Sept. 29, 2011), to support the contention that the Hanson Plaintiffs
have standing to sue, that reliance is misplaced.  *See* Pl. Opp. at 6, 10, 19.  Like *NRA*, the Fifth
Circuit decision that affirmed it, *Jennings* premised its conclusion that the individual plaintiffs
had suffered injury-in-fact on the fact that they could not buy any handgun from any FFL.  *See
Jennings*, slip op. at 8 ("The FFLs from whom [two plaintiffs] would purchase their handguns
have refused to sell them handguns in the past because they are under 21.").  By contrast, the
Hanson Plaintiffs may buy handguns from any FFL in the country, provided that the handguns
are delivered to a Washington, D.C. FFL, from whom the Hanson Plaintiffs may retrieve the
handguns directly.

seller delivers the handguns to a Washington D.C. FFL.  Plaintiffs are thus simply incorrect when they claim that for purposes of standing, "[t]he consumer Plaintiffs here . . . are identically situated to the *NRA* and *Dearth* plaintiffs."  Pl. Opp. at 7.  *See Lane*, 703 F.3d at 673 & n.3 (distinguishing *Dearth*, which found standing "where a regulation prevented plaintiff from legally obtaining a firearm in the United States at all" from case challenging the same provisions challenged here, which "do not prevent [plaintiffs] from exercising their Second Amendment right to bear arms" and finding no injury-in-fact).  Moreover, because the Hanson Plaintiffs do not assert the same injury alleged by the plaintiff in *Dearth*, whether or not the injury at issue there was traceable to the actions of the defendants is irrelevant here.  *See also Lane*, 703 F.3d at 674 n.5 ("The standing question in *Dearth* was whether the plaintiff alleged an injury in fact; traceability was not an issue.").  Thus, neither *NRA* nor *Dearth* supports the Hanson Plaintiffs' contention that they have sufficiently alleged an injury-in-fact.[2]

Nor does *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748 (1976), support the premise that the Hanson Plaintiffs have standing to sue.  Pl. Opp. at 6, 9.  In *Virginia Pharmacy*, prescription drug consumers were permitted to challenge, under the First Amendment, a statute prohibiting pharmacists from advertising prescription drug prices, on the grounds that there exists a "First Amendment right to receive information and ideas, and that freedom of speech necessarily protects the right to receive."  425 U.S. at 757 (citations and

---

[2] It is not clear why Plaintiffs believe that *Maya v. Centex Corp.*, 658 F.3d 1060 (9th Cir. 2011), advances their contention that the Hanson Plaintiffs have standing.  Pl. Opp. at 7-8.  Plaintiffs cite this case to support their assertion that "if the imposition of additional costs were the only injury sustained by handgun consumers, that would be injury enough for Article III purposes." *Id.* (citing *Maya*, 658 F.3d at 1069).  But Defendants do not dispute that an alleged imposition of additional costs constitutes a cognizable injury; rather, as Defendants have explained, even if the Hanson Plaintiffs have sustained such an injury, that injury is traceable to a third party not before this Court (Mr. Sykes), and is not likely to be redressed by a favorable ruling.  *See* Def. Mot. at 9-14.

internal punctuation omitted).  However, *Virginia Pharmacy* – like *Carey* and *Doe* – predates the

Supreme Court's modern standing doctrine, announced in cases like *Lujan*, in which the

Supreme Court held that "when the plaintiff is not himself the object of the government action or

inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult'

to establish." *Lujan*, 504 U.S. at 562.  In any event, the Supreme Court has acknowledged that

standing requirements – including the prudential requirement that a litigant assert its own rights

rather than those alleged by third parties – have typically been relaxed when First Amendment

claims are asserted, including the requirement that a litigant may not ordinarily assert the rights

of third parties.  *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("[This] Court has altered

its traditional rules of standing to permit – in the First Amendment area – attacks on overly broad

statutes with no requirement that the person making the attack demonstrate that his own conduct

could not be regulated by a statute drawn with the requisite narrow specificity.  Litigants,

therefore, are permitted to challenge a statute not because their own rights of free expression are

violated, but because of a judicial prediction or assumption that the statute's very existence may

cause others not before the court to refrain from constitutionally protected speech or

expression.") (citation and internal punctuation omitted); *Eisenstadt v. Baird*, 405 U.S. 438, 445

n.5 (1972) ("Indeed, in First Amendment cases we have relaxed our rules of standing without

regard to the relationship between the litigant and those whose rights he seeks to assert precisely

because application of those rules would have an intolerable, inhibitory effect on freedom of

speech.") (citing cases).[3]  Applying these relaxed standards outside the First Amendment context

would thus be inappropriate.[4]

---

[3] *See also, e.g.*, *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013) ("Despite the language of *Lujan* and similar cases, however, we assess pre-enforcement First Amendment claims . . . under somewhat relaxed standing and ripeness rules."); *Cooksey v.*

Finally, neither *Freeman v. Corzine*, 629 F.3d 146 (3d Cir. 2010), nor *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848 (7th Cir. 2000), establishes that the Hanson Plaintiffs have standing to sue.  Pl. Opp. at 9.  Those two cases "found standing for wine consumers prevented from acquiring wine directly from out-of-state wine sellers as a result of market regulations." *Lane*, 703 F.3d at 672 (citing *Freeman*, 629 F.3d at 154, *Bridenbaugh*, 227 F.3d at 849-50).  But as the Fourth Circuit has explained, "[t]he plaintiffs in those cases alleged that they were unable to acquire the wines they wished to purchase through interstate commerce," whereas here, because the Hanson Plaintiffs "are not prevented from obtaining the handguns they desire," they fail to allege an injury-in-fact.  *Id.* at 672-73.  The consumer plaintiffs in *Freeman* and *Bridenbaugh* were prevented from obtaining the product they sought (there, particular bottles of wine).  *Freeman*, 629 F.3d at 154-55 (noting that plaintiffs were "directly constrained" by the challenged provisions); *Bridenbaugh*, 227 F.3d at 850 (noting that plaintiffs' claim "is direct rather than derivative" because they were prevented from purchasing wines from out-of-state vintners).  Here, as in *Lane*, because the Hanson Plaintiffs "are not prevented from obtaining the handguns they desire," these cases do not support the Hanson Plaintiffs' assertion of Article III standing.

In short, none of the case law cited by Plaintiffs demonstrates that the Hanson Plaintiffs have standing to sue.

---

*Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) ("The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact."); *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1000 (9th Cir. 2010) ("[W]hen a challenged statute risks chilling the exercise of First Amendment rights, the Supreme Court has dispensed with rigid standing requirements[.]" (citation and internal punctuation omitted)).

[4] Moreover, the Fifth Circuit's citation of *Virginia Pharmacy* in *NRA* does not support standing here because, as explained above, the injury asserted by plaintiffs in *NRA* is not the same injury as that alleged by the Hanson Plaintiffs.

**2.  The Hanson Plaintiffs Assert No Cognizable Injuries Other Than the Transfer Fee Caused By an Independent Actor Not Before the Court.**

As Defendants have explained, the Hanson Plaintiffs fail to allege any cognizable Article III injury apart from the transfer fee that is traceable to the actions of an independent third party not before the Court.  Def. Mot. at 9-13.  Though Plaintiffs challenge this conclusion, they fail to present concrete facts sufficiently alleging any other Article III injury.  Pl. Opp. at 8-9.  First, to the extent that the Hanson Plaintiffs try to assert standing by alleging that the challenged laws purportedly limit their choices as consumers, harm market competition, and raise prices, *id.* at 8, that attempt fails because such claims are too speculative and lack the specificity required to constitute injury in fact, as explained in Defendants' opening brief.  *See* Def. Mot. at 19-20. Second, to the extent that the Hanson Plaintiffs allege injury in the form of "frustrated sales" resulting from their own decisions not to purchase handguns from dealers outside of Washington, D.C. because of the existence of the challenged laws, Pl. Opp. at 8, any such allegedly frustrated sales are traceable to the Hanson Plaintiffs' alleged decisions not to engage in these sales, not to Defendants.  *See* Def. Mot. at 18-19 (citing cases).  Notably, Plaintiffs' opposition brief fails to discuss the relevant case law cited by Defendants showing that these other theories on which the Hanson Plaintiffs attempt to premise standing are meritless.

Third, to the extent that the Hanson Plaintiffs allege a threat of "prosecut[ion] and incarcerat[ion] . . . for violating" the challenged laws as grounds for finding standing, Pl. Opp. at 13, that attempt fails.  The Hanson Plaintiffs fail to satisfy the standing requirements for pre-enforcement review of Section 922(b)(3) because they do not allege that they have any actual, concrete plans to violate the law.  *See Lujan*, 504 U.S. at 564 ("'[S]ome day' intentions – without any description of concrete plans, or indeed any specification of *when* the someday will be – do not support a finding of the 'actual or imminent' injury that our cases require.") (emphasis in

original); *KVUE, Inc. v. Moore*, 709 F.2d 922, 928 (5th Cir. 1983) (a plaintiff cannot "challenge

the constitutionality of a state criminal statute merely because he desires to wipe it off the books

or even because he may some day wish to act in a fashion that violates it"); Def. Mot. at 16-17

(citing cases).  Moreover, Section 922(b)(3) imposes criminal penalties only on an FFL who

"sell[s] or deliver[s]" firearms to a person not residing in the State where the FFL's place of

business is located.  18 U.S.C. § 922(b)(3); *see also Lane*, 703 F.3d at 674 n.5 ("The plaintiffs

aver that if they take possession of handguns in [their State of residence], they will be arrested

and prosecuted.  Whether or not this is true, the law prohibits FFLs from conveying handguns to

the plaintiffs in [that State] in the first place.").  In any event, it is not accurate for Plaintiffs to

represent that the only reason that the Hanson Plaintiffs are allegedly "foregoing their purchase

from Mance" is "because they do not want the Defendants to put them in jail."  Pl. Opp. at 13.

In fact, the declarations filed by the Hanson Plaintiffs both state, in relevant part: "Rather than

violate the law, *or have the handguns shipped at my expense for transfer, again at my expense,*

*through a District of Columbia-based federal firearms licensee*, Mance and I *agreed to refrain*

from completing any handgun transfers. . ."  Decl. of Andrew Hanson ¶ 10 (App. 5) ("A. Hanson

Decl."); Decl. of Tracey Ambeau Hanson ¶ 10 (App. 8) ("T. Hanson Decl.") (emphasis added).

Thus, the Hanson Plaintiffs have failed to assert any cognizable injury-in-fact, other than the

transfer fee caused by an independent actor (Mr. Sykes) not before the Court.

