IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| FREDRIC RUSSELL MANCE, JR., et al., | § | Case No. 4:14-CV-00539-O |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| ERIC HOLDER, et al., | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Plaintiffs, Fredric Russell Mance, Jr., Tracey Ambeau Hanson,

Andrew Hanson, and Citizens Committee for the Right to Keep and Bear Arms, by and through

undersigned counsel, and submit their Memorandum of Points and Authorities in Reply to

Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

Dated: November 24, 2014                    Respectfully submitted,

Alan Gura (Va. Bar No. 68842)           William B. Mateja (Texas Bar No. 13185350)
Gura & Possessky, PLLC                   Michael D. Nammar (Texas Bar No. 24091685)
105 Oronoco Street, 305                  Fish & Richardson P.C.
Alexandria, VA 22314                     1717 Main Street, Suite 5000
703.835.9085/Fax 703.997.7665           Dallas, TX 75201
                                         214.747.5070/Fax 214.747.2091

By:   /s/ Alan Gura_____    By:   /s/ William B. Mateja_____
      Alan Gura                              William B. Mateja

TABLE OF CONTENTS

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      The Government Fails to Distinguish Plainly Controlling and Persuasive
        Precedent Negating Its Various Standing Theories. . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     The Government's Various Standing Theories Remain Unproven. . . . . . . . . . . . . 9

III.    The Second Amendment Secures a Right to Acquire Guns. . . . . . . . . . . . . . . . . 11

IV.     The Right to Acquire Arms Is Not Too "Generalized" a Concept. . . . . . . . . . . . 14

V.      The Interstate Handgun Transfer Ban Is Subject to Heightened Scrutiny. . . . . . . 17

VI.     The Interstate Handgun Transfer Ban Is Not Constitutional. . . . . . . . . . . . . . . . . 18

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

TABLE OF AUTHORITIES

Cases

*Barrows* v. *Jackson*,
346 U.S. 249 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bridenbaugh* v. *Freeman-Wilson*,
227 F.3d 848 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Carey* v. *Population Serv., Int'l*,
431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-7, 13

*Church of Lukumi Babalu Aye* v. *City of Hialeah*,
508 U.S. 520 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Craig* v. *Boren*,
429 U.S. 190 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Dearth* v. *Holder*,
641 F.3d 499 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 8

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16-18

*DKT Memorial Fund, Ltd.* v. *Agency for International Dev.*,
810 F.2d 1236 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Doe* v. *Bolton*,
410 U.S. 179 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7, 10, 17

*Ezell* v. *City of Chicago*,
651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 11, 17, 18

*Freeman* v. *Corzine*,
629 F.3d 146 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Griswold* v. *Connecticut*,
381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Heller* v. *District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hernandez* v. *Cremer*,
913 F.2d 230 (5th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Ill. Ass'n of Firearms Retailers* v. *City of Chicago*,
961 F. Supp. 2d 928 (N.D. Ill. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Kent* v. *Dulles*,
357 U.S. 116 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Kowalski* v. *Tesmer*,
543 U.S. 125 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Kyllo* v. *United States*,
533 U.S. 27 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Lujan* v. *Defenders of Wildlife*,
504 U.S. 555 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*McDonald* v. *City of Chicago*,
561 U.S. 742 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
700 F.3d 185 (5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Peoples Rights Org.* v. *City of Columbus*,
152 F.3d 522 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Reliable Consultants* v. *Earle*,
517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 13

*Reynolds* v. *United States*,
98 U.S. 145 (1879). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Schad* v. *Mt. Ephraim*,
452 U.S. 61 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Schneider* v. *State*,
308 U.S. 147 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States* v. *Chester*,
628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Chovan*,
    735 F.3d 1127 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States* v. *Coil*,
    442 F.3d 912 (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*United States* v. *Decastro*,
    682 F.3d 160 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Valley Forge Christian Coll.* v. *Ams. United for Separation of Church and State, Inc.*,
    454 U.S. 464 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 11

*Vill. of Arlington Heights* v. *Metropolitan Housing Dev. Corp.*,
    429 U.S. 252 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Constitutional Provisions

U.S. Const. amend. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## Statutes and Regulations

18 U.S.C. § 922(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

18 U.S.C. § 922(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9, 10, 19

28 U.S.C. § 2201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Civ. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## Other Authorities

Appellees' Br., *Nat'l Rifle Ass'n* v. *Bureau of Alcohol, Tobacco,*
    *Firearms & Explosives*, Fifth Circuit No. 11-10959 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Memorandum of Points and Authorities in Reply to Defendants' Opposition
to Plaintiffs' Motion for Summary Judgment

Argument

I.    The Government Fails to Distinguish Plainly Controlling and Persuasive
      Precedent Negating Its Various Standing Theories.

The Government's handling of the Fifth Circuit's controlling precedent in *Nat'l Rifle*

*Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir.

2012) ("*NRA*") continues to raise troubling questions. Having failed to mention *NRA*'s standing

holding at all, and its rather obvious implications here, the Government now seeks to distinguish

the case by contradicting its own arguments before the Fifth Circuit in *NRA*.

