**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **FREDRIC RUSSELL MANCE, JR. et al.,** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:14-cv-539-O** |
| | § | |
| **ERIC H. HOLDER, JR. and B. TODD** | § | |
| **JONES,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment and their Brief and Appendix in Support (ECF Nos. 15-17), filed September 23, 2014; and Plaintiffs' Response (ECF No. 24), filed October 17, 2014. Also before the Court are Plaintiffs' Motion for Summary Judgment and their Memorandum and Appendix in Support (ECF Nos. 21-23), filed October 17, 2014; Defendants' combined Response and Reply and their Brief and Appendix in Support (ECF No. 27), filed November 7, 2014; and Plaintiffs' Reply (ECF No. 31), filed November 24, 2014. The Court held a hearing on these motions on January 20, 2015. Having considered the motions, the briefing, the record, and the applicable law, the Court finds that Defendants' Motion to Dismiss should be and is hereby **DENIED**. For the reasons that follow, Plaintiffs' Motion for Summary Judgment is **GRANTED**, and Defendants' Motion for Summary Judgment is **DENIED**.

## I.     BACKGROUND

Plaintiffs Fredric Russell Mance, Jr. ("Mance"), Andrew Hanson ("Andrew Hanson"), Tracey Ambeau Hanson ("Tracey Hanson"), and the Committee for the Right to Keep and Bear Arms ("the Committee") (collectively, "Plaintiffs") brought this action to challenge the federal regulatory regime as it relates to the buying, selling, and transporting of handguns over state lines under 18 U.S.C. §§ 922(a)(3) and 922(b)(3). *See* 2d Am. Compl., ECF No. 33. Specifically, Plaintiffs allege that "the federal interstate handgun [transfer] ban limits their choices as consumers, harms competition in the market, and raises prices," and the ban infringes on a fundamental right guaranteed by the Constitution. *Id.* at ¶¶ 22, 35.

At issue are several federal statutes, as well as laws of the state of Texas and the District of Columbia. Texas law does not forbid the sale of handguns to individuals residing outside the state. The District of Columbia does not prohibit the importation of firearms, but it does require that all firearms be registered. *See* D.C. Code § 7-2502.01(a) (2014). Pursuant to provisions enacted as part of the Gun Control Act of 1968, 18 U.S.C. §§ 921-31, subsections 922(a)(3) and 922(a)(5) forbid individuals from transporting into or receiving in their state of residency any firearm acquired outside of that state, except for firearms acquired by bequest or intestate succession or pursuant to a transfer from a federally licensed dealer under 18 U.S.C. § 922(b)(3). 18 U.S.C. § 922(a). Section 922(b)(3) and 27 C.F.R. § 478.99(a) bar a federal firearms licensee from transferring[1] firearms to individuals who do not reside in the state in which the dealer's place of business is located. 18 U.S.C. § 922(b)(3); 27 C.F.R. § 478.99(a). This restriction does not apply to the transfer of shotguns or rifles.

---

[1] Specifically, § 922(b)(3) makes it unlawful for a federal firearms licensee to "sell or deliver" a firearm to a non-federal firearms licensee. 18 U.S.C. § 922(b)(3).

*See* 18 U.S.C. § 922(b)(3); 27 C.F.R. § 478.96(c)(1). The Court refers to these statutes and regulations, collectively, as the federal interstate handgun transfer ban.[2]

The undisputed facts are as follows. Mance, a Texas resident, is a federal firearms licensee ("FFL") who retails firearms from his business in Arlington, Texas. Andrew and Tracey Hanson, a husband and wife, are residents of the District of Columbia and are legally eligible to purchase and possess firearms. On June 21, 2014, the Hansons met with Mance to purchase two handguns. Mance could not sell and deliver the handguns directly to the Hansons because it was illegal to do so under 18 U.S.C. § 922(b)(3) and 27 C.F.R. § 478.99(a). Instead, the only option available to the Hansons and Mance was to transfer the handguns to the only FFL in the District of Columbia, Charles Sykes ("Sykes"), who would then complete the sale. The transfer to Sykes would require a $125-fee per transfer as well as shipping costs. Sykes does not carry his own inventory of firearms. In summary, the Hansons would pay Mance for the firearms in Texas, pay the costs associated with Mance shipping the firearms to Sykes in the District of Columbia, and then retrieve the firearms from Sykes after paying him a $125 transfer fee per firearm. Because the Hansons could not immediately take possession, they declined to complete the transaction with Mance. Tracey Hanson, Andrew Hanson, and Mance are members of the Committee, a non-profit organization dedicated to promoting Second Amendment rights. In response to these restrictions, Plaintiffs filed this action on July 14, 2014.

---

[2] Although "federal interstate handgun transfer ban" may be a bit of a misnomer because these restrictions do not completely bar interstate transfers of handguns, it sufficiently captures the prohibition related to transfers to non-federal firearms licensees. Federal firearms licensees are necessary to complete interstate transactions because a citizen without a federal firearms license is barred from acquiring a handgun directly from a federal firearms licensee in another state. *See* 18 U.S.C. § 922(b) ("Paragraphs (1), (2), (3), and (4) of this subsection shall not apply to transactions between [federal firearms licensees].").

3

They seek injunctive and declaratory relief, costs, and attorney's fees. The instant motions have been fully briefed and are ripe for adjudication.

## II.    LEGAL STANDARDS

Defendants Eric H. Holder, Jr. and B. Todd Jones ("Defendants")[3] move to dismiss Plaintiffs' claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or, in the alternative, to enter summary judgment for Defendants pursuant to Rule 56. Defs.' Mot. Dismiss, ECF No. 15. Because the Court considers evidence beyond the pleadings that has been attached to Defendants' motions as well as attached to Plaintiffs' cross-motion for summary judgment, the motion to dismiss under Rule 12(b)(6) is subsumed by the summary judgment motions. *See Exxon Corp. v. Md. Cas. Co.*, 599 F.2d 659, 661 (5th Cir. 1979).