###           3.        The Hanson Plaintiffs Fail to Distinguish Case Law on Point Showing That They Lack Standing.

Plaintiffs fall short in their attempt to cast doubt on decisions cited by Defendants

demonstrating that the Hanson Plaintiffs lack standing.  *See* Pl. Opp. at 13-19.  Initially, the

Fourth Circuit's decision in *Lane* is directly on point because the Hanson Plaintiffs, like the

plaintiffs in *Lane*, are "residents of Washington, D.C. who wish to acquire handguns from other states," and who are challenging the constitutionality of Section 922(b)(3) and 27 C.F.R. § 478.99. *Lane*, 703 F.3d at 670. Furthermore, Plaintiffs' contention that *Lane* "is flatly inconsistent with *NRA* as to standing," Pl. Opp. at 14, is incorrect because, as explained above, the plaintiffs in *Lane* – like the Hanson Plaintiffs – did not assert the same injury alleged by the *NRA* plaintiffs. *See supra* I.A.1. *NRA* found standing to exist because the plaintiffs alleged "the injury of not being able to purchase handguns from FFLs." *NRA*, 700 F.3d at 192. And *Lane* expressly distinguished the factual circumstances before it as "differ[ing] from those in which courts have found standing for plaintiffs prevented outright from obtaining or possessing firearms." *Lane*, 703 F.3d at 673. The plaintiffs in *Lane* – like the Hanson Plaintiffs – "do not allege such an injury" because they can purchase handguns from FFLs.[5] *Lane* is thus on point here, both factually and legally, and demonstrates that the Hanson Plaintiffs lack standing to sue.

No more persuasive is Plaintiffs' attempt to distinguish *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), which held that the plaintiffs lacked standing to claim that a federal law that banned certain firearms (but "grandfathered" in others) purportedly caused the price of banned devices and grandfathered arms to increase, thus violating the plaintiffs' constitutional rights. In that case, the court explained, a "fatal flaw with plaintiffs' economic injury theory is that it is third-party weapon dealers and manufacturers – not the government defendants – who have raised the prices of assault weapons." *Id.* at 1130. Thus, the challenged law did not "direct manufacturers or dealers to raise the price of regulated

---

[5] Nor, contrary to Plaintiffs' assertion, did *Lane* misread the D.C. Circuit's decision in *Dearth*. Pl. Opp. at 14 n.4. Rather, the Fourth Circuit accurately described *Dearth* as "finding standing where a regulation prevented plaintiff from legally obtaining a firearm in the United States at all." *Lane*, 703 F.3d at 673.

weapons," and therefore the plaintiffs' alleged injury "does not satisfy the requirements of Article III because it is 'th[e] result [of] the independent action of some third party not before the court.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). As Defendants' opening brief made clear, *San Diego* recognized that the independent decisions of gun dealers broke the chain of causation between the alleged injury and the challenged federal law, demonstrating the flaw in the Hanson Plaintiffs' causation argument.

In response, Plaintiffs mistakenly claim that *San Diego* is not relevant here because of two later Supreme Court cases, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007), and *District of Columbia v. Heller*, 554 U.S. 570 (2008). Pl. Opp. at 15-17. *MedImmune* is arguably inconsistent with one aspect of *San Diego* – namely, its analysis of pre-enforcement standing. *See Jackson v. City & Cnty. of San Francisco*, 829 F. Supp. 2d 867, 871 (N.D. Cal. 2011) (in light of *MedImmune*, questioning the *San Diego* court's conclusion that the plaintiffs had "failed to show the high degree of immediacy that is necessary for standing under these circumstances" because the "acts necessary to make plaintiffs' injury – prosecution under the challenged statute – materialize are almost entirely within plaintiffs' own control"). But the point of law for which Defendants cited *San Diego* was its analysis of causation, not its discussion of pre-enforcement standing, and *MedImmune* does not affect the continued viability of *San Diego*'s causation analysis.[6] Additionally, as Defendants' opening brief explained, the Ninth Circuit's conclusion that the plaintiffs' alleged economic injuries were not "fairly traceable" to the challenged federal

---

[6] Nor does *MedImmune* suggest that the Hanson Plaintiffs have standing to bring a pre-enforcement challenge to Section 922(b)(3). As explained above, Section 922(b)(3) imposes criminal penalties only on an FFL who "sell[s] or deliver[s]" firearms to a person not residing in the State where the FFL's place of business is located. 18 U.S.C. § 922(b)(3); *see also Lane*, 703 F.3d at 674 n.5 ("The plaintiffs aver that if they take possession of handguns in [their State of residence], they will be arrested and prosecuted. Whether or not this is true, the law prohibits FFLs from conveying the handguns to the plaintiffs in [that State] in the first place.").

law, 98 F.3d at 1130, is not affected by *Heller*'s recognition that the Second Amendment protects "an individual right to keep and bear arms."  Def. Mot. at 11 n.4 (quoting *Heller*, 554 U.S. at 595).  Moreover, even if, as Plaintiffs argue, *San Diego*'s analysis of economic injury and causation might apply only to Commerce Clause claims, and not Second Amendment claims – a point that Defendants do not concede – the conclusion that the Hanson Plaintiffs have failed to establish causation because of the independent actions of a third party rests on more case law than just *San Diego*.  *See* Def. Mot. at 10 (citing, *inter alia*, *Allen v. Wright*, 468 U.S. 737, 759 (1984)), *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26 (1976)), *id.* at 13-14 (citing additional cases); *see also Haile v. Town of Addison*, 264 F. Supp. 2d 464, 465-67 (N.D. Tex. 2003) (airplane owner lacked standing to challenge fee assessed against fuel permit holders, having failed to demonstrate that his alleged injury – higher fuel prices – was not the result of the independent action of third-party permit holders not before the Court).

In short, Plaintiffs fail to distinguish case law showing that the Hanson Plaintiffs lack standing.

### 4. The Hanson Plaintiffs Cannot Show That a Favorable Decision Is Likely to Redress Any Alleged Injury-in-Fact.

To satisfy the redressability element of standing, a plaintiff must show that it is "likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (internal punctuation omitted).  Defendants' opening brief explained that the Hanson Plaintiffs fail to make such a showing because a federal statute not challenged by Plaintiffs – 18 U.S.C. § 922(a)(3) – prohibits them from purchasing handguns from Plaintiff Mance and transporting them to their residence in Washington, D.C.  Def. Mot. at 13-14. Plaintiffs' response to this conclusion, Pl. Opp. at 17-19, is not persuasive.  Though it is correct that Section 922(a)(3) states that it "shall not apply to the transportation or receipt of a firearm

14

obtained in conformity with [18 U.S.C. § 922(b)(3)]," *see* Pl. Opp. at 17-18, Plaintiffs fail to explain the relevance of this exception. Section 922(b)(3) sets forth two conditions under which a person not residing in the State where a FFL's business is located may receive a firearm from that FFL: (1) the sale or delivery of a rifle or shotgun, provided that the transferor and transferee meet in person, and the sale, delivery, and receipt fully comply with the law of both States, or (2) the loan or rental of a firearm for temporary use for lawful sporting purposes. 18 U.S.C. § 922(b)(3). But the Hanson Plaintiffs neither allege (i) that they seek to purchase a rifle or shotgun from Plaintiff Mance nor (ii) that they seek to rent a firearm from him for lawful sporting purposes. And because the Hanson Plaintiffs fail to allege that they would fall within these exceptions under which Section 922(a)(3) "shall not apply," that section applies to them, and prohibits them from "transport[ing] into or receiv[ing] in" their State of residence "any firearm purchased or otherwise obtained by" them "outside that State."

Additionally, none of Plaintiffs' four arguments remedy the situation. Pl. Opp. at 18-19. First, Plaintiffs cite no authority (and Defendants are aware of none) to support the proposition that the Court may simply "extend[] [an] injunction" to prohibit the enforcement of a federal statute neither challenged nor mentioned in a complaint. *Id.* at 18. Second, the Prayer for Relief portion of Plaintiffs' complaint does not alter the fact that the Hanson Plaintiffs fail to allege that they wish to purchase a rifle or shotgun from Plaintiff Mance, or that they wish to rent a firearm for him for lawful sporting purposes. *See id.* at 18-19. Because Section 922(b)(3) prohibits persons other than FFLs from transporting (or receiving) a firearm obtained outside their State of residence into their State of residence, except for these two exceptions, nothing in the Prayer for Relief allows the Hanson Plaintiffs to "transport[] or recei[ve] [a] firearm . . . in conformity with" Section 922(b)(3). Third, while cases cited by Plaintiffs might support the general

principle that in some circumstances, a court need not decide whether one or more plaintiffs has standing if another plaintiff has standing, *id.* at 19, none of these cited cases involved a situation where (as here) another provision of law not challenged in the case would prevent a favorable ruling from redressing one or more plaintiffs' alleged injuries. In any event, as explained below, the other plaintiffs lack standing. *See infra* I.B; I.C. Fourth, a claim "which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). Thus, the Hanson Plaintiffs fail to satisfy the redressability element of standing.

In sum, the Hanson Plaintiffs fail to establish causation or redressability with respect to the only cognizable Article III injury they allege (namely, the transfer fee resulting from the independent action of Mr. Sykes, a party not before the Court). The Court should thus dismiss the Hanson Plaintiffs' claims for lack of subject matter jurisdiction.

### B. Plaintiff Mance Has Not Suffered an Injury-in-Fact That Is Fairly Traceable to the Challenged Federal Laws.

Though Plaintiffs allege that the Hanson Plaintiffs "each identified a handgun in [Plaintiff] Mance's inventory" that they wished to buy, Plaintiff Mance alleges that he "agreed to refrain from completing any handgun transfers" to the Hanson Plaintiffs rather than "hav[ing] the handguns shipped at their expense for transfer, at their expense, through [dealer Charles] Sykes." First Am. Compl. ¶¶ 28, 32. Thus, any allegation that Plaintiff Mance suffered injury-in-fact because of a lost sale is directly traceable to the independent decision of Mr. Sykes, a firearms dealer, to impose a fee to transfer handguns, and Plaintiffs' decision to avoid this fee, and thus not to consummate the sale. The injury is not traceable to Defendants. *See* Decl. of Fredric Russell Mance, Jr. ¶ 9 (App. 2) ("Rather than violate the law, *or have the handguns shipped at their expense for transfer, at their expense, through a District of Columbia-based [FFL],* the

16

Hansons and I *agreed to refrain* from completing any handgun transfers. . .") (emphasis added). Consequently, to the extent that Plaintiff Mance alleges that this lost sale constitutes an injury-in-fact, he fails to satisfy the causation element of standing. *See* Def. Mot. at 9-13, 14.[7]

In response, Plaintiffs argue (i) that Plaintiff Mance asserts another cognizable injury-in-fact, and (ii) that Plaintiff Mance may assert the claims of third parties (the Hanson Plaintiffs). Pl. Opp. at 10-11, 14-15.  Neither argument has merit.