The Government claims that the *NRA* plaintiffs suffered an injury because they were

denied access to handguns by *all* FFLs, while Plaintiffs here still have access to *some* FFLs,

hence, there is no constitutional injury. But in its *NRA* brief, which is contained in the Fifth

Circuit docket and is thus a proper subject of judicial notice, the Government argued that

plaintiffs lacked standing because "these laws do not bar other channels of firearm acquisition by

persons who are 18 to 20 years old." Appellees' Br., *Nat'l Rifle Ass'n* v. *Bureau of Alcohol,*

*Tobacco, Firearms & Explosives*, Fifth Circuit No. 11-10959, at 15. "Plaintiffs thus have not

demonstrated any injury-in-fact in light of these available alternative means for obtaining

handguns and handgun ammunition for the purpose of self-defense." *Id.* at 23.

The Fifth Circuit rejected the argument. Dismissing the availability of alternative

channels, including private sales, the court held that "by prohibiting FFLs from selling handguns

to 18-to-20-year-olds, the laws cause those persons a concrete, particularized injury—i.e., the

injury of not being able to purchase handguns *from FFLs*." *NRA*, 700 F.3d at 191-92 (citation

1

omitted) (emphasis added). Respectfully—that does not mean that the outcome in *NRA* hinged on the totality of the FFL prohibition. Quite the opposite: the Fifth Circuit *rejected* the relevance of alternative commercial channels because *particular transactions*, which happened to be FFL transactions, were being denied. It does not matter that Plaintiffs can (sometimes, at great additional cost) obtain handguns from in-state FFLs; they suffer the concrete, personalized injury of not being able to purchase handguns from out-of-state FFLs, and there is no way to distinguish that injury from that acknowledged by this Court and affirmed in *NRA*.

Undaunted, the Government repeatedly claims that Plaintiffs are not injured because they are volunteering not to take advantage of the alternative allowed them by the law. On that theory, no case can ever be heard by a federal court, because a plaintiff can always take her lumps and put up with whatever restrictions the Government imposes. This is not how standing works. The question is not whether Plaintiffs can do what the law permits. The question is, are they injured by being prevented from doing what the law forbids.

Suppose that American citizens challenged a federal rule requiring that all air passengers traveling from Mexico to Texas pass through immigration and customs inspection in Seattle, thereby burdening their fundamental right of international travel recognized in *Kent* v. *Dulles*, 357 U.S. 116 (1958); *see also Hernandez* v. *Cremer*, 913 F.2d 230 (5th Cir. 1990). These plaintiffs would not lack standing for foregoing perfectly legal transit to and from Mexico that the Government would still allow through Seattle, and the chain of causation would not be broken because the airlines might "choose" not to fly the plaintiffs directly from Mexico to Texas, and "choose" to charge additional fare for the detour, which fare the Government does not set. Nor would airlines barred from servicing Texas-Mexico routes lack third-party standing to

2

assert their customers' Fifth Amendment rights. Courts would have little trouble understanding that barring direct Texas-Mexico flights implicates a real, traceable, and redressable injury, and would proceed to examine whether such flights are encompassed within the travel right and, if so, whether their prohibition passes constitutional muster.

Similar to its *NRA* arguments, the Government seeks to distinguish *Dearth* v. *Holder*, 641 F.3d 499 (D.C. Cir. 2011) because Mr. Dearth was unable to purchase firearms at all, while here, Plaintiffs might still purchase firearms. But nothing in *Dearth*'s standing analysis hinged on the prohibition's extent. Dearth twice tried, but failed, to purchase firearms, owing to his state-residence status—the same problem facing Plaintiffs here. *Dearth*, 641 F.3d at 501.

> [Dearth] argues the Government denied him the ability to buy a firearm by requiring, via Question 13 on Form 4473, that he reside in a state as a condition of making such a purchase. We agree with Dearth that the Government has denied him the ability to purchase a firearm and he thereby suffers an ongoing injury.

*Id.* at 502.

Note the *Dearth* court's reference to "a" firearm, not "all" firearms. The difference is meaningful. Just as the Government has sung a different song before the Fifth Circuit in *NRA*, so, too, did the Government make that opposite argument in *Dearth*. Per the Government, Dearth was not injured because he can still buy guns in Canada. *See* Pl. Br. Opp. Summ. Judgment, Dkt. 24, at 14 n.4. Incredibly, this argument—that the Government does not violate the Second Amendment by banning access to guns in the United States, so long as plaintiffs can acquire guns in another country[1]—passed muster in the District Court, but the appeal is still outstanding, and

---

[1]*Contra Schneider* v. *State*, 308 U.S. 147 (1939); *Schad* v. *Mt. Ephraim*, 452 U.S. 61 (1981); *Ezell* v. *City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011) (allowing people to speak in another jurisdiction is no answer to a First Amendment claim, "[t]hat sort of argument should be no less unimaginable in the Second Amendment context").