### A.    Dismissal Under Federal Rule 12(b)(1) for Lack of Standing

"Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013); *see also Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 218 (5th Cir. 1989). In claims for declaratory or injunctive relief, standing may be satisfied by the presence of "at least one individual plaintiff who has demonstrated standing to assert the[ ] [contested] rights as his own." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977); *see also Horne v. Flores*, 557 U.S. 433, 446-47 (2009). "The doctrine of standing asks 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Cibolo Waste*, 718 F.3d at 473 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)). Constitutional

---

[3] Eric H. Holder is the Attorney General for the United States. B. Todd Jones is the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.

standing requires a plaintiff to establish that she has suffered an injury in fact traceable to the defendant's actions that will be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

For an association to have standing to bring suit on behalf of its members, the association must show that "[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citation omitted). "The first prong requires that at least one member of the association have standing to sue in his or her own right." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012) [hereinafter *NRA*] (citing *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587-88 (5th Cir. 2006)).

### B.     Summary Judgment

Summary judgment is proper when the pleadings and evidence on file show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c).

When reviewing the evidence on a motion for summary judgment, the court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

### III.   ANALYSIS

#### A.   Defendants' Motion to Dismiss for Lack of Standing

As a threshold issue, the Court must address Defendants' claim that Plaintiffs lack standing to bring the instant action. Defendants argue that the Court should dismiss Plaintiffs' claims for lack of subject-matter jurisdiction for four reasons: (1) the Hansons' alleged injury-in-fact is not traceable to Defendants; (2) the Hansons have not shown redressability; (3) Mance has not suffered an injury-in-fact traceable to the challenged laws; and (4) the Committee has not shown associational standing. *See* Defs.' Br. Supp. Mot. Dismiss, ECF No. 16. While the Court need only establish standing by the presence of at least one individual plaintiff who can assert the contested rights as his own, out of an abundance of caution the Court will address the standing of all parties. *See Vill. of Arlington Heights*, 429 U.S. at 264. The Court first focuses its analysis on the Hansons' claims.

Defendants contend that the Hansons' claimed injury is the $125 transfer fee that Sykes requires to import out-of-state handguns, making the injury traceable only to Sykes and not the challenged statutes. Defs.' Br. Supp. Mot. Dismiss 9-10, ECF No. 16. Defendants rely on the Fourth Circuit's decision in *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012), in which the Fourth Circuit noted

6

that section 922(b)(3) was directed at FFLs, not the plaintiffs as potential purchasers, and that the injury alleged was not traceable to the ban, but rather to the FFLs who chose to charge transfer fees. *Lane*, 703 F.3d at 673-74. The *Lane* court also held that the plaintiffs would not suffer an absolute deprivation in that they could obtain handguns even though they face additional costs and logistical hurdles. *Id.* at 673.

The Fifth Circuit, however, has found standing under comparable circumstances when potential individual purchasers challenged an age restriction on firearms purchases. *See NRA*, 700 F.3d at 191. Even though the age restriction did not bar 18-to-20-year-olds from possessing or using handguns, "prohibiting FFLs from selling handguns to 18-to-20-year-olds . . . cause[d] those persons a concrete, particularized injury—i.e., the injury of not being able to purchase handguns from FFLs." *Id.* at 191-92 (citing *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Counsel, Inc.*, 425 U.S. 748, 750-57 (1976)). Unlike *Lane*, the Fifth Circuit found potential individual purchasers had standing, even though the law directly applies to FFLs and even though they did not suffer an absolute deprivation of their Second Amendment rights. *See id.* As the law caused their deprivation and a favorable ruling would relieve them of this injury, the plaintiffs in *NRA* had standing. *Id.*

Here, as in *NRA*, the Hansons are not faced with an absolute deprivation of their rights, but they are still faced with a present injury—their inability to purchase and take possession of handguns directly from an FFL at the time they desire due to their residence. *See Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir. 2011) (noting that it is "a profoundly mistaken assumption" to assume "that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction"). Defendants conceded that this might amount to an injury. *See* Tr. Oral Arg. at 23 ("Well, they may have an injury in that they can't get the handgun exactly there. But that's not

7

traceable to the law because the law would allow them to get the handgun as long as they got it from a dealer in their home state."). Although *Lane* held that the plaintiffs' injuries, if any, were caused by the unnamed FFLs and not the law at issue, this Court declines to apply similar reasoning. The sole reason that the Hansons must go through Sykes to complete their desired transaction with Mance is because the federal interstate handgun transfer ban requires them to do so. But for the federal interstate handgun transfer ban, Mance and the Hansons would have been able to complete their desired transaction. In other words, the Court's favorable ruling for Plaintiffs would redress Plaintiffs' injury. The Court finds that the Hansons have suffered a cognizable injury that is traceable to Defendants' enforcement of the federal interstate handgun transfer ban that would be redressed by the Court's favorable ruling. Accordingly, the Hansons have standing to bring the instant action. *See Lujan*, 504 U.S. at 560-61.

Next, Defendants argue that the Committee lacks standing because it cannot show that any of its members possess standing. Defs.' Br. Supp. Mot. Dismiss 17, ECF No. 16. As previously discussed, the Hansons are members of the Committee. Furthermore, the Court finds that the interests the Committee seeks to protect are germane to its purpose, and neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. *See* Pls.' App. Supp. Mot. Summ. J. (Versnel Decl.), App. at 10-11, ECF No. 23. Thus, the Committee has associational standing to bring this action on behalf of its members. *See Ass'n of Am. Physicians & Surgeons*, 627 F.3d at 550.

Finally, the Court addresses Mance's standing. Defendants argue Mance has suffered no injury in fact. As stated above, Mance was unable to consummate the sale of handguns to the Hansons because of § 922(b)(3). The loss of a sale is clearly an injury to Mance in his own right, and

a distributor such as Mance also has standing to assert the rights of third parties seeking access to his goods. *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682-83 (1977); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (holding that lost sales and damage to business reputation provide standing).