> **1.    Plaintiff Mance Asserts No Cognizable Injury-in-Fact Other Than the Lost Sale to the Hanson Plaintiffs, Which Is Fairly Traceable to the Actions of a Third Party Not Before the Court and to Plaintiffs' Decision Not to Finalize the Sale.**

Plaintiffs assert that Plaintiff Mance has alleged another cognizable injury, in that "[b]arring a dealer from selling an item to a consumer" is an injury-in-fact.  Pl. Opp. at 10.  Even if correct, this statement is irrelevant because the challenged laws do not prohibit Plaintiff Mance from selling any item to any consumer.  Plaintiff Mance may sell handguns to the Hanson Plaintiffs – or any person residing outside of Texas – by arranging for the handguns to be delivered to an FFL in the buyer's State of residence, from whom the buyer may obtain the handguns directly.  *See* 18 U.S.C. § 922(b)(3).  Thus, Plaintiff Mance cannot assert an injury-in-fact like the firing-range designer in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), who challenged a law "prohibit[ing] all firing ranges in the [C]ity [of Chicago]," *id.* at 690.  Plaintiff Mance also cannot assert as an injury-in fact that there is a "flat-out ban on FFLs selling

---

[7] As an initial matter, as Defendants' opening brief noted, at least one court has expressed "some doubt" that a firearms seller "can have standing to bring a Second Amendment challenge."  *See* Def. Mot. at 14 n.6 (quoting *Colo. Outfitters Ass'n v. Hickenlooper*, __ F. Supp. 2d __, 2014 WL 3058518, at *8 (D. Colo. June 26, 2014)); *see also Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1204 (11th Cir. 1991) ("If the plaintiff is prosecuting a constitutional claim, moreover, the injury[-in-fact] must be the deprivation of a constitutional right.").  Plaintiffs' sole response is that such an argument "goes to the merits, not to standing," Pl. Opp. at 10, but Plaintiffs fail to cite any authority to counter *Colorado Outfitters* or *Cone Corporation*.

handguns to certain people," Pl. Opp. at 10 n.2, because the challenged laws do not ban Plaintiff Mance from selling handguns to any consumer.  This distinguishes the present case from *Jennings*, in which FFLs could not sell handguns to 18-to-20 year olds.  *See supra* n.1. Additionally, Plaintiffs' citation to *NRA* to support their contention that Plaintiff Mance has alleged a cognizable injury, *id.*, is puzzling because no FFLs were named plaintiffs in *NRA*. Indeed, the Fifth Circuit in that case – after concluding that 18-to-20 year olds prohibited from buying handguns from FFLs had sufficiently alleged injury-in-fact – expressly declined to decide whether the NRA had standing to assert claims on behalf of its FFL members.  *See* 700 F.3d at 192 ("Having established [an 18-to-20 year old's] standing and the NRA's associational standing on behalf of its 18-to-20-year-old[] members, we need not discuss the NRA's associational standing on behalf of its FFL members.").

Nor has Plaintiff Mance alleged any other cognizable injury-in-fact.  Though Plaintiff Mance alleges that if not for Section 922(b)(3), he would profit from selling handguns to (unspecified) consumers residing outside of Texas, First Am. Compl. ¶¶ 24-25, he fails to allege an injury that is "actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal punctuation omitted), or "certainly impending," *Clapper*, 133 S. Ct. at 1147 (citation omitted).  Though economic harm is recognized as a legally protected interest, like any other alleged harm, it must be "concrete and particularized" for standing purposes, *Lujan*, 504 U.S. at 560, and "a possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to government action." *Abbot Labs. v. Gardner*, 387 U.S. 136, 153 (1967).  Here, other than his alleged lost sale to the Hanson Plaintiffs – an alleged injury that is fairly traceable to the action of a third party not before the Court – Plaintiff Mance fails to specify any particular sale that he was unable to transact with any particular potential customer.  Moreover, Plaintiffs

18

cite no legal authority to support their contention that Plaintiff Mance has sufficiently alleged a non-speculative, concrete and particularized harm, Pl. Opp. at 10 n.2, nor do they attempt to distinguish the case law cited by Defendants showing that Plaintiff Mance has failed to sufficiently allege injury-in-fact.  *See* Def. Mot. at 15-16 (citing cases).

### 2.   Prudential Standing Requirements Bar Plaintiff Mance From Asserting the Rights of Third Parties.

In addition to the constitutional requirements for standing, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc*., 454 U.S. 464, 474 (1982). Among these principles is that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  The Supreme Court has "require[ed] that a party seeking third-party standing make two additional showings." *Id*. at 130.  "First, we have asked whether the party asserting the right has a 'close' relationship with the person who possesses the right." *Id*. (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).  "Second, we have considered whether there is a 'hindrance' to the possessor's ability to protect his own interests." *Id*.[8]  Because of these requirements, Plaintiff Mance may

---

[8] The Supreme Court also explained that it has "not looked favorably upon third-party standing" except for "certain circumstances," in which they have been "quite forgiving with [its] criteria,": (1) in First Amendment cases, and (2) "when enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights." *Kowalski*, 543 U.S. at 130 (emphasis in original).  Neither circumstance is implicated here.  This is not a First Amendment case, and enforcing Section 922(b)(3) against Plaintiff Mance will not violate the rights of any alleged potential customers because Plaintiff Mance may sell handguns to these alleged customers, provided that he ships the purchased handguns to dealers in their States.  *See Lane*, 703 F.3d at 673 ("To obtain a handgun from another state, the plaintiffs must pay a transfer fee and visit multiple FFLs, but the laws do not prevent them from exercising their Second Amendment right to bear arms.  This case thus differs from those in which courts have found standing for plaintiffs prevented outright from obtaining or possessing firearms.").

not challenge Section 922(b)(3) "on behalf of" unspecified third parties (namely, alleged

potential out-of-State handgun customers) because he lacks the required close relationship with

these alleged, but unidentified, customers.[9]  *See* First Am. Compl. ¶ 25.

Moreover, Plaintiffs misplace their reliance on case law to support their contention that

Plaintiff Mance may assert the rights of these alleged customers.  *See* Pl. Opp. at 10-11.  *Carey*

was decided long before the Supreme Court's 2004 *Kowalski* decision, and cannot overcome the

later decision's holding.  Additionally, the Seventh Circuit's conclusion in *Ezell* that a supplier of

firing range-facilities could assert the third-party rights of potential customers is not persuasive

because it does not apply (or even mention) the two-part showing required by the Supreme Court

in *Kowalski*.  Nor did the district court decision in *Illinois Association of Firearms Retailers v.*

*City of Chicago*, 961 F. Supp. 2d 928, 931 & n.3 (N.D. Ill. 2014), apply this two-part showing;

indeed, that decision cites no case law other than *Ezell* to support its determination that an

association of firearms retailers had standing – an issue that (unlike here) was not disputed by the

defendants.  Moreover, though Plaintiffs cite *Reliable Consultants v. Earle*, 517 F.3d 738 (5th

Cir. 2008), a case which allowed two plaintiffs engaged in the retail sale of sexual devices to

assert their customers' substantive due process rights, they fail to mention that the Fifth Circuit

permitted this only because of "Supreme Court precedent holding that (1) bans on commercial

transactions involving a product can unconstitutionally burden individual *substantive due*

*process* rights and (2) lawsuits making this claim may be brought by providers of the product."

*Id*. at 743 (emphasis added).  But this is not a substantive due process case, so *Reliable*

---

[9] "Unlike a dismissal for lack of constitutional standing, which should be granted under Rule 12(b)(1), a dismissal for lack of prudential or statutory standing is properly granted under Rule 12(b)(6)."  *Harold H. Huggins Realty, Inc. v. FNC, Inc*., 634 F.3d 787, 795 n.2 (5th Cir. 2011).  Defendants thus respectfully request that this portion of their motion to dismiss be considered under Rule 12(b)(6), rather than Rule 12(b)(1).

*Consultants* is inapposite.  Finally, *United States v. Coil*, 442 F.3d 912 (5th Cir. 2006), also cited

by Plaintiffs, is distinguishable on the same grounds because it too involved a third-party

assertion of customers' substantive due process rights.

In sum, Plaintiff Mance has failed to show that he has standing to sue in his own right, or

to assert the third-party rights of alleged unidentified customers.  The Court should thus dismiss

Plaintiff Mance's claims.

### C.      Plaintiff CCRKBA Lacks Standing to Sue.

To establish standing to sue as the representative of its members, an organization must

"show that its members, or any one of them, would have standing individually."  *Nat'l Treasury*

*Emps. Union v. U.S. Dep't of the Treasury*, 25 F.3d 237, 241 (5th Cir. 1994).  Plaintiff Citizens

Committee for the Right to Keep and Bear Arms ("CCRKBA") alleges that its members include

(i) individuals who wish to buy handguns from dealers located outside their State of residence

without using an intermediary dealer, and (ii) FFLs who wish to sell handguns to buyers who

reside outside the FFL's place of business without using an intermediary dealer.  First Am.

Compl. ¶¶ 22, 23.  However, neither group of persons has standing to sue.

### 1.      CCRKBA Members Who Wish to Buy Handguns from Dealers Located Outside Their State of Residence Without Using an Intermediary Dealer Lack Standing.

As explained above, individuals in the first category of members have no standing to sue

because any alleged injury results from a transfer fee charged by an intermediary dealer, and is

not caused by Defendants.  *See supra* I.A; *see also Lane*, 703 F.3d at 674 n.6 (firearms-rights

organization lacked associational standing to challenge Section 922(b)(3) derivative of

Washington, D.C. resident-members challenging the law, because the members failed to

establish injury-in-fact or traceability).  Additionally, to the extent that any of CCRKBA's

members allege injury in the form of "frustrated sales" resulting from their decisions not to purchase handguns outside their State of residence because of the existence of the challenged federal laws, First Am. Compl. ¶ 22, such allegedly frustrated sales are fairly traceable to the alleged decisions of these members not to engage in these sales, not to Defendants. Furthermore, CCRKBA's allegations that the challenged laws purportedly limit its members' choices as consumers, harm market competition, and raise prices, are insufficient to confer standing. *See* Def. Mot. at 19-20.

Plaintiffs' reliance on *NRA* as supporting associational standing here, Pl. Opp. at 20, fails for the same reason that their reliance on this case to allege standing for the Hanson Plaintiffs fails – namely, that Plaintiffs do not allege the same injury that was asserted in *NRA*, "i.e., the injury of not being able to purchase handguns from FFLs." *NRA*, 700 F.3d at 192. *Ezell*, also cited by Plaintiffs, is similarly distinguishable. In that case, the Seventh Circuit found associational standing because three member-plaintiffs had sufficiently alleged injury-in-fact – namely, that their city's "absolute ban on firing ranges" prohibited, "everywhere in the city, the means of satisfying a condition the City imposes for lawful firearm possession" (range training). *Ezell*, 651 F.3d at 695. That, too, is not the injury asserted by the Hanson Plaintiffs. Moreover, in *Ezell*, unlike here, it was undisputed that these three member-plaintiffs had standing. *Id.* at 696. *NRA* and *Ezell* are thus not on point. *See also Kachalsky v. Cacace*, 817 F. Supp. 2d 235, 251 (S.D.N.Y. 2011) (firearms-rights organization lacked associational standing to challenge state firearms law where organization merely "alleges in conclusory fashion that the various Defendants have enforced the challenged laws, customs, and practices against [its] membership, but . . . neither identified particular members who have standing, nor specified how they would

have standing to sue in their own right"), *aff'd on other grounds*, 701 F.3d 81 (2d Cir. 2012),

*cert. denied*, 133 S. Ct. 1806 (2013).