3

the D.C. Circuit may yet take a different view. In any event, that argument did not aid the Government's unsuccessful standing arguments on appeal in the case.

The Government, of course, has no response to the D.C. Circuit's holding that "the requirement[]of traceability [is] clearly met." *Dearth*, 641 F.3d at 501. It can only offer that "because the Hanson Plaintiffs do not assert the same injury alleged by the plaintiff in *Dearth*, whether or not the injury at issue there was traceable to the actions of the defendants is irrelevant here." Def. Br., Dkt. 28, at 7.

Respectfully—Dearth and the Plaintiffs here *both* challenge 18 U.S.C. § 922(b)(3)'s residence restriction, as administered by Defendants' Form 4473. Both are disqualified from engaging in their transactions on account of state residence. Is the Government claiming that *Dearth* involved some *other* law codified at 18 U.S.C. § 922(b)(3)? Do the Hansons reside in some parallel universe, where Form 4473s are administered by *other* Eric Holders? How is the Government's policing of 18 U.S.C. § 922(b)(3)'s residence restrictions, through Form 4473, traceable to the Government in *Dearth*, but not traceable to the Government here? Dearth resides in Winnipeg and the Hansons in Washington, and so neither reside in the same state as their respective FFLs. How are their injuries traced differently, if not to the same Government defendants, administering the same question on the same form?

The Government claims that *Carey* v. *Population Serv., Int'l*, 431 U.S. 678 (1977), is irrelevant because "[t]he excerpt from *Carey* relied on by Plaintiffs to support the Hanson Plaintiffs' standing is taken from the section of that decision exploring the merits of the plaintiffs' claim, rather than plaintiffs' standing to sue." Def. Br., Dkt. 28, at 4.

Of course, the Supreme Court need not preface every discussion of a traceable, redressable injury with a headline, "This Discussion Has Implications for Standing." The issue here is whether the Government, by banning the sale of a product, injures consumers—and the fact that the *Carey* claim had merit establishes that the *Carey* consumers *had standing*, because they were injured, in exactly the same way that Plaintiffs are injured. If contraceptive consumers are injured by "the restriction of distribution channels to a small fraction of the total number of possible retail outlets," *Carey*, 431 U.S. at 689, the same is true here—and that injury is just as redressable by this Court.

In *Doe* v. *Bolton*, 410 U.S. 179 (1973), doctors had standing to challenge, among others, a law barring women from obtaining out-of-state abortions. But the Government claims that *Doe* "is distinguishable because the challenged law in *Doe* prevented the plaintiff from exercising a constitutional right." Def. Br., Dkt. 28, at 5 (quotation omitted). This is merely begging the question. *Of course* Plaintiffs here are claiming that they are being barred from exercising a constitutional right. *See* U.S. Const. amend. II (securing "the right of the people, to keep and bear arms"). But standing inquiries are not about whether the Constitution is being violated, they are about cognizable, traceable, redressable injuries-in-fact. Merit questions are a separate matter.

Perhaps sensing that jurisdiction cannot be defeated by arguing a case on the merits, the Government falls back on the argument "that in the 1970s, the Supreme Court had 'visibly relaxed its traditional standing principles in deciding abortion cases,' making the applicability of *Doe* beyond its specific constitutional context problematic at best." Def. Br., Dkt. 28, at 5 (quotation omitted). In other words, there is more standing to assert the unenumerated right to an abortion, than there is to assert the enumerated Second Amendment right to keep and bear arms.

Abortion is a first class right, which people may access the federal courts to enforce, but the Second Amendment is a poor relation, its violations effectively immunized from judicial review.

The Supreme Court flatly barred this theory long ago. At least for standing purposes, no constitutional right is "in some way less 'fundamental' than" others. *Valley Forge Christian Coll.* v. *Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 484 (1982).

> The requirement of standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Moreover, we know of no principled basis on which to create a hierarchy of constitutional values or a complementary "sliding scale" of standing which might permit respondents to invoke the judicial power of the United States.

*Id.* (citation and footnote omitted). Even if abortion cases were the vehicle by which the 1970s Court "relaxed" its Article III doctrine, the discussion on standing relates to Article III, not abortion or gun or any other rights. Surely Second Amendment claimants could not distinguish unfavorable Article III precedent by arguing that such cases involved, for example, environmental causes.

The Government's arguments against the relevance of *Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), are no better. Suggesting, incorrectly, that this case and others inconvenient to the Government's position have been overruled *sub silentio*, the Government offers that "*Virginia Pharmacy*—like *Carey* and *Doe*—predates the Supreme Court's modern standing doctrine," by which "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish" where the plaintiffs are not directly subjected to the regulation at issue. Def. Br., Dkt. 28, at 8 (quoting *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 562 (1992)).