Further, Defendants' reliance on *Lane* in opposition to the Hansons' standing undermines their argument in opposition to Mance's standing. In *Lane*, the Fourth Circuit noted the individual firearms purchasers lacked standing because the federal interstate handgun transfer ban did "not apply to them but rather to the FFLs from whom they would buy handguns." 703 F.3d at 672. The *Lane* court concluded that the plaintiffs' reliance on the Supreme Court's decision in *Carey* was inapposite because the Supreme Court in *Carey* had before it a *distributor* of contraceptives, not individual purchasers, and concluded a distributor had standing to challenge restrictions placed on the sale of contraceptives. *Id.* The Fourth Circuit in *Lane* therefore concluded *Carey* did not apply because there were no FFLs, i.e. distributors, in the lawsuit. *Id.* Regardless of the Fourth Circuit's reasoning about the applicability of *Carey* on the standing of individual purchasers, it clearly indicated an FFL plaintiff who is "directly affected" by § 922(b)(3) would have standing. *Id.*

The facts in this case indisputably demonstrate Mance suffered an injury, in the form of losing specific business with the Hansons, that is traceable to the federal interstate handgun transfer ban, and a favorable ruling from this Court would provide redress. Thus, according to *Lane*, *Carey*, and general standing principles, Mance has standing. *See Lujan*, 504 U.S. at 560-61. Having established the standing of each of the plaintiffs, the Court now proceeds to the merits of the claim.[4]

--------

[4] Defendants initially argued Mance lacked standing because he faced no imminent threat of prosecution. Defs.' Br. Supp. Mot. Summ. J. 16, ECF No. 16. However, Defendants later acknowledged that Mance would have a reasonable fear of prosecution if he were to sell handguns directly to the Hansons. Tr.

B.       **Cross Motions for Summary Judgment**

Neither party asserts there are genuine issues of material fact, therefore the Court focuses its analysis on the legal arguments presented by the parties. Here, Plaintiffs challenge the constitutionality of the federal interstate handgun transfer ban under the Second Amendment and the Due Process Clause of the Fifth Amendment. The Court analyzes the ban against both amendments in turn, beginning with the Second Amendment.

1.       Second Amendment

Plaintiffs challenge the federal interstate handgun transfer ban on its face, as applied in the context of handgun sales that do not violate any state or local laws, and as applied in the context of handgun sales where state or local laws require a license, pre-registration, or other form of approval to proceed with the sale. 2d Am. Compl. ¶ 36, ECF No. 33. "[F]acial and as-applied challenges have different substantive requirements." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 425 (5th Cir. 2014) (citing *Doe v. Reed*, 561 U.S. 186, 194 (2010)). The Court will first address the facial challenge to the federal interstate handgun transfer ban. To prevail on a facial challenge, Plaintiffs must show that either no set of circumstances exists under which the law would be valid or that the statute lacks any plainly legitimate sweep. *United States v. Stevens*, 559 U.S. 460, 473 (2010); *Catholic Leadership Coal.*, 764 F.3d at 426.

―――――――――――――

Oral Arg. at 43-44 ("If he were to sell directly to the Hansons, yes, that would certainly implicate (b)(3). . . . We no longer contend that the law would not apply to Mr. Mance or that he doesn't have sufficient fear of prosecution."). "[I]t is not necessary that [a party] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *see also Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 818 (5th Cir. 1979) (A justiciable controversy exists when "the plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing, the challenged measure."). Thus, Defendants have abandoned this argument.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has recognized that the Second Amendment confers an individual right to keep and bear arms. *See District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). This right is not unlimited, however, and the Supreme Court acknowledged that some conditions may still be constitutional, such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27. In fact, the Supreme Court noted that this incomplete list of regulatory measures is "presumptively lawful." *Id.* at 627 n.26.

The Supreme Court has not set out an analytical framework for determining whether other firearms regulations comport with the Second Amendment. *See NRA*, 700 F.3d at 194 ("*Heller* did not set forth an analytical framework with which to evaluate firearms regulations in future cases."). To analyze challenges under the Second Amendment, the Fifth Circuit, along with its sister circuits, employs a two-step inquiry:

> the first step is to determine whether the challenged law impinges upon a right protected by the Second Amendment—that is, whether the law regulates conduct that falls within the scope of the Second Amendment's guarantee; the second step is to determine whether to apply intermediate or strict scrutiny to the law, and then to determine whether the law survives the proper level of scrutiny.

*Id.*; *see also United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*); *Ezell*, 651 F.3d at 701-04; *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *but see United States v.*

11

*Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc) (forgoing the two-step framework to avoid the "levels of scrutiny quagmire," but applying intermediate scrutiny to a categorical restriction). In the first step, courts must look to whether the law "harmonizes with the historical traditions associated with the Second Amendment guarantee." *NRA*, 700 F.3d at 194. In essence, if the alleged burden at issue is consistent with longstanding, historic traditions of firearms restrictions, it "falls outside the Second Amendment's scope" and "passes constitutional muster." *See id.* at 195. Conversely, should the Court determine that the law burdens conduct that falls within the Second Amendment's scope, the Court must then apply the appropriate level of means-ends scrutiny. *Id.*

        *a.*     *Whether the Law Falls Within the Scope of the Second Amendment*

For the first step, the Court looks for any evidence of founding-era thinking that contemplated that interstate, geography-based, or residency-based firearm restrictions would be acceptable. *See Ezell*, 651 F.3d at 701-02 ("The answer [to the 'scope' question] requires a textual and historical inquiry into original meaning."); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). For example, in *NRA*, the Fifth Circuit found historic traditions of age restrictions for the possession of firearms dating back to the Revolution. *See* 700 F.3d at 204 n.17. The Fifth Circuit stated that "[t]he important point is that there is considerable historical evidence of age-and safety-based restrictions on the ability to access arms." *Id.* at 201-02. Likewise, in *Heller*, the Supreme Court illustrated examples of historical limitations on the right protected by the Second Amendment by noting that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." 554 U.S. at 626 (citations omitted); *see also Heller II*, 670 F.3d at 1252.