Additionally, as noted above, Plaintiffs' contention that the Hanson Plaintiffs "do not

voluntarily refrain from buying handguns from out-of-state dealers," Pl. Opp. at 21, is fatally

undermined by the Hanson Plaintiffs' concession that they "*agreed to refrain* from completing

any handgun transfers" from Plaintiff Mance, rather than choosing to "have the handguns

shipped at [their] expense for transfer" to a Washington, D.C. FFL.  A. Hanson Decl. ¶ 10; T.

Hanson Decl. ¶ 10 (emphasis added).  Moreover, Plaintiffs' failure to cite any evidence to

support their conjectural assertion that the Hanson Plaintiffs suffer from "less competition, less

selection, and higher prices" because of the challenged laws, Pl. Opp. at 21, renders this assertion

"speculative at best." *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1363 (D.C. Cir. 2012) (citation

omitted); *see also id.* at 1362-64 (consumer lacked standing to assert claim that airline's ban on

reselling tickets prevented him from buying a less expensive ticket by foreclosing emergency of

secondary market; such alleged injury was too speculative to constitute Article III injury).  Such

a nebulous allegation of less competition or less selection does not assert an injury that is

"concrete and particularized, and actual or imminent," rather than "conjectural or hypothetical."

*Lujan*, 504 U.S. at 560; *see also Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C.

Cir. 1983) ("[W]here injury is alleged to occur within a market context, the concepts of causation

and redressability become particularly nebulous and subject to contradictory, and frequently

unprovable, analyses.").  Courts routinely reject such a generalized grievance of a particular class

of citizens as establishing injury-in-fact.  *See San Diego*, 98 F.3d at 1127, 1131-32 (associations'

and individuals' allegations that they "wish[ed] and intend[ed] to engage in activities prohibited

by" federal law prohibiting transfer of certain firearms "amount[ed] to no more than a

generalized grievance shared in substantially equal measure by a large class of citizens, and thus

do not warrant the exercise of jurisdiction") (citation and internal punctuation omitted).

In short, CCRKBA may not assert associational standing on behalf of the Hanson

Plaintiffs (or other alleged similar members) because they fail to establish that these members

have standing to sue in their own right.

> **2.    Licensed CCRKBA Members Who Wish to Sell Handguns to Buyers Residing Outside the State Where Their Businesses Are Located Without Using an Intermediary Dealer Also Lack Standing.**

Defendants' opening brief explained that CCRKBA dealer-members who allegedly wish

to sell handguns to persons who do not reside in the State in which the dealer-members operate,

without using an intermediary dealer, lack standing.  Def. Mot. at 21-22.  These members fail to

establish the causation requirement of standing for the same reason that the Hanson Plaintiffs

lack causation: namely, that the only cognizable injury alleged (a transfer fee) is fairly traceable

to the independent action of a third-party dealer not before the Court.  Moreover, Plaintiffs fail to

identify any dealer-member – other than Plaintiff Mance – who was allegedly frustrated from

selling any particular handgun to any person.  And contrary to Plaintiffs' description, Pl. Opp. at

21, Plaintiff Mance did voluntarily agree not to sell the Hanson Plaintiffs a particular handgun

because of the existence of the challenged laws.  As his declaration makes clear, Plaintiff Mance

was aware he could sell the Hanson Plaintiffs the handguns allegedly sought by them by using an

intermediary FFL, but chose not to avail himself of this option.  *See* Mance Decl. ¶ 9 ("Rather

than violate the law, *or have the handguns shipped* at their expense for transfer, at their expense,

*through a District of Columbia-based federal firearms licensee*, the Hansons and I *agreed to*

*refrain* from completing any handgun transfers unless it became legal for the Hansons to take

delivery of the handguns from me.") (emphasis added).  And though Plaintiff Mance instead

24

elected to file suit, he failed to include among the defendants the party that caused the only cognizable injury he alleges: namely, Mr. Sykes, the FFL who charges the transfer fee that, by their own admission, prevented Plaintiff Mance and the Hanson Plaintiffs from completing their transaction.

In short, because Plaintiff CCRKBA has failed to show that dealer-members like Plaintiff Mance have standing, it lacks associational standing to sue on their behalf.  The Court should thus dismiss this case for lack of subject-matter jurisdiction.

## II.     The Challenged Laws Do Not Violate the Second Amendment.

In *NRA*, the Fifth Circuit held that in cases alleging Second Amendment claims, courts should apply a "two-step inquiry."  700 F.3d at 194.  First, "[i]f the challenged law burdens conduct that falls outside the Second Amendment's scope, then the law passes constitutional muster."  *Id*. at 195 (citation omitted).  Second, "[i]f the law burdens conduct that falls within the Second Amendment's scope, we then proceed to apply the appropriate level of means-end scrutiny."  *Id.*

Here, the Court's inquiry can end at Step One because the challenged laws do not impose any burden, let alone a substantial burden, on conduct historically protected by the Second Amendment.  However, even if the Court were to proceed to the second step in an abundance of caution, the laws readily pass muster under intermediate scrutiny, the appropriate level of review. The Court should thus dismiss Plaintiffs' claims or enter summary judgment for Defendants.

### A.     The Challenged Laws Do Not Burden Conduct Protected by the Second Amendment.

In addressing the merits of Plaintiffs' claims, "the first inquiry is whether the conduct at issue falls within the scope of the Second Amendment right."  *NRA*, 700 F.3d at 194 (citations omitted).  The Fifth Circuit in *NRA* noted that it was not entirely clear whether *Heller*'s list of

25

"presumptively lawful regulatory measures," 554 U.S. at 627 n.26, applied to Step One or Two.
*See NRA*, 700 F.3d at 196 ("It is difficult to discern whether," *inter alia*, "'laws imposing
conditions and qualifications on the commercial sale of arms,' by virtue of their presumptive
validity, either (i) presumptively fail to burden conduct protected by the Second Amendment, or
(ii) presumptively trigger and pass constitutional muster under a lenient level of scrutiny.")
(quoting *Heller*, 554 U.S. at 626-27) (citations omitted).   "For now," however, the Fifth Circuit
"state[d] that a longstanding, presumptively lawful regulatory measure – whether or not it is
specified on *Heller*'s illustrative list – would likely fall outside the ambit of the Second
Amendment; that is, such a measure would likely be upheld at step one of our framework."  *Id.*
(citing *Heller v. Dist. of Columbia* ("*Heller II*"), 670 F.3d 1244, 1253 (D.C. Cir. 2011), for the
proposition that "a regulation that is 'longstanding,' which necessarily means it has long been
accepted by the public, is not likely to burden a constitutional right; concomitantly the activities
covered by a longstanding regulation are presumptively not protected from regulation by the
Second Amendment").

Defendants' opening brief explained that the Court's inquiry could end at Step One
because the challenged laws are a species of "longstanding, presumptively lawful measures" that
"fall outside the ambit of the Second Amendment," as demonstrated by the fact that between
1909 and 1939, numerous States enacted laws restricting the acquisition, possession, or carrying
of one or more types of firearms to State residents.  Def. Mot. at 26-27 & nn.10-11.[10]

---

[10] In addition to the 11 States identified in Defendant's opening brief, *see* Def. Mot. at 26 & App.
102-108, Alabama, Arkansas, Indiana, Oregon, and Rhode Island also enacted laws in the early
twentieth century restricting the possession or carrying of firearms – or certain firearms – to
State residents (App. 109-114).  Additionally, in 1918, Montana made it "unlawful for any
person to purchase, borrow, or otherwise acquire possession of any firearm . . . from any person,
firm or corporation outside of the State of Montana, without first obtaining a permit from the
sheriff of the County in which such person lives." (App. 111-112).

26

Additionally, the text of the Second Amendment addresses the "right of the people to keep and bear Arms," U.S. Const. amend. II, but is silent on the ability to sell or buy firearms in any particular forum, and courts have repeatedly declined to find that the Amendment protects such a right.  Def. Mot. at 25.

Plaintiffs respond with two primary arguments.  First, they ask this Court to recognize, for the first time, two new constitutional rights – the right to buy firearms from a licensed dealer operating outside one's State of residence without using an in-State dealer, and the right of licensed dealers to sell firearms outside the State in which they operate without using an intermediary dealer in the purchaser's home State.  Mem. Supp. Pl. Mot. for Summ. J. at 13-21 [ECF No. 22] ("Pl. Cross-MSJ").  Second, Plaintiffs argue that the challenged laws do not represent a type of "longstanding, presumptively lawful measure" regulating firearms.  *Id*. at 21-27.  Neither argument is persuasive.

> **1.**    **Plaintiffs Neither Cite Any Decisions Holding That the Second Amendment Includes an Unconditional Right to Buy or Sell Firearms, Nor Present Any Evidence That the Second Amendment Was Ever Understood to Protect Such a Right.**

No court has recognized the purported constitutional rights asserted by Plaintiffs.  Even if viewed at a higher level of generality, any contention that the Second Amendment extends its protection to buying and selling firearms cannot be squared with *Heller*'s conclusion that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures."  554 U.S. at 626-27 & n.26.  And neither *Heller* nor *McDonald v. City of Chicago*, 561 U.S. 742 (2010), discussed the buying or selling of firearms.

At the outset, Plaintiffs confuse the relevant issue by arguing that, because the Second Amendment protects the right to keep a handgun, it must protect the right to acquire a handgun.  Pl. Cross-MSJ at 13-15.  First, the conclusion does not necessarily follow from the premise –

neither *Heller* nor *McDonald* discussed whether the scope of the Second Amendment included a right to "acquire" firearms in general, or handguns in particular.  Rather, *Heller* "h[e]ld that the District[ of Columbia's] ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  554 U.S. at 635.  And *McDonald* held that the Fourteenth Amendment incorporated "the Second Amendment right recognized in *Heller*" to apply to the States.  561 U.S. at 791 (plurality opinion); *see also id. at* 805 (Thomas, J., concurring).