6

Of course, the Fifth Circuit does not share this view. It expressly relied on *Virginia Pharmacy* in deciding *NRA* barely two years ago. *See NRA*, 700 F.3d at 192. Neither have *Carey* or *Doe* been overruled—these remain foundational constitutional precedents. If *Carey*, *Doe*, and *Virginia Pharmacy* are all overruled, that is indeed dramatic news and would require at least some citation to that effect, or at least, a developed argument. Nor does the Government explain how it is that Plaintiffs are not the ones directly subject to the regulation at issue. And even if standing is "substantially more difficult" in indirect cases, it is also "not precluded," *Lujan*, 504 U.S. at 562, so in the end, this argument obtains the Government nothing.

Moreover, without any apparent sense of irony, the same paragraph claiming that *Virginia Pharmacy*, decided in 1976, is obsolete, then cites 1972 and 1973 cases purporting to limit pre-enforcement standing to the First Amendment. In other words, if a pre-*Lujan* case supports Plaintiffs' standing, it is obsolete, even if the Fifth Circuit expressly relied upon it not two years ago in a practically identical case; but if a pre-*Lujan* case might be alleged to support the Government's theories, even if the case pre-dates Plaintiffs' cases, it remains valid.

Of course, the Government's claim that pre-enforcement standing is limited to the First Amendment—blithely asserted without any developed argument—is wrong, as demonstrated by innumerable cases such as *Carey*, which allowed pre-enforcement standing to challenge contraceptive sales restrictions; *Reliable Consultants* v. *Earle*, 517 F.3d 738 (5th Cir. 2008), which allowed pre-enforcement standing to challenge sex-toy sale restrictions; and various cases allowing for pre-enforcement standing to challenge gun sale restrictions, *e.g.*, *Peoples Rights Org.* v. *City of Columbus*, 152 F.3d 522 (6th Cir. 1998). Absolutely nothing in the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, limits its reach to First Amendment cases.

7

In any event, Plaintiffs' case is not more in the nature of a pre-enforcement case than was either *NRA* or *Dearth*. As the D.C. Circuit understood *Dearth*, it was not a pre-enforcement case at all, but rather one of non-applicant standing. "[W]e hold the Government cannot so easily avoid suit when it has erected a regulatory scheme that precludes Dearth from truthfully completing the application form the Government requires for the purchase of a firearm." *Dearth*, 641 F.3d at 502. The concept of non-applicant standing is not new. "The Supreme Court has recognized that otherwise qualified non-applicants may have standing to challenge a disqualifying statute or regulation." *DKT Memorial Fund, Ltd.* v. *Agency for International Dev.*, 810 F.2d 1236, 1238 (D.C. Cir. 1987) (citing *Vill. of Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1976)). Here, the Plaintiffs are perfectly qualified to engage in their desired transaction but for their inability to truthfully fill out Form 4473 in any way that might satisfy the challenged provision.

Finally, the Government mischaracterizes the facts of *Bridenbaugh* v. *Freeman-Wilson*, 227 F.3d 848, 850 (7th Cir. 2000) and *Freeman* v. *Corzine*, 629 F.3d 146 (3d Cir. 2010). Repeating the mischaracterization of those cases by the Fourth Circuit—which studiously ignored this Circuit's controlling law—the Government claims that the only issue in the wine cases was the inability to obtain specific bottles of wine, while the Hansons are not barred from obtaining specific guns. Even were this characterization of *Bridenbaugh* and *Freeman* correct—and it is not— it would be a distinction without a difference. The cases stand for the proposition that when a government bans commercial transactions on grounds of state residence, the impacted consumers have an Article III injury. Nothing in the reasoning of *Bridenbaugh* and *Freeman* is based upon the total availability of the particular article involved in the transaction.

8

In *Bridenbaugh*, "difference in price [was] another source of injury," as "Indiana dealers collect state excise taxes on wines that pass through their hands, while the shippers with which plaintiffs used to deal do not." *Bridenbaugh*, 227 F.3d at 849-50. The *Freeman* plaintiffs challenged a law prohibiting them from importing only one gallon of wine each 24 hours, absent a $50 fee, *Freeman*, 629 F.3d at 152 & n.2, because "traveling to distant wineries in order to return with small quantities of wine is highly impracticable." *Id.* at 154. Plaintiffs' claims are indistinguishable. They complain of the added expense and impracticability of purchasing out-of-state handguns, and likewise complain of the attendant loss of choice.

Precedent confirms that Plaintiffs have standing.

II.   THE GOVERNMENT'S VARIOUS STANDING THEORIES REMAIN UNPROVEN.

There is little point in addressing at length the other arguments against standing proffered by the Government—for example, that Plaintiffs' only injury is the transfer fee imposed by a person the Government does not control, where the Fifth Circuit quite plainly recognizes that the denial of FFL sales is an injury; or that their injury is conjectural, *when the Hansons have already flown to Dallas and filled out forms with Mance*, and when it does not take a strong leap of logic to presume that American consumers would buy handguns across state lines, just as they buy everything else. The Citizens Committee for the Right to Keep and Bear Arms ("CCRKBA") plainly has associational standing. *See NRA*, 700 F.3d at 191.