12

Defendants list the earliest known state residency restrictions on the purchase or possession of firearms, with the earliest of these restrictions occurring in 1909.[5] *See* Defs.' App. Supp. Mot. Summ. J. Ex. 2, App. at 103, ECF No. 17-1. Defendants have not presented, and the Court cannot find, any earlier evidence of longstanding interstate, geography-based, or residency-based firearm restrictions. The Court need not require "a precise founding-era analogue," but these early twentieth century state residency restrictions do not date back quite far enough to be considered longstanding. *See NRA*, 700 F.3d at 196. While two-hundred years from now, restrictions from 1909 may seem longstanding, looking back only to 1909, today, omits more than half of America's history and belies the purpose of the inquiry. *See Heller*, 554 U.S. at 634-35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1175 n.21 (9th Cir. 2014) (*Heller* and *McDonald* made clear "the scope of the Second Amendment right depends not on post-twentieth century developments, but instead on the understanding of the right that predominated from the time of ratification through the nineteenth century."); *Ezell*, 651 F.3d at 702-03 ("[I]f the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment – [here, 1791] – then the analysis can stop there."). In the absence of any evidence of founding-era thinking that contemplated that interstate, geography-based, or residency-based firearm restrictions would be acceptable, the Court finds that the federal interstate handgun transfer ban burdens conduct that falls within the scope of the Second Amendment. Having

---

[5] In 1909, West Virginia amended its code to require a state license for the possession of firearms and other dangerous weapons. *See* Defs.' App. Supp. Mot. Summ. J. Ex. 2, App. at 103, ECF No. 17-1 (citing 1909 W. Va. Acts 394, 395-96).

found that the conduct at issue falls within the scope of the Second Amendment, the Court moves to step two.

b.      *Whether to Apply Strict or Intermediate Scrutiny*

The Court must now determine the appropriate level of scrutiny to apply. Defendants argue that the federal interstate handgun transfer ban imposes only minimal burdens, so heightened scrutiny is not warranted. Defs.' Br. Supp. Mot. Summ. J. 27-28, ECF No. 16. Plaintiffs contend that because the ban targets all citizens, every handgun consumer is severely impacted by a restriction on the most preferred firearm in the nation for use in self-defense. *See Heller*, 554 U.S. at 628-29 (noting District of Columbia ban on handguns banned "the most preferred firearm in the nation to keep and use for protection of one's home and family."). They argue that the "trade in an article to which people have an enumerated, fundamental right cannot be the subject of reduced scrutiny." Pls.' Mem. Supp. Mot. Summ. J. 28, ECF No. 22.

In *NRA*, although the Fifth Circuit determined that age-restrictions were a longstanding, historic tradition, it moved to the second step "in an abundance of caution" and applied intermediate scrutiny. 700 F.3d at 204. The court reasoned that only intermediate scrutiny applied for three reasons: (1) an age qualification on commercial firearm sales was significantly different from a total prohibition on handgun possession; (2) the age restriction did not strike at the core of the Second Amendment by preventing 18-to-20-year-olds from possessing and using handguns for home defense because it was not a historical outlier; and (3) the restriction only had temporary effect because the targeted group would eventually age out of the restriction's reach. *Id.* at 205-07.

Here, Defendants contend that the Court need not engage in heightened scrutiny because any burden created by the federal interstate handgun transfer ban is "de minimis." Defs.' Br. Supp. Mot.

14

Summ. J. 27-30, ECF No. 16. Defendants rely on the Second Circuit's opinion in *United States v. Decastro*, 682 F.3d 160, 166-67 (2d Cir. 2012), which held that heightened scrutiny is reserved for regulations that "substantially" burden the Second Amendment right. Defs.' Br. Supp. Mot. Summ. J. 27-30, ECF No. 16; *see also* Tr. Oral Arg. at 46. Under this standard, a plaintiff may rebut the presumption that a longstanding regulation is presumptively lawful by showing that the regulation has more than a de minimis effect upon his right; "[a] requirement of newer vintage is not, however, presumed to be valid." *Heller II*, 670 F.3d at 1253. As discussed above, the federal interstate handgun transfer ban is not longstanding, making the de minimis standard inappplicable.[6] *See supra* Part III.B.1.a.

"A law that burdens the core of the Second Amendment guarantee—for example, 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home'—would trigger strict scrutiny." *NRA*, 700 F.3d at 205 (quoting *Heller*, 554 U.S. at 635) (internal citation omitted). At its core, the Second Amendment protects *law-abiding*, *responsible* citizens. *Id.* at 206. Instead of limiting the federal interstate handgun transfer ban to a discrete class of people, it prevents all legally responsible and qualified individuals from directly acquiring handguns from FFLs in every state other than their state of residency and the District of Columbia.[7] *See Ezell*, 651 F.3d at 708 ("Here

---

[6] In addition, Defendants were unable to articulate precisely when to apply the de minimis standard within the Fifth Circuit. *See* Tr. Oral Arg. at 51-58.

[7] While it is technically true that individuals outside of the District of Columbia are also unable to directly purchase and take possession of handguns from a District of Columbia FFL, there appears to be only one FFL in the District of Columbia, and he does not possess inventory and only remains in business to receive firearms for District of Columbia residents who purchase firearms from FFLs outside of the District of Columbia in compliance with §§ 922(a)(3) and 922(b)(3). *See Lane*, 703 F.3d at 670-71. As a practical matter then, no one outside of the District of Columbia is deprived of the right to purchase a handgun from a District of Columbia retail FFL at this time. Post *Heller* however, should a District of Columbia FFL open for business, only District of Columbia residents could purchase and take delivery from him.