Second, contending that the relevant issue is whether the Second Amendment protects a right to acquire handguns casts the inquiry at too high a level of generality.  This Court need not decide whether the Second Amendment protects a general right to acquire handguns because the challenged laws do not prevent the Hanson Plaintiffs from acquiring handguns.  The Hanson Plaintiffs are free to acquire handguns from any source.  Additionally, they may buy a handgun from any licensed FFL in the nation, provided only that, if the FFL is located outside Washington, D.C. (where the Hanson Plaintiffs reside), it must first transfer the handguns to an FFL located in Washington, D.C.  Thus, it is unnecessary for the Court to determine whether or not the Second Amendment protects a general right to acquire handguns because the Hanson Plaintiffs do not – and cannot – allege that the challenged laws prevent them from acquiring handguns.[11]  *See Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring)

---

[11] It is also unnecessary for the Court to decide whether "the Second Amendment secures the right to make . . . arms."  Pl. Cross-MSJ at 15 n.7.  Plaintiffs have not alleged – nor could they allege – that the challenged laws prevent Plaintiff Mance from making arms.  And contrary to Plaintiffs' contention, *Martin v. Harrington & Richardson, Inc.*, 743 F.2d 1200 (7th Cir. 1984), has nothing to do with whether the Second Amendment protects any such right.  *See id.* at 1201-06 (affirming dismissal of action against firearms manufacturers, alleging that manufacturing and

(explaining that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it[,]" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied") (citations and internal punctuation omitted). Rather, at most, the Hanson Plaintiffs allege that the challenged laws prevent them from buying a handgun from the dealer of their choice without using an intermediary dealer, and Plaintiff Mance alleges that the laws prevent him from selling a handgun to the Hanson Plaintiffs without using an intermediary dealer.  But Defendants are not aware of any case holding that the Second Amendment protects an unfettered right to buy handguns from the dealer of one's choice – or conversely, for a dealer to sell handguns to any non-prohibited buyer – without any conditions or qualifications on that sale.

The case law cited by Plaintiffs, Pl. Cross-MSJ at 15-16, does not show that courts have recognized any such right.  Initially, Plaintiffs' selective quotation from *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980), omits the Supreme Court's cautionary prefatory remark:

> *Notwithstanding the appropriate caution against reading into the Constitution rights not explicitly defined*, the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees.  For example, the rights of association and of privacy, the right to be presumed innocent, and the right to be judged by a standard of proof beyond a reasonable doubt in a criminal trial, as well as the right to travel, appear nowhere in the Constitution or Bill of Rights.

*Id.* at 579-80 (emphasis added).  Here, the Court should decline Plaintiffs' invitation to read into the Constitution a right not explicitly defined (namely, a constitutional right to buy handguns from an out-of-State dealer without using an intermediary dealer).  *See Dronenburg v. Zech*, 741 F.2d 1388, 1396 (D.C. Cir. 1984) ("If it is in any degree doubtful that the Supreme Court should

---

selling handguns to the public is an ultra-hazardous activity giving rise to strict liability for any damage done by the handguns, for failure to state a claim under Illinois tort law).

freely create new constitutional rights, we think it certain that lower courts should not do so.");

*Ashwander*, 297 U.S. at 346-47 (Brandeis, J., concurring).

Additionally, Plaintiffs overread the Fifth Circuit's decision in *Reliable Consultants*,

which "assesse[d] the constitutionality of a Texas statute making it a crime to promote or sell

sexual devices."  517 F.3d at 740; *see* Pl. Cross-MSJ at 15, 19.  The sentence partly quoted by

Plaintiffs on page 15 of their brief is taken from the Fifth Circuit's discussion of third-party

standing, in which the Fifth Circuit rejected the State's argument that sellers "who distribute[d]

sexual devices for profit" could not assert the rights of their customers, relying on "Supreme

Court precedent holding that (1) bans on commercial transactions involving a product can

unconstitutionally burden individual substantive due process rights and (2) lawsuits making this

claim may be brought by providers of the product."  *Id*. at 743.  In rejecting this argument, the

Fifth Circuit noted: "Other Supreme Court cases hold that businesses can assert the rights of their

customers and that restricting the ability to purchase an item is tantamount to restricting that

item's use."  *Id*. (citing *Carey*, 431 U.S. at 683-91, and *Washington v. Glucksberg*, 521 U.S. 702,

723 (1997)).  But in rejecting the State's standing argument, the Fifth Circuit was deciding only

whether "*bans* on commercial transactions involving a product can unconstitutionally burden

individual *substantive due process* rights," *id*. (emphasis added), a limitation underscored by the

fact that the cases cited for support – *Carey*, *Glucksberg*, and *Griswold v. Connecticut*, 381 U.S.

479 (1965) – all involved substantive due process claims.  The Fifth Circuit was not deciding

whether (as here) cases not involving bans on the sale or purchase of an item and not addressing

substantive due process claims would constitute a constitutional violation.  Thus, because

*Reliable Consultants* decided only whether, under Supreme Court precedent, bans on the sale of

30

a particular item violated substantive due process, that case is not germane to the issue of whether a condition on the sale of handguns is consistent with the Second Amendment.

For similar reasons, *Carey* is inapposite here. In the portion of the opinion cited by Plaintiffs, the Supreme Court was examining whether a "prohibition of the distribution of nonmedical contraceptives to adults except through licensed pharmacists" was inconsistent with the constitutional "right of the individual to be free from unwarranted governmental intrusion into the decision whether to bear or beget a child." *Carey*, 431 U.S. at 686, 687 (citation and internal punctuation omitted). But Plaintiffs have cited no case law suggesting that the scope of protection afforded under substantive due process principles is comparable in any way to the scope of the Second Amendment. Moreover, in the sentence quoted by Plaintiffs, the Court was weighing the degree to which "[a] total prohibition of the sale of contraceptives" would intrude upon this right. *Id.* at 687. Because the laws challenged here do not prohibit the sale of handguns, *Carey* is inapposite.

Similarly misplaced is Plaintiffs' reliance on dicta from *Andrews v. State*, 50 Tenn. 165, 1871 WL 3579 (1871). Pl. Cross-MSJ at 15. At issue in that case was the constitutionality of a statute making it unlawful "to publicly or privately carry a dirk, swordcane, Spanish stiletto, belt or pocket pistol or resolver" in the State of Tennessee. *Andrews*, 1871 WL 3579, at *3. Because the case had nothing to do with the sale or purchase of firearms, the sentence partly quoted by Plaintiffs is pure dictum. Moreover, though Plaintiffs quote a sentence from a district court decision outside this Circuit that "[o]ne cannot exercise the right to keep and bear arms without actually possessing a firearm," that quotation is irrelevant here because the challenged laws do not prohibit the Hanson Plaintiffs from possessing firearms. Pl. Cross-MSJ at 15 (quoting *Silvester v. Harris*, __ F. Supp. 2d __, 2014 WL 4209563, at *27 (E.D. Cal. Aug. 25, 2014)).

31

Plaintiffs' selective quotation of a sentence from *Illinois Retailers* – another district court decision outside this Circuit – omits language noting that the Second Amendment right permits "many restrictions on the sales of arms."  *See* 961 F. Supp. 2d at 930 (stating that the Second Amendment right "must also include the right to acquire a firearm, although that acquisition right is far from absolute: there are many long-standing restrictions on who may acquire firearms (for examples, felons and the mentally ill have long been banned) and there are *many restrictions on the sales of arms* (for example, licensing requirements for commercial sales") (emphasis added).  In any event, the Chicago ordinance at issue in *Illinois Retailers* "ban[ned] virtually all sales and transfers of firearms inside the City's limits" – a far cry from the limited effect of the laws challenged here.  *Id.*[12]

Furthermore, despite Plaintiffs' assertion that not all "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful," Pl. Cross-MSJ at 16 (quoting *Heller*, 554 U.S. at 626-27 & n.26), the Fifth Circuit made clear in *NRA* that "a longstanding, presumptively lawful regulatory measure – whether or not it is specified on *Heller*'s illustrative list – would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." *NRA*, 700 F.3d at 196. And as explained below, the challenged law is a representative example of just such a longstanding, presumptively lawful measure that falls outside the Second Amendment's scope.

---

[12] Plaintiffs' citation to a letter written by Thomas Jefferson, Pl. Cross-MSJ at 16, is likewise unavailing.  Written when he was Secretary of State, Jefferson was offering a diplomatic explanation to avoid an international incident, not interpreting the Second Amendment or the traditional right to bear arms on which it was based.  *See* 3 Thomas Jefferson Randolph, ed., *Memoirs, Correspondence, and Miscellanies, From the Papers of Thomas Jefferson* (2d ed. 1830), *available at* http://www.gutenberg.org/files/16783-h/16783-h.htm.  *See also Waisbord v. United States*, 183 F.2d 34, 37 (5th Cir. 1950) (quoting Jefferson in proper context).  Finally, in the sentence Plaintiffs quote from *Heller*, 554 U.S. at 583 n.7, the Court was simply citing a list of writings to demonstrate the usage of the phrase "keep arms" in the eighteenth and early-nineteenth centuries, not necessarily endorsing the views expressed in those writings.

Finally, as Defendants have noted, courts have repeatedly declined to extend the protections of the Second Amendment to the sale or purchase of firearms. *See* Def. Mot. at 25 (citing cases). And Plaintiffs' attempts to distinguish this case law, Pl. Cross-MSJ at 18-20, are not persuasive. Contrary to Plaintiffs' characterization, *United States v. King*, 532 F.2d 505 (5th Cir. 1976), draws a sharp distinction between the "right to keep and bear arms" and "dealing in firearms." *Id.* at 510. One of the appellants in *King* claimed that 18 U.S.C. § 922(a)(1), which prohibits non-licensed persons from dealing in firearms, violated the Second Amendment. *Id.* The Fifth Circuit rejected this claim, explaining: "With the argument that the statute violates appellant's right to keep and bear arms we firmly disagree. He was neither charged with nor convicted of keeping and bearing arms. He was charged with and convicted of engaging, without a license, in the business of dealing in firearms and of conspiring with others so to do." *Id.* (citing cases). The Fifth Circuit thus refused to extend the scope of the Second Amendment to protect an unfettered right to sell firearms (which, if it existed, might cast doubt on the law challenged by the appellant).

Additionally, Plaintiffs are correct that 18 U.S.C. § 922(d)(3), the statute challenged under the Second Amendment in *United States v. Chafin*, 423 F. App'x 342 (4th Cir. 2011), bars the selling of firearms to an unlawful user of drugs. However, in determining whether the law burdened conduct within the Second Amendment's scope, the Fourth Circuit plainly stated that "although the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm" and that "Chafin has not pointed this court to any authority, and we have found none, that remotely suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a

firearm." *Id.* at 344 (emphasis in original).  Nor, as explained above, have Plaintiffs pointed this Court to any such authority.