The Government's redressability claim with respect to the Hansons, that they could not prevail without challenging also 18 U.S.C. § 922(a)(3), displays awareness that the section provides an exemption for transactions compliant with Section 922(b)(3). If this Court strikes down Section 922(b)(3) as being too restrictive, how could the Government continue to enforce

9

Section 922(a)(3) in a manner that would not take into account the Court's ruling with respect to

Section 922(b)(3)'s scope? There is, however, a simple expedient for this, provided by Fed. R.

Civ. P. 15, and Plaintiffs address this issue by separate motion for leave to amend their complaint

on this point. The Government takes no position on that motion.

As for Mance's standing, the Fifth Circuit has already admonished the Government where

it "d[id] not offer a serious argument to rebut standing" in the case of a commercial distributor

asserting the rights of his customers. *United States* v. *Coil*, 442 F.3d 912, 915 n.2 (5th Cir. 2006)

(citations omitted). Considering the Government's moving papers completely ignored the

directly controlling Fifth Circuit precedent on standing, it is difficult to see the Government

obtaining a different standing result here than it did in *Coil*.

And indeed, the Government's argument with respect to Mance is decidedly not serious.

Turning again to the calendar, the Government offers that the Supreme Court's opinion in

*Kowalski* v. *Tesmer*, 543 U.S. 125, 129 (2004) must have overruled *Carey*, if not the entire

doctrine of third-party standing. "*Carey* was decided long before the Supreme Court's 2004

*Kowalski* decision, and cannot overcome the later decision's holding."  Def. Br., Dkt. 28, at 20.

But *Kowalski* did not overrule *Carey*. To the contrary—the opinion's plain text reveals that it

*reaffirmed* commercial sale cases, including, *specifically*, contraception cases. *See Kowalski*, 543

U.S. at 130 (citing *Griswold* v. *Connecticut*, 381 U.S. 479 (1965)); *see also Kowalski*, 543 U.S.

at 135 (Thomas, J., concurring) (citing *Carey* as good law). Of course the Court also noted that

third-party standing exists in cases where the transactions concern beer, *Kowalski*, 543 U.S. at

130 (citing *Craig* v. *Boren*, 429 U.S. 190 (1976)); real property, *id.* (citing *Barrows* v. *Jackson*,

346 U.S. 249 (1953)); and abortion, *id.* (citing *Doe*).

10

Why should guns be different?

As other courts have held, guns are not different. *Kowalski* did not involve any commercial transactions. But *Ezell* v. *City of Chicago*, 651 F.3d 684 (7th Cir 2011), and *Ill. Ass'n of Firearms Retailers* v. *City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014), did. The Government's complaint that these cases were wrongly decided, as they somehow conflict with *Kowalski*, is wrong. As stated *supra*, *Kowalski* plainly approves of commercial third-party standing, which has long been the law.

As for the Government's calendar-based *Kowalski* argument: In *Coil*, which concerned standing to assert customer's constitutional rights in obscene materials, the Fifth Circuit had no trouble condemning the Government's standing argument as non-serious two years after *Kowalski*. The Fifth Circuit also wasted no time in affirming standing in *Reliable Consultants*, which concerned sex toys, four years after *Kowalski*. And how does the Government distinguish *Reliable Consultants*? "[T]his is not a substantive due process case." Def. Br., Dkt. 28, at 20. In other words, just as there is more "abortion standing" than Second Amendment standing, Def. Br., Dkt. 28, at 5,  there is more "sex toy standing" than Second Amendment standing. *Contra Valley Forge*, 464 U.S. at 484.

III.    THE SECOND AMENDMENT SECURES A RIGHT TO ACQUIRE GUNS.

The Government does not have any serious argument against the notion that if the Second Amendment secures a right to "keep" handguns, it must, of course, secure the right to *acquire* handguns. As Plaintiffs explained, early twentieth century state enactments concerning, largely, regulations on the *carrying* of guns, do not remotely implicate, let alone disprove, the right to *acquire* guns. Pl. Summ. Judg. Br., Dkt. 22, at 24-26. In response, the Government still endorses

11

the relevance of the laws it cited "restricting the acquisition, possession, *or carrying* of one or more types of firearms." Def. Br., Dkt. 28, at 26 (emphasis added). By this logic, Plaintiffs and Bill Gates, together, have billions of dollars.

Of course, it is unclear why a restriction on a type of gun is relevant here, nor is there any attempt to refute the fact that at the times these laws were enacted, the Second Amendment has been held inapplicable as against the states by the Supreme Court. Defendants respond that some, though not all, states had analogous provisions securing the right to bear arms. But there is no reason to assume that each of those provisions was understood to be co-extensive with the Second Amendment—particularly where, in many of these states, Plaintiff Tracey Hanson might never have been able to acquire a handgun on account of her race.

Yet the Government adds additional irrelevant laws of the same vintage, suffering from the same defects. And one such law actually contradicts the Government's position: "in 1918, Montana made it 'unlawful for any person to purchase, borrow, or otherwise acquire possession of any firearm . . . from any person, firm or corporation outside of the State of Montana, without first obtaining a permit from the sheriff of the County in which such person lives.'" Def. Br., Dkt. 28, at 26 n.10 (citation omitted). *Exactly*. Montana allowed its residents to acquire firearms out of state, and chose to subject that activity to a permit. That no more defeats the notion that the right to acquire guns extended outside the state, than does attorney licensing contradict the right to counsel. Notably, Montana's law mirrors that of the District of Columbia today, which encourages out-of-state handgun purchases.