. . . the plaintiffs are the 'law abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude under *Heller*."). To obtain a handgun from an out-of-state FFL retailer, the federal interstate handgun transfer ban imposes substantial additional time and expense to those who desire to purchase one. Restricting the distribution channels of legal goods protected by the Constitution to a small fraction of the total number of possible retail outlets requires a compelling interest that is narrowly tailored. *See Carey*, 431 U.S. at 689; *Marzzarella*, 614 F.3d at 94 ("[I]nfringements on protected rights can be, depending on the facts, as constitutionally suspect as outright bans."). The Court, therefore, applies strict scrutiny—that is, the law must be narrowly tailored to be the least restrictive means of achieving a compelling government interest. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

c.      *Strict Scrutiny Analysis*

Defendants contend that the Government's interest in restricting out-of-state handgun purchases is to protect "public safety and permit[ ] States to regulate firearms traffic within their own borders." Defs.' Br. Supp. Mot. Summ. J. 32, ECF No. 16. They argue the federal interstate handgun transfer ban combats the "serious problem of individuals going across state lines to procure firearms which they could not lawfully obtain or possess in their own state and without the knowledge of their local authorities." Defs.' App. Supp. Mot. Summ. J. Ex. 1 (S. Rep. No. 89-1866 (1966)), App. at 19, ECF No. 17-1. Under the law, FFLs may transfer rifles and shotguns to nonresidents so long as the FFL and recipient meet in person and the transfer fully complies with the legal requirements of both states. 18 U.S.C. § 922(b)(3)(A). The prohibition on directly transferring firearms to nonresidents applies only to handguns. *See id.* § 922(b)(3). Defendants argue that Congress focused on handguns, as opposed to rifles and shotguns, because "[t]he evidence before [Congress] overwhelmingly

16

demonstrated that the handgun is the type of firearm that is principally used in the commission of serious crime." Defs.' Mot. at 7. Finally, Defendants proffer that Congress required interstate handgun transfers to take place through in-state FFLs as an attempt to limit circumvention of state handgun laws "by ensuring that transfers are made only by dealers who are well-acquainted with and required to follow a State's handgun laws, allowing States to monitor more effectively the enforcement of State gun laws by focusing on dealer compliance."[8] Defs.' Br. Supp. Mot. Summ. J. 37, ECF No. 16.

First, the Court agrees the Government's interest in preventing handgun crime is a compelling interest. *See United States v. Salerno*, 481 U.S. 739, 754 (1987); *NRA*, 700 F.3d at 208-09. The parties' dispute centers around whether regulating the interstate market is appropriately limited in this fashion. *See* Defs.' Br. Supp. Mot. Summ. J. 32-37, ECF No. 16; Pls.' Mem. Supp. Mot. Summ. J. 27-33, ECF No. 22. Defendants contend that these provisions were appropriately "designed to prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one." Defs.' Br. Supp. Mot. Summ. J. 34, ECF No. 16 (quoting H.R. Rep. No. 90-1577 (1968)). As discussed above, it is Defendants' burden to prove in this case that the federal interstate handgun transfer ban is narrowly tailored to achieve this goal. In essence, Defendants must prove that requiring the participation of an additional FFL in out-of-

---

[8] Defendants also advanced the argument that the Second Amendment does not protect the right of individuals to *sell* firearms. *See* Defs.' Br. Supp. Mot. Summ. J. 25, ECF No. 16. Though *Heller* endorsed laws that imposed conditions and qualifications on the commercial sale of firearms, a court must necessarily examine the nature and extent of an imposed condition to analyze its constitutionality. *Marzzarella*, 614 F.3d at 92 n.8. "If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in *prohibiting* the commercial sale of firearms. Such a result would be untenable under *Heller*." *Id.* (emphasis added). Accordingly, the Court finds that operating a business that provides Second Amendment services is generally protected by the Second Amendment, and prohibitions on firearms sales are subject to similar scrutiny.

state handgun purchases is narrowly tailored to the stated goals of reducing violent handgun crime, preventing those unable to lawfully possess handguns from obtaining them, and providing states notice of handgun sales to state residents. *See Citizens United*, 558 U.S. at 340.

To prove this restriction is necessary, Defendants point to the statistics identified by Congress when it enacted the 1968 Gun Control Act. *See* Defs.' Br. Supp. Mot. Summ. J. 3-6, 34-35, ECF No. 16. In targeting the handgun for heightened restrictions, Congress found that 70% of murders were committed using a handgun, and 78% of firearm-related homicides of police officers were committed with a handgun. *Id.* at 34. Defendants have provided updated figures that largely mirror these statistics. *See id.* at 35 n.14. It is undisputed that these numbers supported, and perhaps continue to support, taking steps to address the use of handguns by the irresponsible.[9] These statistics, however, do not speak to the need for, and the reasonableness of, requiring the participation of an additional in-state FFL in all transactions involving out-of-state handguns.

Defendants appear to rely on the information provided by the Senate Report to the 1968 Gun Control Act to support the current need for the federal interstate handgun transfer ban. *See generally id.* As stated above, Congress determined that prohibited individuals easily evaded local firearms restrictions by simply crossing state lines. In support, the Senate Judiciary Committee investigation provided that in suburban Maryland, 58% of one firearms dealer's handgun sales were to District of

---

[9] Although the law creates a distinction between the transfer of handguns and the transfer of rifles and shotguns, Congress did consider statistics showing significant harm caused by rifles and shotguns, in addition to that of handguns. In fact, distinguishing between handguns and long guns was one of the controversial aspects of the statute. S. Rep. No. 89-1866 (1966), App. at 62, ECF No. 17-1. Congress saw evidence of "a substantial misuse of rifles and shotguns," including "that of the total number of firearms murders each year, some 30 percent [were] perpetrated by persons armed with rifles and shotguns." *Id.* at 63, 54. In spite of these statistics, Congress decided not to disturb transfers of rifles and shotguns to the same extent as handguns. *See* 18 U.S.C. § 922(b)(3); 27 C.F.R. § 478.96(c)(1). These types of conclusions regarding conflicting evidence are generally left to Congress. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 199 (1997).