Furthermore, the plaintiffs in *Montana Shooting Sports Association v. Holder*, No. 09-147, 2010 WL 3926029 (D. Mont. Aug. 31, 2010), claimed, *inter alia*, that federal firearms laws (including the Gun Control Act) exceeded Congress's Commerce Clause power as applied to the intrastate manufacture and sale of firearms.  *Id.* at *14-15.  In rejecting this claim, the Court also rejected a contention that in light of *Heller* and *McDonald*, it "should apply strict scrutiny to its review of federal firearms laws."  *Id.* at *22.  Noting that the plaintiffs had not alleged a Second Amendment claim, the Court also stated: "Even if Plaintiffs had alleged a Second Amendment violation, *McDonald* says nothing about extending Second Amendment protection to firearm manufacturers or dealers.  Because the United States Supreme Court did not intend for its holding in *McDonald* and *Heller* to undermine existing laws regulating the manufacture and sale of firearms, [two pre-*Heller* Commerce Clause decisions] control."  *Id*.  *Montana Shooting* thus reaffirmed that "[t]he federal firearms laws at issue here do just what *Heller* considered appropriate – they impose conditions and qualifications on the manufacture and sale of arms."  *Id*. at *21.  The same is true of the federal firearms laws at issue here.[13]  And though Plaintiffs assert that this Court "cannot rely upon" *Teixeira v. County of Alameda*, No. 12-3288, 2013 WL 4804756 (N.D. Cal. Sept. 9, 2013), Pl. Cross-MSJ at 20, any alleged shortcomings of that decision do nothing to cast doubt on its observation that neither the Supreme Court nor other

---

[13] Plaintiffs concede that it is "undisputed" that, as noted in *Montana Shooting*, "*Heller* recognized that firearms manufacturers and dealers are properly subject to regulation by the federal government under existing federal firearms laws."  Pl. Cross-MSJ at 20 (quoting *Montana Shooting*, 2010 WL 3926029).  If this statement is undisputed, it is not clear why Plaintiff Mance is challenging one such "existing federal firearms law" – namely, 18 U.S.C. § 922(b)(3) – despite the fact that *Heller* recognized that he is "properly subject to regulation" under such "existing" laws.

courts have "extended the protections of the Second Amendment to the sale or purchase of guns." *Id*. at *6.

Finally, while it might be correct that a "ban" on "the sale of protected guns" would be constitutionally suspect, Pl. Cross-MSJ at 21, as explained above, the challenged laws do not ban the sale or purchase of any guns. Rather, they place a condition on the purchase of handguns from sellers who do not operate in the buyer's State of residence. Plaintiffs' contrary contention rests on a mischaracterization of the effects of the challenged laws. Therefore, Plaintiffs' reliance on cases involving total bans on the sale of certain products, Pl. Cross-MSJ at 21, is fundamentally misplaced.

Plaintiffs thus neither cite any decision holding that the Second Amendment protects an unconditional right to buy or sell firearms, nor marshal any evidence that the Amendment was ever understood to protect any such alleged right.

> **2.    The Challenged Laws Fall Outside the Scope of the Second Amendment Because Laws Restricting the Acquisition, Possession, or Carrying of Firearms to State Residents Are Longstanding in American Law.**

The Fifth Circuit has stated that "a longstanding, presumptively lawful regulatory measure – whether or not it is specified on *Heller*'s illustrative list – would likely fall outside the ambit of the Second Amendment; that is, such a measure would likely be upheld at step one of our framework." *NRA*, 700 F.3d at 196. Moreover, as the Fifth Circuit explained:

> *Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue. *See* [*United States v.*] *Skoien*, 614 F.3d [638,] 640-41 [(7th Cir. 2010) (en banc)] ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791."); *cf. Heller II*, 670 F.3d at 1253–54 (relying on early 20th-century state statutes to show that D.C. handgun registration requirement was "longstanding" and did not "impinge upon the right protected by the Second Amendment"). After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage. *See* [*United States v.*] *Booker*, 644 F.3d [12,] 23-

35

24 [(1st Cir. 2011)] (explaining that the federal felony firearm possession ban, 18 U.S.C. § 922(g)(1), "bears little resemblance to laws in effect at the time the Second Amendment was ratified," as it was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968); *Skoien*, 614 F.3d at 640-41 (explaining that 18 U.S.C. § 922(g)(4), which forbids firearm possession by a person who has been adjudicated to be mentally ill, was enacted in 1968); Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376-80 (2009) (showing that a strictly originalist argument for *Heller*'s examples – including bans on firearm possession by felons and the mentally ill, and laws imposing conditions on commercial arms sales – is difficult to make).

700 F.3d at 196-97.  Given this clear statement by the Fifth Circuit, Plaintiffs' contention that to be considered longstanding, a regulation must nevertheless identify some Founding-Era analogue, Pl. Cross-MSJ at 21-23, is simply mistaken.  And Plaintiffs' reliance on purportedly contrary decisions from the Seventh and Ninth Circuits, Pl. Cross-MSJ at 22, fails in light of *NRA*'s clear statement.  Moreover, unduly focusing on Founding Era legislation ignores the fact that once granted, legislative power is not lost if it lies dormant for any period of time.  *See, e.g.*, *Crowell v. Benson*, 285 U.S. 22, 86 n.53 (1932) ("It was not until the Act of March 3, 1875 . . . that Congress extended the jurisdiction of the circuit courts to 'cases arising under the laws of the United States,' thus permitting to be exercised the vast range of power which had lain dormant in the Constitution since 1789.") (citations and internal punctuation omitted); *see also Skoien*, 614 F.3d at 641 ("It would be weird to say that [18 U.S.C.] § 922(g)(9) [prohibiting the possession of firearms by a persons convicted of a crime of domestic violence] is unconstitutional in 2010 but will become constitutional by 2043, when it will be as "longstanding" as § 922(g)(1) was when the Court decided *Heller*.").  And contrary to Plaintiffs' contention, that Section 922(b)(3) was enacted in 1968 does not prevent the Court from recognizing it as representing a longstanding type of firearms regulation.  "After all, *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current version of these bans are of mid-20th century

vintage." *NRA*, 700 F.3d at 196.  Indeed, 18 U.S.C. § 922(g)(4), which forbids firearm

possession by a person who has been adjudicated to be mentally ill, was also enacted in 1968,

*see Skoien*, 614 F.3d at 640-41, but that did not prevent *Heller* from characterizing "prohibitions

on the possession of firearms by . . . the mentally ill" as "longstanding."  *Heller*, 554 U.S. at 626.

Consequently, because at least 16 States enacted laws between 1909 and 1939 restricting

the acquisition, possession, carrying, or purchase of one or more types of firearms to State

residents (App. 102-114), such laws are longstanding.  Though Plaintiffs raise several objections

to this evidence, none has merit.

First, Plaintiffs object that these laws are State laws, and the Second Amendment was not

incorporated against the States until 2010, Pl. Cross-MSJ at 23-24.  This objection does not carry

the weight Plaintiffs believe it does.  Twelve of the 16 States had Second Amendment analogues

in their respective State constitutions when they enacted the statutes at issue.[14]  *See* Eugene

Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191 (2006);

*see also NRA*, 700 F.3d at 202 nn.14 & 15 (discussing States with longstanding restrictions on

the purchase or use of particular firearms by persons under 21 that had State constitutional

analogues to the Second Amendment at the time they enacted these restrictions).

Second, as noted above, Plaintiffs' contention that a firearms regulation cannot be

considered longstanding unless a Framing-Era analogue can be cited, Pl. Cross-MSJ at 24, is

contradicted by both *Heller* and *NRA*.  As *NRA* noted, *Heller* demonstrated not only that "a

regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era

analogue," but also that courts "may rely on a wide array of interpretive materials to conduct a

historical analysis."  *NRA*, 700 F.3d at 196, 194 (citing *Heller*, 554 U.S. at 600-26); *see also id.*

---

[14] Alabama, Arkansas, Georgia, Indiana, Maine, Massachusetts, Michigan, Missouri, Montana,
North Carolina, Oregon, and Rhode Island.

at 194 n.8 (discussing the "variety of legal and other sources" from different time periods examined by the *Heller* Court). Contrary to Plaintiffs' characterization, the Fifth Circuit in *NRA* did not require any showing that "a modern enactment echoes a type of restriction known to the Framers," Pl. Cross-MSJ at 24, before deeming that enactment longstanding. *See NRA*, 700 F.3d at 204 (court was "inclined to uphold the challenged federal laws at step one of our analytical framework," despite the fact that it was "unable to divine the Founders' specific views on whether 18-to-20-year-olds had a stronger claim than 17-year-olds to the Second Amendment guarantee"). Though *NRA* clearly considered views of the Founding Generation to be *relevant* to this inquiry, *see id.* at 200-02, Plaintiffs fail to show that the Fifth Circuit *required* such evidence of Founding-Era views for courts in this Circuit to find a species of firearms regulation longstanding. *See id.* at 196 (citing *Heller II* as "relying on early 20th-century state statutes to show that D.C. handgun registration requirement was 'longstanding' and did not 'impinge upon the right protected by the Second Amendment'"). Had the Fifth Circuit in *NRA* required litigants to provide evidence of Founding-Era attitudes, it presumably would have said so more clearly.

Third, Plaintiffs seek to discount the relevance of laws conditioning the carrying of a firearm on State residency, as opposed to laws conditioning the purchase of firearms on State residency; they also seek to discount laws that authorized issuance of licenses or permits to persons who maintained an in-State business, rather than only to State residents. Pl. Cross-MSJ at 24-27. But such distinctions are trivial in light of their fundamental resemblance: like the challenged laws, these early State laws regulated firearms ownership on the basis of whether an individual resided in the State in which the firearm was purchased or carried. Thus, the Fifth Circuit in *NRA* deemed relevant to its inquiry laws "expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of 'minors' to purchase

38

or use particular firearms while the state age of majority was set at age 21." *NRA*, 700 F.3d at

202.  The court did not quibble over whether these analogous laws only regulated the sale of

handguns to minors, as opposed to their use – as was the case with the challenged law, 18 U.S.C.

§ 922(b)(1) – or whether the laws applied to handguns, as opposed to other types of weapons.

Rather, the court focused on the obvious similarities between the challenged law and the earlier

State law analogues.  Such similarities also plainly exist between 18 U.S.C. § 922(b)(3) and the

State laws identified by Defendants.  Notably, most of these early State laws – like Section

922(b)(3) – regulated only handguns (pistols and revolvers), not long guns.  Moreover, Plaintiffs'

attempts to distinguish what they assert to be the purposes of these laws from the purposes

underlying Section 922(b)(3), Pl. Cross-MSJ at 25, 26, rest purely on speculation and not on the

texts of the actual laws.

In sum, historical evidence establishes that the basic requirement of State residence as a

qualification for the purchase or possession of firearms is longstanding in American law.  The

Court may thus end its inquiry at Step One of the analysis described in *NRA*.