There is no clear answer to the fact that the Supreme Court referenced the right to acquire a gun. "What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it,

from mounting his Gun on his Chimney Piece . . .?" *District of Columbia* v. *Heller*, 554 U.S. 570, 583 n.7 (2008) (quotation omitted). Various courts, from 1871 through 2014, have explicitly held this right exists, and there is no way to understand *NRA* without acknowledging the fact that the Fifth Circuit operated under the same presumption, Pl. Summ. Judgment Br., Dkt. 22, at 16-17.

None of the Government's attacks on this common sense proposition have any merit. Its attacks on *Reliable Consultants* and *Carey* are based, again, on the fact that those cases dealt with substantive due process rights. So what. The cases' recognition of a right to acquire did not turn on the rights' specific natures. The not very difficult concept is, if one has a right to keep and use something under the Constitution, one has the right to *acquire* it. Nor does the scope of the retail restriction matter. The question here is, is there a right? Only once the right is acknowledged, as it must be, does a court evaluate the merits.

And under no fair reading of *NRA* did the Fifth Circuit reject the concept that there is a right to acquire handguns. Again, the opinion contains many pages that the Government prefers to skip— on this point, a lengthy discussion "summariz[ing] considerable evidence" about whether "burdening the conduct at issue—the ability of 18-to-20-year-olds to purchase handguns from FFLs—is consistent with a longstanding, historical tradition . . . ." *NRA*, 700 F.3d at 203. The Fifth Circuit never thought to address whether there is a right to acquire handguns, probably because the proposition is too obvious to waste time on. Instead, the Fifth Circuit considered historical regulations that "targeted particular groups for public safety reasons," *id.* at 200, especially the young. And even though it suspected that the particular regulation at issue—not *all* commercial regulations, but the one at issue concerning 18-20-year-olds—passed step one, the

13

Fifth Circuit *still* was not so sure of the matter as to dispense with step two, and only upheld the

regulation after proceeding with an intermediate scrutiny level analysis. *Id.* at 204.

It seems somewhat absurd that so much effort must be dedicated to establishing the

notion that there is a right to acquire what one has a fundamental right to keep. The Fifth Circuit

understood this much in holding there is a right to acquire *sex toys* under the unenumerated

substantive due process right of intimate relations, but the Government expects this Court to hold

there is no right to acquire "arms" under the Second Amendment?

IV.    The Right to Acquire Arms Is Not Too "Generalized" a Concept.

Perhaps understanding just how untenable its "no right" position is, the Government

attacks Plaintiffs for addressing the law "at too high a level of generality." Def. Br., Dkt. 28, at

28. And in advancing that theory, the Government elevates the Complaint's level of generality

well-beyond anything imagined, let alone claimed, by the Plaintiffs. The Government condemns

the "*Unconditional* Right to Buy or Sell Firearms," *id.* (emphasis added), "an *unfettered* right to

buy handguns from the dealer of one's choice," *id.* at 29 (emphasis added), or a right to handgun

sales "without any conditions or qualifications." *Id.*

None of these supposedly claimed rights are found in the Complaint. Nothing in

Plaintiffs' filings suggests a claim to unconditional, unfettered, or absolute rights. And Plaintiffs

need not prove that there is a *totally unqualified* right, simply to defeat one discreet qualification.

Accordingly, the argument that "[t]his Court need not decide whether the Second

Amendment protects a general right to acquire handguns because the challenged laws do not

prevent the Hanson Plaintiffs from acquiring handguns," Def. Br., Dkt. 28, at 28, is silly.

Constitutional law is not an all-or-nothing proposition, such that every regulation, every burden

on constitutional rights falling short of a complete prohibition is valid. And if this Court believes there is no right to acquire handguns, it should say so. But there is no way to decide the case without passing on the question Plaintiffs present, which is based on a normal right to acquire handguns, subject, as all rights are, to some regulation—not an *unfettered*, absolute, limitless, etc. right to acquire handguns.

Just as it seeks to view Plaintiffs' claims at stratospheric levels of generality, so, too, does the Government go too far in the other direction. It alternatively prefers to view this case not as one that asks whether a regulation of the right to acquire guns goes too far, but whether there is a right "to sell or buy firearms *in any particular forum*," *id.* at 27 (emphasis added), or a "right to buy firearms *from a licensed dealer operating outside one's State of residence without using an in-State dealer*, [or] a right of licensed dealers to sell firearms *outside the State in which they operate without using an intermediary dealer in the purchaser's home State*," *id.* (emphasis added). Because no rights exist at this level of specificity, the Government always wins by improperly shifting the burden to the individual. After all, Plaintiffs cannot prove that there were regulated dealers in 1791, let alone regulated dealers with any particular expectations about residency requirements.