Columbia residents and that subsequent criminal record checks determined that 40% of those purchasers had criminal records. *Id.* at 4. The investigation also revealed that a separate dealer made 40% of his handgun sales to District of Columbia residents and 23% of those sales were to purchasers with criminal records. *Id.*

These statistics notwithstanding, Defendants fail to provide reasonably *current* figures to show the federal interstate handgun sale ban is narrowly tailored. Strict scrutiny is a demanding standard that requires Defendants to show the governmental interest to be compelling and the associated regulation narrowly tailored to serve that interest. *See Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011). To be narrowly tailored, the curtailment of constitutional rights must be actually necessary to the solution. *Id.* The principal purpose in enacting the 1968 Gun Control Act was to curb crime by keeping "firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." *Huddleston v. United States*, 415 U.S. 814, 824 (1974); *see also Heller*, 554 U.S. at 626-27 (noting Supreme Court was not "cast[ing]doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."). Congress intended to accomplish this with the federal interstate handgun transfer ban, which would provide states with notice of those who purchased handguns *and* "prevent the avoidance of State and local laws controlling firearms by the simple expediency of crossing a State line to purchase one." Defs.' Br. Supp. Mot. Summ J. 34, ECF No. 16.

When the federal interstate handgun transfer ban was enacted in 1968, an instant electronic background check system did not exist. In 1993, Congress sought to strengthen the ability of all FFLs to avoid transferring firearms to persons who could not legally posses them under state or federal law by amending the 1968 Gun Control Act with the "Brady Act." *See* Brady Handgun Violence

19

Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993). Pursuant to the Brady Act, before an FFL may sell or deliver a firearm to a non-FFL, he must complete a criminal background check through the National Instant Criminal Background Check System ("NICS") to ensure the purchaser is legally entitled to obtain and possess the firearm. 18 U.S.C. § 922(t). States may also create a Point of Contact ("POC"), who acts as a liaison to NICS, to run the background check and receive notice of anticipated firearms purchases by its citizens. *See* 28 C.F.R. §§ 25.1-.2, 25.6(d). In other words, to complete a background check, the FFL contacts either (1) the state POC, if there is one; or (2) NICS, if the state has not designated a POC. *See id.* Current law therefore ensures potential purchasers can legally acquire and possess a firearm under state and federal law, and those states that desire to receive notice of firearms purchased by its citizens simply establish a POC.

Obviously, none of this infrastructure existed in 1968. Yet, in this case, it appears Defendants rely on statistics from the 1968 Senate Report to support the continued need for an in-state FFL in every out-of-state handgun transaction. *See, e.g.*, Tr. Oral Arg. at 50. ("[E]xtensive investigations over several years *before* [Congress] passed the Gun Control Act in 1968 . . . revealed a serious problem of individuals going across state lines to obtain firearms that the could not lawfully obtain or possess in their own state or residence and without the knowledge of their local authorities.") (emphasis added).

This argument fails to take into account the current version of the 1968 Gun Control Act, nor does it address how simply crossing state lines under the modern regime can circumvent state law. *See Shelby Cnty. v. Holder*, 133 S. Ct. 2612, 2619 (2013) (noting current burdens on constitutional rights "must be justified by current needs"); *see also NRA*, 700 F.3d at 209 (Evidence demonstrates that the link "between the ban and its objective has *retained* its reasonableness.") (emphasis added).

20

In *NRA*, the Fifth Circuit found reasonably current data supported the continued reasonable fit between the federal age restriction on the acquisition of handguns and the Government's interest. *NRA*, 700 F.3d at 209 (relying on 1999 statistics). In this case, Defendants provided recent data to support their argument that concealable handguns remain involved in homicides at the same significant rate as occurred in 1968. *See* Defs.' Br. Supp. Mot. Summ. J. 34 n.14, ECF No. 16. It may be that the federal interstate handgun transfer ban remains justified because the Brady Act fails to prevent prohibited individuals from crossing state lines to illegally acquire and possess handguns they otherwise would not obtain, and the Brady Act fails to provide notice to those states who desire it.[10] However, Defendants have failed to carry their burden to show the federal interstate handgun transfer ban is narrowly tailored to achieve the intended objective under current law. *See Shelby Cnty.*, 133 S. Ct. at 2627 (noting formula affecting constitutional rights must be appropriate "in light of current conditions"); *Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460, 463 (7th Cir. 2009) (stating items specifically protected by the Constitution can be restricted only "by evidence, and not just asserted"); *see also Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (holding that the government cannot rely on speculation or conjecture to support government interest).

---

[10] The Court notes the findings Congress made in the NICS Improvements Act. *See* NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, § 2, 122 Stat. 2559 (2008). The findings underscore two tragedies that occurred after NICS failed to stop certain firearm purchases. *Id.* Congress enacted the NICS Improvement Act to close loopholes in NICS and ensure that those failures did not occur again. *Id.* While two tragedies constitute two too many, they are not enough to conclude that the Brady Act is not working. From its inception on March 1, 1994, through December 31, 2010, approximately 2.1 million attempts-to-purchase firearms were blocked under the Brady Act. *See* Bureau of Justice Statistics, *Background Checks for Firearm Transfers, 2010-Statistical Tables*, U.S. Dep't of Justice 4 (Table 1) (Feb. 2013), http://www.bjs.gov/content/pub/pdf/bcft10st.pdf. Even if the Brady Act and the NICS Improvements Act are not as effective as they currently appear, Defendants have not met their burden to show the Court that the federal interstate handgun transfer ban is still necessary when enforced in addition to those Acts.