### B.    Because Any Burden Imposed by the Challenged Laws Is Minimal, No Heightened Scrutiny Is Warranted.

As Defendants' opening brief explained, several federal Courts of Appeals have declined

to apply heightened constitutional scrutiny to regulations that, like the laws challenged here, do

not substantially burden the exercise of the Second Amendment right.  *See* Def. Mot. at 27-30;

*United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 838 (2013);

*Heller II*, 670 F.3d at 1253, 1260; *Nordyke v. King*, 644 F.3d 776, 786, 787-88 (9th Cir. 2011),

*superseded by* 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc); *see also United States v.*

*Marzzarella*, 595 F. Supp. 2d 596, 599 (W.D. Pa. 2009) (upholding prohibition on possessing

firearm with obliterated serial number; "The regulation at issue here imposes a burden on gun

ownership that is practically negligible when compared to the District of Columbia's complete ban on operable firearms within the home."), *aff'd*, 614 F.3d 85 (3d Cir. 2010).[15]

Plaintiffs' response, which conflates these courts' substantial-burden analysis with rational-basis review, Pl. Cross-MSJ at 10-13, is mistaken. A substantial-burden analysis is a two-tier analysis, and is not the same as rational-basis review. *See Nordyke*, 644 F.3d at 789-91 (rejecting "mere rational basis scrutiny" to analyze Second Amendment claims, in favor of substantial-burden analysis); *cf. Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458-59 (5th Cir. 2014) (affirming preliminary injunction preventing enforcement of state law as unduly burdening constitutional right to privacy, even though it satisfied rational-basis review); *Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 911-12 (9th Cir. 2014) ("In [*Planned Parenthood of Se. Pennsylvania v.*] *Casey*[, 505 U.S. 833 (1992)], a plurality of the Supreme Court rejected both strict scrutiny and rational-basis review of abortion regulations, holding instead that laws regulating pre-viability abortions are unconstitutional if they impose an 'undue burden' on a woman's right to abortion.") (citing *Casey*, 505 U.S. at 876). Nor did *Heller* foreclose the application of a substantial-burden analysis. *See Heller*, 554 U.S. at 632 (distinguishing colonial regulations from the District's handgun restriction because the former did not "remotely burden the right of self-defense as much as an absolute ban on handguns" and

---

[15] Commentators have also recognized that a substantial-burden analysis is particularly useful in analyzing Second Amendment claims. *See* Volokh, 56 UCLA L. Rev. at 1461 ("The best way to protect self-defense rights, I think, is to acknowledge that courts are likely to find slight burdens to be constitutional, to focus on defining the threshold at which the burden becomes substantial enough to be presumptively unconstitutional, and to concretely evaluate the burdens imposed by various gun restrictions."). And "the mantra that not all regulations are prohibitions has been commonplace in American right-to-bear-arms law for over 150 years, with only a few departures." *Id*. at 1461 (citing *Owen v. State*, 31 Ala. 387, 388 (1858), upholding law prohibiting the carrying of concealed weapons against state constitutional challenge because the law "was not designed to destroy the right" but was instead "a mere regulation of the manner in which certain weapons are to be borne").

thus do not "undermine our analysis"); *id.* (distinguishing handgun restriction from colonial laws imposing minor fines for unauthorized discharge of weapons, and noting that "[t]hose [colonial] laws provide no support for the severe restriction in the present case"); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1456-57 (2009) ("Volokh") (noting that *Heller* struck down the District's handgun ban because it made "self-defense materially more difficult" and that the *Heller* Court's "analysis suggested that the severity of the burden was important").[16]

To the extent Plaintiffs argue that any burden imposed by the challenged laws is substantial, Pl. Cross-MSJ at 13 n.6, this argument is no more persuasive than the similar argument rejected by the Second Circuit in *Decastro*. That case addressed a Second Amendment challenge to 18 U.S.C. § 922(a)(3), which prohibits the transportation into one's State of residence of firearms purchased or obtained outside that State. The Court rejected the Second Amendment challenge, explaining that the statute "does not substantially burden [appellant's]

---

[16] Plaintiffs also attempt to distinguish cases that declined to employ heightened constitutional scrutiny when analyzing regulations that did not impose a substantial or significant burden on fundamental constitutional rights, such as *Zablocki v. Redhail*, 434 U.S. 374 (1978), and *Gonzales v. Carhart*, 550 U.S. 124 (2007), on the ground that heightened review is allegedly required whenever a regulation appears to conflict with a specific prohibition enumerated in the Constitution. Pl. Cross-MSJ at 13 n.6. Plaintiffs are mistaken. *See Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 694 n.24 & 697 n.27 (2010) (reaffirming holding of *Employment Div. v. Smith*, 494 U.S. 872 (1990), that the Free Exercise Clause does not bar the enforcement of otherwise-valid regulations of general application that incidentally burden religious conduct); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652-53, 663 (1995) (employing reasonableness test in evaluating Fourth Amendment claim and declining to apply least-restrictive-means requirement). And as the Second Circuit observed, "[t]he weight of the burden matters in assessing the permissible bounds of regulation in other constitutional contexts" including free-speech and takings-clause contexts. *Decastro*, 682 F.3d at 167-68 (citing, *inter alia*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also id.* at 168 (a "law that regulates the availability of firearms" does not substantially burden "the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense")) (citations omitted).

41

right to keep and bear arms" because it "does nothing to keep someone from purchasing a firearm in her home state, which is presumptively the most convenient place to buy anything." *Decastro*, 682 F.3d at 168.  As with the laws challenged here, "[t]he evident purpose of the statute is to stop circumvention of state laws regulating gun possession; it does so by requiring state residents to comply with conditions of sale and similar requirements in their home state." *Id*. (citation omitted).  "Moreover," as is also true here, the statute "does not bar purchases from an out-of-state supplier if the gun is first transferred to a licensed gun dealer in the purchaser's home state."  *Id*. (citation omitted).  Accordingly, "[i]n light of the ample alternative means of acquiring firearms for self-defense purposes, § 922(a)(3) does not impose a substantial burden on the exercise of [appellant's] Second Amendment rights."  *Id*.

Plaintiffs err in their suggestion that *NRA* requires this Court to depart from *Decastro* and apply at least intermediate scrutiny.  The laws challenged in *NRA* prevented 18-to-20-year-olds from obtaining handguns from any licensed dealer anywhere in the United States, and thus, like the laws challenged in *Heller*, imposed more than a *de minimis* burden on the plaintiffs' claimed core constitutional right.  700 F.3d at 191-92.  The Fifth Circuit therefore did not have occasion to address how it might evaluate laws like those challenged in *Decastro* and here that impose a far lesser burden.

*Decastro* was not decided based on the determination that the Second Amendment right is not "really worth insisting upon," as Plaintiffs suggest, Pl. Cross-MSJ at 12 (quoting *Heller*, 554 U.S. at 634), but rather by the recognition that heightened scrutiny is often reserved in a variety of contexts only for those regulations that substantially burden other fundamental constitutional rights.  682 F.3d at 166-67 (collecting cases addressing right to marry, right to vote, and other First and Fourteenth Amendment rights).  Moreover, as the Second Circuit

42

explained, its approach was consistent with *Heller*'s rejection of rational basis review for "restrictions that undoubtedly did impose a significant burden on core Second Amendment rights." *Id.* at 167 n.5. Thus, there is no reason for this Court to depart from the sound reasoning of the Second Circuit in *Decastro*—the only court to address the question of how to evaluate this type of regulation. This Court should uphold the challenged laws on ground that they impose no substantial burden on a right protected by the Second Amendment.

C.      **Even If Plaintiffs' Suit Implicates Their Second Amendment Rights, the Challenged Federal Laws Are Constitutional.**

Defendants' opening brief explained that, even if the Court were to conclude that Plaintiffs' claims implicate their Second Amendment rights, the challenged provisions readily withstand heightened constitutional scrutiny because they substantially relate to the important government interest of preventing circumvention of State handgun laws. Plaintiffs urge the Court to apply strict scrutiny to the challenged laws, but they provide no sound reason to depart from controlling Fifth Circuit precedent on this issue. Plaintiffs also fail to undermine the reasonable fit between the challenged laws and this objective. Plaintiffs' claims therefore fail as a matter of law.

1.   **The Court Should Apply No More Than Intermediate Scrutiny.**

Even while they assert that the level of scrutiny is "unimportant," Pl. Cross-MSJ at 30, Plaintiffs urge the Court to apply strict scrutiny to the challenged laws. Plaintiffs' argument for a stringent level of review is based on a fundamental mischaracterization of the challenged laws. As noted above, contrary to Plaintiffs' assertions, there is no "blanket prohibition" or "ban" on interstate handgun transfers, nor are Plaintiffs (or anyone else) denied a "national market for handguns." *Id*. at 27-28, 30. The laws permit any non-prohibited person to purchase a handgun

43

from a licensed dealer in any State in the United States, as long as an FFL in the person's home State delivers the handgun.

Moreover, Plaintiffs' assertion that strict scrutiny applies here is impossible to reconcile with *Heller*'s statement that "laws imposing conditions and qualifications on the commercial sales of arms" are "presumptively lawful," 554 U.S. at 626-27 & n.26, and with the Fifth Circuit's application of intermediate scrutiny to a more restrictive qualification on the commercial sale of arms in *NRA*, 700 F.3d at 205-06. Although the law challenged in *NRA* prohibited *all* commercial sales of handguns from FFLs to 18-to-20-year-olds, the court determined that the laws "unquestionably . . . trigger nothing more than 'intermediate scrutiny,'" primarily because they are "[f]ar from a total prohibition on handgun possession and use." *Id.* at 205-07 (noting that plaintiffs could still acquire and possess handguns through non-commercial means and could continue to "possess, use, and purchase long guns"). Even laws that "make it considerably more difficult for a person lawfully to acquire and keep a firearm" do not trigger strict scrutiny if they do not "prevent an individual from possessing a firearm in his home or elsewhere." *Id.* at 206 (citing *Heller II*, 670 F.3d at 1255-58) (internal alterations and quotation marks omitted). Because the laws challenged here, like those at issue in *NRA*, "resemble laws imposing conditions and qualifications on the commercial sale of arms, which *Heller* deemed presumptively lawful," the laws "must not trigger strict scrutiny." *Id.* To the extent the Court applies heightened scrutiny at all, no more than intermediate scrutiny is appropriate.

Finding no support in controlling Supreme Court and Fifth Circuit case law, Plaintiffs offer several independent reasons the Court should apply strict scrutiny. None are persuasive. First, Plaintiffs assert that reduced scrutiny cannot apply because "[o]ur national union presupposes something of a free trade zone among its core benefits." Pl. Cross-MSJ at 27-28.

44

However, Plaintiffs offer no support whatsoever for this conclusory assertion, let alone explain why it warrants strict scrutiny. In any event, as noted above, the laws do not prevent Plaintiffs from obtaining firearms from any dealer in the country – as long as they take delivery from a licensed dealer in their home state. Plaintiffs likewise cite no authority for their assertion that the core Second Amendment right includes a right to purchase a handgun directly from an out-of-State FFL without using an intermediary dealer. *See id.* at 28; *cf. NRA*, 700 F.3d at 194 (*Heller* "identified the Second Amendment's central right as the right to defend oneself in one's home, and concluded that an absolute ban on home handgun possession—a gun-control law of historic severity—infringed the Second Amendment's core").