Few constitutional claims might ever survive the Government's interesting and novel theory of deriding rights altogether as "generalized" concepts, and framing every constitutional case as one seeking a different, highly specific "right" defined by the requested relief. The First Amendment, which protects the free exercise of religion, says nothing about sacrificing chickens. But free exercise principles are not too generalized a concept to secure chicken sacrifice—a very specific act—and in the exercise of a religion that had not yet originated in 1791, no less. *See*

15

*Church of Lukumi Babalu Aye* v. *City of Hialeah*, 508 U.S. 520 (1993). The Framers had never seen thermal imaging devices. But the Fourth Amendment's Warrant Clause was not too generalized a concept to secure one's home against such means of surveillance. *Kyllo* v. *United States*, 533 U.S. 27 (2001).

That is how constitutional law usually works, and it works the same way in the Second Amendment. It may be correct to say, in the colloquial sense, that the Second Amendment secures the right to have handguns and functional firearms in the home. But that is not exactly what *Heller* held. In *Heller*, "we *held* that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, *and* we struck down a District of Columbia law that banned the possession of handguns in the home." *McDonald* v. *City of Chicago*, 561 U.S. 742, 749-50 (2010) (emphasis added). The District of Columbia argued strenuously that its laws could survive recognition of the Second Amendment as an individual right, a position shared by the Solicitor General, who acknowledged a symbolic right but claimed a trial was needed to determine if banning handguns and the keeping of functional firearms was constitutional. But the Court disagreed. What the Government would deride as a "generalized concept," the keeping and bearing arms, could not sustain the District's laws. As *McDonald* described it, a holding defining the right, generally, was made, and then the case's facts were applied to it.

Unsurprisingly, *Heller* anticipated the Government's narrow-right line of argument, because Justice Breyer presented a version of this in dissent. The majority answered:

> Justice Breyer chides us for leaving so many applications of the right to keep and bear arms in doubt, and for not providing extensive historical justification for those regulations of the right that we describe as permissible. But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify

the entire field, any more than *Reynolds* v. *United States*, 98 U.S. 145 (1879), our first in-depth Free Exercise Clause case, left that area in a state of utter certainty.

*Heller*, 554 U.S. at 635 (citation omitted).

The correct approach is not to ask whether the laws survive an absolute right, because there is no absolute right. Nor is this a case about a "right," as such, to purchase handguns from regulated dealers in another state, any more than *Doe* was about an interstate abortion right, or *Lukumi Babalu* was about a "right to sacrifice animals." This is a case calling for an "application[] of the right to keep and bear arms," *Heller*, 554 U.S. at 635, specifically, whether the right to keep handguns, which must necessarily include the right to acquire handguns, is violated by the interstate handgun transfer ban. It is.

V.      THE INTERSTATE HANDGUN TRANSFER BAN IS SUBJECT TO HEIGHTENED SCRUTINY.

The Government continues to rely again on outlier cases such as *United States* v. *Decastro*, 682 F.3d 160 (2d Cir. 2012) that applied rational basis to uphold Second Amendment restrictions. And notwithstanding its earlier protestations that abortion standards have nothing to do with the Second Amendment when it comes to standing, the Government veers 180 degrees to argue for importing the abortion right's "undue burden" standard.

To be sure, apart from the Second Circuit, no court has ever applied rational basis or "undue burden" to the Second Amendment. None. At least one court has specifically rejected the argument. "The City urges us to import the 'undue burden' test from the Court's abortion cases, but we decline the invitation. Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate . . . ." *Ezell*, 651 F.3d at 706 (citation omitted).

17

And again, the law of *this* circuit: "Assuming that the challenged federal laws burden conduct within the scope of the Second Amendment, we must evaluate the laws under a suitable standard of constitutional scrutiny." *NRA*, 700 F.3d at 205. The only standards mentioned by the Fifth Circuit: strict and intermediate. *Id.* "This more lenient level of scrutiny could be called 'intermediate' scrutiny, but regardless of the label, this level requires the government to demonstrate a 'reasonable fit' between the challenged regulation and an 'important' government objective." *Id.* at 195 (citations omitted).

It bears repeating: "[W]e know that *Heller*'s reference to 'any standard of scrutiny' means any *heightened* standard of scrutiny; the Court specifically excluded rational-basis review." *Ezell*, 651 F.3d at 701 (citation omitted). "[S]ome sort of heightened scrutiny must apply." *United States* v. *Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013). "[T]he [Supreme] Court would apply some form of heightened constitutional scrutiny if a historical evaluation did not end the matter." *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir. 2010). "*Heller* clearly does reject any kind of 'rational basis' or reasonableness test," *Heller* v. *District of Columbia*, 670 F.3d 1244, 1256 (D.C. Cir. 2011), and thus, the choice is "between strict and intermediate scrutiny," *id.* at 1257.

Not that the choice here matters, because the Government cannot satisfy either test.