The evidence and the law before the Court indicate FFLs, wherever they may be located, are required to conduct background checks under current law before they sell or deliver any firearm to a non-FFL. *See* 18 U.S.C. § 922(b)(3). These checks identify both federal and state disabilities. *See* 18 U.S.C. § 922(t). While Defendants argue that state handgun laws are far more diverse and complex than state laws relating to rifles and shotguns, they do not provide relevant evidence that the ban is necessary to continue serving the goal of complying with state law, much less evidence that it is narrowly tailored to do so.[11] Nor do Defendants address why the current POC system is insufficient to provide notice to states that desire it. The current law relating to rifles and shotguns provides an example of a narrowly tailored law, especially when it is taken together with instant electronic background checks, face-to-face meeting requirements, state POCs, and published compilations of state and local firearms laws.[12] In short, the current statutory scheme presents less

---

[11] The Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives is required to annually furnish FFLs with an updated compilation of state laws and published ordinances, which is necessary for them to ensure that their firearms transactions comport with state and local law. *See* 27 C.F.R. § 478.24.

[12] FFLs must also verify and conform to numerous state firearms laws for rifles and shotguns. For example, Texas has no laws restricting semi-automatic assault weapons, whereas California bans most semi-automatic assault weapons and .50 caliber rifles and prohibits the sale and transfer of large capacity magazines. *See* Cal. Penal Code § 30605 (West 2014). A Texas FFL must ensure that a Sacramento, California resident who purchases a rifle is legally entitled to do so under federal, Texas, California, and Sacramento law. *Compare* Tex. Loc. Gov't Code § 229.001(West 2013) (limiting Texas municipalities' authority to locally regulate firearms) *with* Cal. Const. art. XI, § 7 (allowing local authorities in California, including cities and counties, to regulate firearms). Similarly, a non-Texas FFL must ensure that a Texas resident who purchases a rifle is legally entitled to do so under federal law and the laws of both states. While a California FFL in San Diego might have to research the local handgun restrictions in place for a Sacramento, California resident purchaser, some 500 miles to the north, nothing prevents an out-of-state FFL from Reno, Nevada, from conducting the same research to ensure that a handgun transaction with a Sacramento resident, some 100 miles away, comports with federal, Nevada, California, and Sacramento restrictions. Under current law, an FFL is not authorized to transfer any firearm to anyone until the state or federal authority confirms the transfer is legally permitted under state and federal law. *See* 18 U.S.C. § 922(t).

restrictive alternatives to achieve the goals that Congress identified in 1968, rendering the federal interstate handgun transfer ban not narrowly tailored.

Finally, Defendants argue that states do not have the ability to prosecute FFLs whose sales are made out of state and violate that state's law. *Id.* at 36-37 (quoting H.R. Rep. No. 99-495 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1335); *see also* Tr. Oral Arg. at 68. But, "the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality" of certain legislation. *See United States v. Morrison*, 526 U.S. 598, 614 (2000) (holding that simply because Congress concluded that a particular activity substantially affected interstate commerce did not necessarily make it so). There already exists a federal statute that imposes criminal liability on FFLs who sell illegal firearms in another state under 18 U.S.C. § 922(b)(3), and Defendants do not explain why a *state* could not prosecute that out-of-state FFL if he violates state law as well. It appears that Defendants rely on the fact that Congress *believed* that states would be unable to prosecute an out-of-state FFL who sold to one of their residents in violation of state law; thus, requiring the participation of the in-state FFL would allow states to prosecute such illegal firearms sales. The Court agrees that states indeed have an interest in prosecuting such crimes but fails to see how a state would be unable to prosecute out-of-state FFLs that illegally sell guns to their citizens. While Congress's findings indicated that states could not prosecute rogue out-of-state FFLs, nothing in the findings, and nothing presented by Defendants here, supports such a conclusion. *See Morrison*, 526 U.S. at 614 (stating that determining whether congressional findings are sufficient to sustain congressional action is a matter for the judiciary).

Based on the foregoing, the Court concludes that Defendants have not shown that the federal interstate handgun transfer ban is narrowly tailored to be the least restrictive means of achieving the

Government's goals under current law. The federal interstate handgun transfer ban is therefore unconstitutional on its face.

The Court further finds, in the alternative, the federal interstate handgun transfer ban is unconstitutional when applied to the facts of this case. The essence of an as-applied challenge is the claim that the manner in which a statute was applied to the plaintiff in a particular circumstance violated the Constitution. *See In re Cao*, 619 F.3d 410, 434 (5th Cir. 2010); *Khachaturian v. Fed. Election Comm'n*, 980 F.2d 330, 331 (5th Cir. 1992). Texas law allows the sale of handguns to residents of other states, and the District of Columbia does not prohibit the importation of firearms as long as they are registered. *See* D.C. Code § 7-2502.01(a) (2014). Further, based on the undisputed facts in this case, the Hansons are fully qualified under federal, District of Columbia, and Texas law to purchase and possess handguns, and the Hansons each identified a handgun in Mance's inventory that is legal for them to possess and bring into the District of Columbia. As discussed above, requiring that the Hansons pay additional costs and fees and wait until they return to the District of Columbia to retrieve their firearms from Sykes amounts to a regime that is not narrowly tailored to achieve the Government's compelling interest. Accordingly, the federal interstate handgun transfer ban is unconstitutional as applied to Plaintiffs.