Finally, Plaintiffs' attempt to analogize the challenged laws to a hypothetical law banning the interstate sale of books is fundamentally flawed. Courts have appropriately recognized that First Amendment doctrines provide a "poor analogy" for considering Second Amendment challenges. *Hightower v. City of Boston*, 693 F.3d 61, 80 (1st Cir. 2012); *see also, e.g., United States v. Chester*, 628 F.3d 673, 687 (4th Cir. 2010) (Davis, J., concurring) (*Heller*'s "limited references" to the First Amendment "are hardly an invitation to import the First Amendment's idiosyncratic doctrines wholesale into a Second Amendment context, where, without a link to expressive conduct, they will often appear unjustified"); *Kachalsksy*, 817 F. Supp. 2d at 267 n.32 (declining to "apply *substantive* First Amendment rules in the Second Amendment context") (emphasis in original). And as a practical matter, the dangers associated with the use of firearms require different policy considerations than regulation of speech. *See, e.g., Drake v. Filko*, 724 F.3d 426, 438 (3d Cir. 2013) (upholding legislature's policy judgment that, "given the obviously dangerous and deadly nature of handguns, requiring a showing of particularized need for a

permit to carry one publicly serves the State's interest in public safety"), *cert. denied*, 134 S. Ct. 2134 (2014).

In sum, Plaintiffs have provided no sound basis for applying a more stringent standard of review here than the Fifth Circuit applied in *NRA*. To the extent the Court applies heightened scrutiny at all, no more than intermediate scrutiny is appropriate.

> **2.    The Fit Between the Challenged Laws and the Important Government Objective of Ensuring Compliance With State Handgun Laws Is Reasonable.**

As explained in Defendants' opening brief, after a multi-year investigation, Congress specifically found that the sale of handguns by FFLs to residents of other States made "ineffective" the stringent handgun regulations in certain States. Pub. L. No. 90-351, Title IV, § 901(a)(5), 82 Stat. at 225. Congress reviewed evidence indicating a "serious problem of individuals going across State lines to procure firearms which they could not lawfully obtain or possess in their own State and without the knowledge of their local authorities." S. Rep. No. 89-1866, at 19 (1966) (App. 019). Congress appropriately sought to limit circumvention of State laws by ensuring that transfers are consummated only through dealers who are well-acquainted with and required to follow a State's handgun laws.[17]

---

[17] Although not directly relevant to the analysis, Plaintiffs are mistaken when they assert that the in-State FFL (which Plaintiffs dub the "local middleman"), "does absolutely nothing that the initial federal firearms licensee cannot do as well." Pl. Cross-MSJ at 31. A background check initiated by an FFL in a purchaser's home State may involve a more extensive universe of records than a check initiated elsewhere. Under federal law, all FFLs are required to initiate a background check prior to transferring a firearm to a prospective purchaser. *See generally Nat'l Rifle Ass'n, Inc. v. Reno*, 216 F.3d 122, 125 (D.C. Cir. 2005) ("The Brady Handgun Violence Prevention Act of 1993 required the Attorney General to establish a 'national instant criminal background check system,' known as the NICS, to search the backgrounds of prospective gun purchasers for criminal or other information that would disqualify them from possessing firearms. A computerized system operated by the FBI, the NICS searches for disqualifying information in three separate databases.") (citing Pub. L. No. 103-159, § 103(b), 107 Stat. 1536 (1993)). All States have the option to implement a State-based NICS program, and currently

Plaintiffs do not dispute this legislative purpose.  Rather, their principal response is to point out what they perceive as the incongruity of permitting direct sales of rifles and shotguns to non-residents of the State in which the FFL operates.  *See* Pl. Cross-MSJ at 31-33.  Plaintiffs are correct that Section 922(b)(3) expressly does not apply:

> to the sale or delivery of any rifle or shotgun to a resident of a State other than a State in which the licensee's place of business is located if the transferee meets in person with the transferor to accomplish the transfer, and the sale, delivery and receipt fully comply with the legal conditions of sale in both such States (and any licensed manufacturer, importer or dealer shall be presumed, for purposes of this subparagraph, in the absence of evidence to the contrary, to have had actual knowledge of the State laws and published ordinances of both States).

18 U.S.C. § 922(b)(3)(A).

However, Congress's decision to enact different requirements for rifles and shotguns does not undermine the fit between the law and Congress's primary objective of preventing circumvention of State handgun laws.  Examining the extensive legislative history of the Gun Control Act, the Fifth Circuit observed that "Congress's concern [was] with the 'particular type of weapon that is predominantly used by the criminal' and that is 'principally used in the commission of serious crime', i.e., 'the handgun.'"  *NRA*, 700 F.3d at 208 (quoting S. Rep. No. 89-1866, at 4-7 (1966)).  Congress specifically determined "that the lawmakers of each State are best able to determine the conditions and needs within their own borders and to pass appropriate legislation in regard to the use of *handguns*."  S. Rep. No. 89-1866, at 5 (App. 005) (emphasis supplied).  Accordingly, Congress expressly "endeavored to draft legislation which would give

---

twenty States designate a State point of contact (POC) either partially or in full to process background checks for the NICS.  *See* 28 C.F.R. § 25.6(d); Federal Bureau of Investigation, *National Instant Criminal Background Check System*, http://www.fbi.gov/about-us/cjis/nics/general-information/nics-overview.  "Upon receiving a request for a NICS background check, [State] POCs may also conduct a search of available files in state and local law enforcement and other relevant record systems. . . ."  28 C.F.R. § 25.6(e).  Thus, a background check requested by an FFL in a purchaser's State of residence may well include information that would not be considered in a check initiated by an out-of-State FFL.

State and local officials notice of the flow of *handguns* into their jurisdictions so as to enable them to regulate their use as dictated by applicable local laws." *Id.* (emphasis supplied). Notwithstanding Plaintiffs' skepticism that State handgun laws are more extensive than State regulation of rifles and shotguns, *see* Pl. Cross-MSJ at 32, Congress specifically found otherwise. *See* S. Rep. No. 89-1866 at 4-5 (App. 004-005) (noting "the much greater extent of control over handguns by the States" and substantial variation in the types of handgun controls imposed by different States). It was therefore eminently reasonable for Congress to focus specifically on the well-documented and acute problem of circumvention of State handgun laws.

As the Fifth Circuit explained in *NRA*, "[i]t is well-settled that 'a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" 700 F.3d at 211 (quoting *Buckley v. Valeo*, 424 U.S. 1, 105 (1976)) (declining invitation to strike down age restriction on commercial handgun sales "on the ground that they do not completely prevent young adults from accessing handguns and committing violent crimes"). So too here, the fact that Congress expressly declined to "indiscriminately place further restrictions on the acquisition of all types of firearms," S. Rep. No. 89-1866, at 4 (App. 004), does not "undermine[] the reasonableness of the fit between the federal scheme and its objective." *NRA*, 700 F.3d at 211.

Furthermore, Plaintiffs' reliance on *Ezell* to undermine the fit between the challenged laws and the governmental interest is misplaced. The city ordinance at issue in that case conditioned lawful possession of a firearm at home on undergoing live firearm range training but simultaneously banned firearm ranges within the city. 695 F.3d at 698; *see also id.* at 712 (Rovner, J., concurring in the judgment) (noting that ordinance imposed "an impossible pre-

48

condition on gun ownership for self-defense in the home"). The laws at issue here lack both the restrictive purpose and effect of the *Ezell* ordinance. They do not require Plaintiffs to travel outside their home State to obtain a firearm; rather, it is Plaintiffs who assert an unfettered right to obtain a handgun nationwide without interacting with a licensed dealer in their home State. *Ezell* itself acknowledged that "laws restricting activity lying closer to the margins of the Second Amendment right, laws that merely regulate rather than restrict, and modest burdens on the right may be more easily justified." *Id.* at 708.

Finally, the fact that the District of Columbia and some other States require police pre-approval of handgun transfers supports, rather than undermines, the fit between the challenged laws and Congress's objective of ensuring compliance with State handgun laws. If the federal laws challenged by Plaintiffs did not exist, residents of those States could more easily avoid the pre-approval requirement by purchasing handguns from out-of-State dealers who may not be familiar with these requirements and would not be accountable to the States for enforcing them. This is precisely the problem Congress sought to address in enacting the Gun Control Act. *See, e.g.*, H.R. Rep. No. 90-1577, 1968 U.S.C.C.A.N. at 4420 (noting that laws were "designed to prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one").

There is thus at least a "reasonable fit," *NRA*, 700 F.3d at 207, between the challenged federal laws and the government's interest in preventing circumvention of State handgun laws. The Court should deny Plaintiffs' Motion for Summary Judgment and enter judgment for the Defendants.

### III.     The Challenged Laws Do Not Violate the Equal Protection Component of the Due Process Clause.

Plaintiffs' second claim for relief, asserting that 18 U.S.C. § 922(b)(3) and its implementing regulation violate the equal protection component of the Due Process Clause, First Am. Compl. ¶¶ 38-39, lacks merit for two reasons.  First, persons who seek to buy handguns from a dealer in their State of residence are not similarly situated to persons outside that State because residents are subject to their State's laws regulating firearms possession, and because it cannot be assumed that "licensees will be able to familiarize themselves with the often complex laws of other states and jurisdictions."  H.R. Rep. No. 99-495, reprinted in 1986 U.S.C.C.A.N. 1327, 1335; *see* Def. Mot. at 38-39.  Second, as Plaintiffs concede, *see* Pl. Cross-MSJ at 34, the challenged laws do not target a suspect class.  Accordingly, because the laws easily satisfy the requirements of intermediate scrutiny, *see supra* part II.C, it follows that they also satisfy the more relaxed standards of rational basis review, which applies to classifications that do not target a suspect class.  *See* Def. Mot. at 39.

## CONCLUSION

This Court lacks subject matter jurisdiction over Plaintiffs' claims because Plaintiffs have failed to allege a concrete injury-in-fact that is traceable to the challenged laws.  Furthermore, these laws do not impose a substantial burden on conduct that is protected by the Second Amendment and would pass constitutional muster in any event.  Accordingly, the Court should dismiss this case or enter summary judgment for Defendants.

Dated:  November 7, 2014                              Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

SARAH R. SALDAÑA
United States Attorney

 /s/ Lesley Farby
DIANE KELLEHER
Assistant Branch Director
DANIEL RIESS
LESLEY FARBY
Trial Attorneys
U.S. Department of Justice
Civil Division, Rm. 7220
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone: (202) 514-3481
Fax: (202) 616-8470
Email: lesley.farby@usdoj.gov
*Attorneys for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

On November 7, 2014, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) or the local rules.

 /s/ Lesley Farby
Lesley Farby