VI.    The Interstate Handgun Transfer Ban Is Not Constitutional.

Finally, on page 46 of the Government's 50-page reply, it seeks to explain how the interstate handgun prohibition might possibly be constitutional. The effort's thinness leaves no doubt as to why the Government labors so hard to avoid reaching the question at all. There is, essentially, no substantive answer.

18

"Congress appropriately sought to limit circumvention of State laws by ensuring that transfers are consummated only through dealers who are well-acquainted with and required to follow a State's handgun laws." Def. Br., Dkt. 28, at 46. In a footnote, the Government adds that "A background check initiated by an FFL in a purchaser's home State may involve a more extensive universe of records than a check initiated elsewhere . . . . a background check requested by an FFL in a purchaser's State of residence may well include information that would not be considered in a check initiated by an out-of-State FFL." *Id.* at 46-47 n.17.

The same, of course, is true of rifle and shotgun sales. Yet those may be made by out-of-state FFLs who *are required to comply with the laws of the purchaser's home state.* 18 U.S.C. § 922(b)(3). Why cannot handgun sales be made to comply with the laws of the purchaser's home state as well? Why cannot Mance run the same background check in selling the Hansons handguns that he is already allowed to run in lawfully selling them rifles? There is no answer.

The issue is not whether Congress could "have gone farther than it did" in regulating long-gun sales. Def. Br., Dkt. 28, at 48 (quoting *NRA*, 700 F.3d at 211). The issue is whether the Government could have gone as far as it did in regulating handgun sales, an issue on which the Government bears the burden of proof even under intermediate scrutiny. Plaintiffs merely point out that when long guns are at issue, much more narrowly tailored laws apply. The different treatment given long guns merely supplies an example of better tailoring, and raises the obvious question of why what works for long guns does not work for handguns—a question the Government fails to answer. Were the Government tomorrow to extend the same restrictions to long gun sales that it does currently to handgun sales, it would be expanding the scope of its constitutional violation.

19

In its only effort to explain why better tailoring is unavailable, the Government offers:

> the fact that the District of Columbia and some other States require police preapproval of handgun transfers supports, rather than undermines, the fit between the challenged laws and Congress's objective of ensuring compliance with State handgun laws. If the federal laws challenged by Plaintiffs did not exist, residents of those States could more easily avoid the pre-approval requirement by purchasing handguns from out-of-State dealers who may not be familiar with these requirements and would not be accountable to the States for enforcing them.

Def. Br., Dkt. 28, at 49.

This makes no sense. Plaintiffs are *not* suggesting that when an out-of-state customer shows up at an FFL seeking a handgun, the FFL should complete the transaction without consulting the customer's state laws. That is absolutely not what the law requires of long gun sales, and it is not what Plaintiffs seek for handguns. Were Plaintiffs to prevail here, they would hardly be exempt from pre-approval requirements, which is why the District of Columbia's Police Chief—not a fan of evading D.C.'s gun laws—rushed to expressly *allow* these types of sales to occur. Had Plaintiffs sought to enable evasion, the D.C. police would not have essentially supported their lawsuit by removing the D.C. barrier to interstate handgun sales in response to the previous round of litigation.

The fact that the District of Columbia and some states require police preapproval of handgun transfers *eliminates* the risk that those jurisdictions' residents would evade local laws, and guarantees that the police already conducted whatever unusual background check might have been required at the local level. An FFL is already required to determine the residence status of every customer, as demanded by Form 4473. When a customer indicates D.C. residence on Form 4473 and presents valid proof of District residence, the FFL can simply demand the D.C. firearm

20

transfer authorization that FFLs already demand of D.C. residents buying rifles and shotguns. Section 922(b)(3), after all, expressly entrusts licensees with responsibility to follow local laws.

To be sure, FFLs should always follow the law. On that there is no dispute. But the Government offers no explanation as to why FFLs can follow local rifle and shotgun laws, which can be quite complex, but not follow local handgun laws—especially when long gun and handgun requirements are identical.

## CONCLUSION

Cutting through all the fog of the Government's endless, meritless standing objections and pleas for reduced scrutiny, in the end, the interstate handgun transfer prohibition would not even pass rational basis review. Nothing in Plaintiffs' relief would bar the Government from continuing to require that FFLs (1) demand proof of their customers' residence, and (2) comply with all state and local laws. The Government's invocation of an anti-circumvention rationale to prohibit transactions that fully comply with all laws makes no sense.

Respectfully, the Court should grant Plaintiffs' motion for summary judgment.

Dated: November 24, 2014

Respectfully submitted,

Alan Gura (Va. Bar No. 68842)
Gura & Possessky, PLLC
105 Oronoco Street, 305
Alexandria, VA 22314
703.835.9085/Fax 703.997.7665

William B. Mateja (Texas Bar No. 13185350)
Michael D. Nammar (Texas Bar No. 24091685)
Fish & Richardson P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
214.747.5070/Fax 214.747.2091

By:   /s/ Alan Gura
      Alan Gura

By:   /s/ William B. Mateja
      William B. Mateja

21

Certificate of Service

On November 24, 2014, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) or the local rules.

/s/ Alan Gura
Alan Gura