> d.    *Intermediate Scrutiny Analysis*

Even if the federal interstate handgun transfer ban merits only intermediate scrutiny, the ban still fails. To withstand intermediate scrutiny, Defendants must show that the law is substantially related to an important government interest. *See, e.g.*, *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 348-49 (5th Cir. 2013). The law need not employ the least restrictive means to achieve its goal, but the law must be reasonably adapted to its public safety objective to pass constitutional

muster. *Id.* at 349. A regulation may not be sustained if it provides only ineffective or remote support for the interest. *Edenfield*, 507 U.S. at 770-71. Instead, "there must be an indication that the regulation will alleviate the asserted harm to a material degree." *Id.*

In *NRA*, the Fifth Circuit applied a means-ends analysis to determine that the federal law prohibiting FFLs from selling handguns to 18-to-20-year-olds survived intermediate scrutiny. 700 F.3d at 208-09. Specifically, the court found that the Government had shown that there was a problem of young persons under 21, who were immature and prone to violence, easily accessing handguns, which facilitate violent crime, primarily by way of FFLs. *Id.* at 208. Therefore, the court found that restricting the ability of young persons under 21 to purchase handguns from FFLs was an appropriate and constitutional response. *Id.* Applying intermediate scrutiny in *McCraw*, the Fifth Circuit found that a Texas law prohibiting 18-to-20-year-olds from publicly carrying handguns was constitutional because (1) it had a similarly "narrow ambit" as the federal law challenged in *NRA*; (2) it targeted the "discrete category" of 18-to-20-year-olds; and (3) the Texas law restricted only the carrying of one type of guns—handguns. *McCraw*, 719 F.3d at 349. Accordingly, the law was appropriately tailored. *Id.*

The federal interstate handgun transfer ban is unique compared to other firearms restrictions because it does not target certain people (such as felons or the mentally ill), conduct (such as carrying firearms into government buildings or schools), or distinctions among certain classes of firearms (such as fully automatic weapons or magazine capacity). Instead, the federal interstate handgun transfer ban targets the entire national market of handgun sales and directly burdens law-abiding, responsible citizens who seek to complete otherwise lawful transactions for handguns. *See Moore v. Madigan,* 702 F.3d 933, 940 (7th Cir. 2012) (stating government must make a "strong showing"

where the challenged restriction curtails "the gun rights of the entire law-abiding adult population"). Again, Defendants have failed to carry their burden to show how the federal interstate handgun transfer ban alleviates, in a material way, the problem of prohibited persons obtaining handguns simply by crossing state lines and depriving states of notice that they have under the amended version of the 1968 Gun Control Act.

It may be that the federal interstate handgun transfer ban provides a reasonable fit to prevent prohibited individuals from crossing state lines to illegally acquire and possess handguns they otherwise would not obtain, even in light of the Brady Act's creation of NICS/POC requirements. In this case, however, Defendants have failed to carry their burden to show the federal interstate handgun transfer ban is a reasonable fit to achieve the intended objective. *See Annex Books*, 581 F.3d at 463; *see also Edenfield*, 507 U.S. at 770-71. Nor have Defendants shown a continued problem with policing out-of-state FFLs. By failing to provide specific information to demonstrate the reasonable fit between this ban and illegal sales and lack of notice in light of the Brady Act amendments to the 1968 Gun Control Act, the ban is not substantially related to address safety concerns. Thus, even under intermediate scrutiny, the federal interstate handgun transfer ban is unconstitutional on its face.

Moreover, the federal interstate handgun transfer ban does not survive intermediate scrutiny when applied to the facts of this case. The undisputed facts indicate that the Hansons would otherwise have been legally permitted to possess the handguns that they selected from Mance and bring them into the District of Columbia. *See* 2d Am. Compl. ¶¶ 26, 28, ECF No. 33. As law-abiding, responsible citizens, the Hansons likely do not pose the threat to public safety that motivated Congress to enact the federal interstate handgun transfer ban. Requiring that the Hansons pay

26

additional costs and fees and wait until they return to the District of Columbia to retrieve their firearms from Sykes amounts to a regime that is not substantially related to the Government's stated goal. *See Shelby Cnty.*, 133 S. Ct. at 2619 ("[C]urrent burdens must be justified by current needs."). Therefore, the federal interstate handgun transfer ban is unconstitutional as applied to Plaintiffs.

### 2.   Due Process Clause of the Fifth Amendment

Plaintiffs contend that, because the laws discriminate based on residence, Defendants' enforcement of the federal interstate handgun transfer ban violates Plaintiffs' right to equal protection of the laws guaranteed by the Fifth Amendment's Due Process Clause. 2d Am. Compl. ¶¶ 39-40, ECF No. 33. The Due Process Clause of the Fifth Amendment provides, in relevant part: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has consistently held that the Due Process Clause contains an equal protection component, which prohibits the United States from discriminating between individuals or groups. *See, e.g.*, *Washington v. Davis*, 426 U.S. 229, 239 (1976); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

"[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Here, the federal interstate handgun transfer ban interferes with the exercise of a fundamental right. The Supreme Court has also held that strict scrutiny is required where the challenged classification impinges on residency. *See Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 254-64 (1974) (holding that a challenge to a state durational-residency requirement to receive free, non-emergency medical care merited strict scrutiny, and the requirement was unconstitutional); *see also Att'y Gen. of N.Y.*

27

*v. Soto-Lopez*, 476 U.S. 898 (1986). The Supreme Court applied strict scrutiny in situations where *state* laws discriminated against non-residents, and those cases involved benefits offered by the state, not constitutional rights. *See id.*; *Mem'l Hosp.*, 415 U.S. at 254. Here, the *federal* law not only creates a discriminatory regime based on residency, but it also involves access to the constitutional guarantee to keep and bear arms. Based on the strict scrutiny analysis above, the Court finds that the federal interstate handgun transfer ban also violates the Due Process Clause of the Fifth Amendment to the United States Constitution. *See supra* Part III.B.1.c.

## IV.    CONCLUSION

Based on the foregoing, it is **ORDERED** that Defendants' Motion to Dismiss for lack of standing (ECF No. 15) is **DENIED**. It is **FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment (ECF No. 21) is **GRANTED**, and Defendants' Motion for Summary Judgment (ECF No. 15) is **DENIED**.

Accordingly, the Court **DECLARES** that 18 U.S.C. § 922(a)(3), 18 U.S.C. § 922(b)(3), and 27 C.F.R. § 478.99(a) are **UNCONSTITUTIONAL**, and Defendants are **ENJOINED** from enforcing these provisions. The Court will issue its final judgment separately.

**SO ORDERED** on this **11th** day of **February, 2015**.


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

28