CTJ



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUL 2 3 2018

CLERK, U.S. DISTRICT COURT
By _____
Deputy            TS

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

4:14-cv-539-0

No. 15-10311

---

FREDRIC RUSSELL MANCE, JR.; TRACEY AMBEAU HANSON;
ANDREW HANSON; CITIZENS COMMITTEE FOR THE RIGHT TO KEEP
AND BEAR ARMS,

        Plaintiffs - Appellees

v.

JEFFERSON B. SESSIONS, III, U. S. ATTORNEY GENERAL; THOMAS E.
BRANDON, Acting Director, Bureau of Alcohol, Tobacco, Firearms and
Explosives,

        Defendants - Appellants

---

Appeal from the United States District Court
for the Northern District of Texas

---

### ON PETITION FOR REHEARING EN BANC

(Opinion 01/19/18, 880 F.3d 183 (5th Cir. 2018))

Before OWEN, and HAYNES, Circuit Judges.*

PER CURIAM:

The court having been polled at the request of one of its members, and a
majority of the judges who are in regular active service and not disqualified
not having voted in favor (Fed. R. App P. 35 and 5th Cir. R. 35), the Petition for
Rehearing En Banc is DENIED.

No. 15-10311

In the en banc poll, seven judges voted in favor of rehearing (Judges Jones, Smith, Elrod, Willett, Ho, Duncan, and Engelhardt) and eight judges voted against rehearing (Chief Judge Stewart and Judges Dennis, Owen, Southwick, Haynes, Graves, Higginson, and Costa).

ENTERED FOR THE COURT:

_____ /s/ *Priscilla R. Owen* _____
UNITED STATES CIRCUIT JUDGE

---

*Judge Prado was a member of the original panel but resigned from the Court on April 2, 2018 and, therefore did not participate in the consideration of the rehearing. This order is being decided by a quorum. 28 U.S.C. §46(d).

No. 15-10311

STEPHEN A. HIGGINSON, Circuit Judge, concurring in denial of rehearing en banc:

With respect for colleagues who have been thoughtful sharing reasons why they perceive the panel decision warrants full court review, I offer several reasons why I do not.

Unlike the dissents, I do not read the panel opinion as demoting the Second Amendment to second-class status or "subject[ing it] to an entirely different body of rules than other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010). Rather, the panel applied the two-step analytic framework adopted by our circuit and all nine other circuits to have considered the issue. *See NRA v. ATF*, 700 F.3d 185, 194–98 (5th Cir. 2012).[1] Mirroring First Amendment doctrine, this test asks: does the regulated conduct fall within the scope of the right? *Id.* at 194. And if it does, is the challenged law appropriately tailored to serve a sufficiently important purpose? *Id.* Severe burdens on core Second Amendment rights—rights of "law-abiding, responsible citizens to use arms in defense of hearth and home," *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)—merit strict scrutiny. *NRA*, 700 F.3d at 195. Less onerous laws, or laws that govern conduct outside the Second Amendment's "core," receive intermediate scrutiny. *Id.*

Neither the rehearing petition nor the lengthiest dissent takes umbrage with this two-step framework; neither one disputes Congress's

---

[1] *See also Kolbe v. Hogan*, 849 F.3d 114, 132 (4th Cir.) (en banc), *cert. denied*, 138 S. Ct. 469 (2017); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 n.34 (11th Cir. 2012); *United States v. Decastro*, 682 F.3d 160, 163–64 (2d Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1252 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 700–04 (7th Cir. 2011); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

Case 4:14-cv-00539-O  Document 37  Filed 07/23/18  Page 4 of 29  PageID 647

No. 15-10311

compelling interest in combating crime by assisting the states' public-safety enforcement of their own legitimate handgun regulations; and neither one contests that the laws challenged here directly further that purpose. The petition and the dissental instead challenge only the panel opinion's fact-bound narrow-tailoring analysis.

That issue does not warrant en banc review. This is especially so because, rather than neglect Second Amendment rights, the panel opinion gave petitioners the benefit of the doubt at every step of this analysis. At step one, the panel assumed out of an abundance of caution that federal laws governing the time, place, and manner of interstate gun sales are not among the longstanding "conditions and qualifications on the commercial sale of arms" that the Supreme Court has deemed "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26. And at step two, the panel again cautiously assumed that the "burdens" of which petitioners complain—namely, the extra days it takes to ship out-of-state firearms to the District of Columbia, plus the attendant shipping costs and fees—are so onerous, and the right to out-of-state gun purchases so near the Second Amendment's "core," that strict scrutiny is required. In my view, the panel opinion needed not concede either step. *See United States v. Focia*, 869 F.3d 1269, 1286–87 (11th Cir. 2017) (upholding 18 U.S.C. § 922(a)(5) as within *Heller*'s "presumptively lawful" categories); *United States v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (declining to apply heightened scrutiny because § 922(a)(3) "does not substantially burden [the] right to keep and bear arms").

But even were we required to apply strict scrutiny to this interstate commercial obligation—a far cry from the complete handgun ban at issue in *Heller*—the panel opinion did so carefully and correctly.

4

No. 15-10311

The laws at issue are not an overbroad prophylactic ban. To be clear: § 922(a) is not a ban on interstate gun transfers. It does not prohibit law-abiding individuals in one state from purchasing a gun from another. It simply conditions that the purchase be made through an in-state, federally licensed dealer. The only prohibitions on gun sales are those imposed by state law. Given the diversity and complexity of those laws, Congress reasonably concluded that relying on dealers in one state to ensure compliance with the laws of all 49 other states, the District of Columbia, and the U.S. territories would perpetuate the same under-enforcement and circumvention of *state* law that § 922(a) was meant to combat.[2] The rejoinder that dealers would be better able to apply the laws of all states and territories if those laws were less complex has no bearing on whether this *federal* law is narrowly tailored. Put simply, Congress has no power to compel states to streamline their gun safety regulations.

Nor is the law fatally underinclusive. Instead, its focus on handguns highlights how § 922(a) hews closely to its compelling purpose of reducing gun-related crime and violence by preventing circumvention of state law. Contrary to the dissental's assertion, we need not speculate why Congress was less concerned with out-of-state purchases of rifles: it's all there in the congressional record.[3] In any event, underinclusivity is not itself fatal: "A State

---

[2] For example, while many states prohibit gun ownership based on mental-health status, "some states report that state privacy laws bar them from providing information to the [National Instant Criminal Background Check System] that would demonstrate a mental health prohibitor for one of its citizens." *The Fix Gun Checks Act: Hearing before the Subcomm. On Crime & Terrorism of the S. Comm. of the Judiciary*, 112th Cong. (2011) (statement of David Cuthbertson, Assistant Director, Criminal Justice Information Services Division, Fed. Bureau of Investigation).

[3] *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(5), 82 Stat. 197, 225 ("[T]he sale or other disposition of *concealable* weapons . . . to non-residents . . . has tended to make ineffective the laws, regulations, and ordinances in the

5

Case 2:14-cv-00539-O Document 57 Filed 07/23/18 Page 6 of 29 PageID 649
Case: 15-10311 Document: 00514565404 Page: 6 Date Filed: 07/20/2018

No. 15-10311

need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1668 (2015).

And it should not be surprising that constitutional challenges sometimes fail, even under strict scrutiny. "Like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. Nor, contrary to any intimation in the dissentals, is the Second Amendment unique in that regard. *See, e.g., Holder v. Humanitarian Law Project*, 561 U.S. 1, 29–39 (2010) (upholding free-speech restriction under strict scrutiny).[4]

Neither do I see a reason for our full court to accept the remaining dissentals' invitation to jettison the uniformly accepted Second Amendment test in favor of a *per se* invalidity rule that no party in this case has pressed[5] and that no federal appellate court has adopted.[6] Each circuit to have considered this proposal has rejected it for what is, in my mind, a sound reason: it is not what the Supreme Court said. *See, e.g., NRA*, 700 F.3d at 197–98 & n.10; *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1264–67 (D.C. Cir. 2011). Although the Supreme Court in *Heller* rejected Justice Breyer's

---

several States and local jurisdictions . . . ." (emphasis added)); S. Rep. No. 90-1097, at 80 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2167 ("The provisions of the title which prohibit a licensee from disposing of firearms (other than rifles and shotguns) to persons who are not residents of the State in which he conducts his business is justified by the record, which is replete with testimony documenting the fact that the purchase of such firearms by persons in other than their residence state is a serious contributing factor to crime.").

[4] I also disagree with the dissental's contention that "reliance on *Williams-Yulee*"—a *First* Amendment case that we have no power to change—"reinforces the concern" that the *Second* Amendment is second-class. Applying the same law in the same way to two rights does not subordinate one to the other, just as upholding a law under strict scrutiny does not demote the burdened right.

[5] *See* Brief for Appellee at 19, 2015 WL 5013572 (observing that courts apply a two-step inquiry and stating "[t]his case appears well-suited to this approach").

[6] *See supra* note 1. Indeed, the dissentals support this argument with only other dissents.

No. 15-10311

"freestanding 'interest-balancing' approach," 554 U.S. at 634, it never suggested that courts should abandon the familiar tiers-of-scrutiny architecture built around analogous provisions like the Equal Protection Clause, Due Process Clauses, and First Amendment. To the contrary, the Court in *Heller* noted that the Second Amendment's doctrinal structure "is no different" from that of the First, *id.* at 635, and explained that the D.C. handgun ban failed "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights," *id.* at 628. Had the Supreme Court meant instead to replace these established standards with a *per se* invalidity rule unrecognized in the law, it would have done so explicitly, not by hiding "elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Scalia, J.).

A decade has passed since the Supreme Court first discovered in the Second Amendment an individual's right to possess a handgun "in defense of hearth and home." *Heller*, 554 U.S. at 635. The dissentals emphasize that the Court has not recently revisited this area of law, and they suggest that our full court must pick up some perceived doctrinal slack. But *Heller* "was not revolutionary in terms of its immediate real-world effects on American gun regulation." *Heller II*, 670 F.3d at 1270 (Kavanaugh, J., dissenting). "Indeed, *Heller* largely preserved the status quo of gun regulation in the United States." *Id.*[7] After all, the opinion invalidated an absolute home-possession handgun ban matched in severity by "[f]ew laws in the history of our Nation," *Heller*,

---

[7] *See also* Eric Ruben & Joseph Blocher, *From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 Duke L.J. 1433, 1507 (2018) (concluding that most Second Amendment claims fail because of limitations on the scope of the right recognized by *Heller* itself). For example, "[f]ully 24 percent" of post-*Heller* Second Amendment challenges have targeted felon-in-possession laws, *id.*, which *Heller* explicitly "presum[ed] lawful," 554 U.S. at 626–27 & n.26.

No. 15-10311

554 U.S. at 629, yet it explicitly left intact a "variety of tools" constitutionally available for combating the tragedy of criminal gun violence and killing in the United States, *id.* at 636. Whether and how to deploy these tools is the subject of a dynamic debate occurring in statehouses and classrooms across the country. That the Constitution permits these discussions and initiatives is not cause for alarm.

I concur in our court's decision not to take this case en banc.

No. 15-10311

JENNIFER WALKER ELROD, Circuit Judge, joined by EDITH H. JONES, JERRY E. SMITH, DON R. WILLETT, JAMES C. HO, STUART KYLE DUNCAN, and KURT D. ENGELHARDT, Circuit Judges, dissenting from denial of rehearing en banc:

I concur in Judge Ho's excellent dissent from denial of rehearing en banc and write separately to address the proper Second Amendment test for assessing gun bans and regulations. Simply put, unless the Supreme Court instructs us otherwise, we should apply a test rooted in the Second Amendment's text and history—as required under *Heller* and *McDonald*—rather than a balancing test like strict or intermediate scrutiny.

Many of our sister circuits have recognized that *Heller* and *McDonald* require a textual and historical approach to the Second Amendment's scope. Most circuits—including our own[1]—have adopted a two-pronged approach, the first prong of which generally asks whether the challenged regulation burdens conduct that falls within the scope of the Second Amendment *as historically understood. See United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194–95 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chi.*, 651 F.3d 684, 702–03 (7th Cir. 2011); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010); *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017); *Heller v. D.C.*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) [*Heller II*].

Disagreement abounds, however, on a crucial inquiry: What doctrinal test applies to laws burdening the Second Amendment—strict scrutiny,

---

[1] Though not without dissent—see generally *National Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc).

No. 15-10311

intermediate scrutiny, or some other evaluative framework altogether? *See Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d 334, 345–46 & n.33 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc) (stating that "there is currently a debate about how to assess the level of scrutiny courts apply to regulations that infringe on gun ownership" and citing *Heller II*, 670 F.3d 1244; *Ezell*, 651 F.3d 684; and *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)); *see also Ezell*, 651 F.3d at 701 ("The [Supreme] Court resolved the Second Amendment challenge in *Heller* without specifying any doctrinal 'test' for resolving future claims.").

The panel opinion here assumes without deciding that strict scrutiny applies.[2] As I have argued previously, however, "unless and until the Supreme Court says differently, . . . '*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.'" *Houston v. City of New Orleans*, 675 F.3d 441, 448 (5th Cir.) (Elrod, J., dissenting) (quoting *Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting)), *opinion withdrawn and superseded on reh'g*, 682 F.3d 361 (5th Cir. 2012); *accord Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 714 F.3d at 338–39 (Jones, J., dissenting from denial of rehearing en banc, joined by Jolly, J.; Smith, J.; Clement, J.; Owen, J.; & Elrod, J.) ("[W]e should presuppose that the fundamental right to keep and bear arms is not itself subject to interest balancing. The right categorically exists, subject to such limitations as were present at the time of the Amendment's ratification.").

"*Heller* and *McDonald* make clear that courts may consider only the text and historical understanding of the Second Amendment when delimiting the

---

[2] Judge Ho's dissent from denial of rehearing en banc adeptly shows why the panel opinion errs even assuming, *arguendo*, that strict scrutiny applies.

10

Case: 15-10311    Document: 00514565404    Page: 11    Date Filed: 07/20/2018
Case 4:14-cv-00539-O   Document 57   Filed 07/23/18   Page 11 of 29   PageID 654

No. 15-10311

Amendment's scope." *City of New Orleans*, 675 F.3d at 449 (Elrod, J., dissenting). "The Supreme Court explained in *Heller* that it would require 'an exhaustive historical analysis' to delineate 'the full scope of the Second Amendment.'" *Id.* (quoting 554 U.S. 570, 626 (2008)). "While declining that undertaking, the *Heller* Court identified as permissible several types of 'longstanding' regulatory measures." *Id.* (quoting 554 U.S. at 626–27). "*Heller* then looked to 'historical tradition' alone to reach its conclusion that the government may ban certain classes of 'dangerous and unusual weapons.'" *Id.* (quoting 554 U.S. at 627). Succinctly stated:

> Gun bans and gun regulations that are longstanding—or, put another way, sufficiently rooted in text, history, and tradition—are consistent with the Second Amendment individual right. Gun bans and gun regulations that are not longstanding or sufficiently rooted in text, history, and tradition are not consistent with the Second Amendment individual right.

*City of New Orleans*, 675 F.3d at 452 (Elrod, J., dissenting) (quoting *Heller II*, 670 F.3d at 1285 (Kavanaugh, J., dissenting)).[3]

I respectfully dissent.

---

[3] Mance and *amici*, the National Rifle Association and National Shooting Sports Foundation, have argued that the regulations at issue cannot be characterized as longstanding. The panel opinion assumes, without deciding, that the regulations at issue are "not 'longstanding regulatory measures.'" *Mance v. Sessions*, 880 F.3d 183, 188 (5th Cir. 2018) (quoting *McDonald v. City of Chi.*, 561 U.S. 742, 786 (2010) (plurality opinion)). As Judge Owen's concurring opinion highlights, "the Government has offered no evidence that an in-state sales requirement has a founding-era analogue or was historically understood to be within the ambit of the permissible regulation of commercial sales of firearms at the time the Bill of Rights was ratified." *Id.* at 194 (Owen, J., concurring). Assuming that the regulations at issue are "not longstanding or sufficiently rooted in text, history, and tradition," the need to apply the proper test here is paramount: Crucially, under a proper text-and-history-based approach, such regulations would be inconsistent with the Second Amendment's individual right. *See City of New Orleans*, 675 F.3d at 452 (Elrod, J., dissenting).

No. 15-10311

DON R. WILLETT, Circuit Judge, joined by EDITH H. JONES, JERRY E. SMITH, JENNIFER WALKER ELROD, JAMES C. HO, STUART KYLE DUNCAN, and KURT D. ENGELHARDT, Circuit Judges, dissenting from denial of rehearing en banc:

Constitutional scholars have dubbed the Second Amendment "the Rodney Dangerfield of the Bill of Rights."[1] As Judge Ho relates, it is spurned as peripheral, despite being just as fundamental as the First Amendment. It is snubbed as anachronistic, despite being just as enduring as the Fourth Amendment. It is scorned as fringe, despite being just as enumerated as the other Bill of Rights guarantees.

The Second Amendment is neither second class, nor second rate, nor second tier. The "right of the people to keep and bear Arms"[2] has no need of penumbras or emanations. It's right there, 27 words enshrined for 227 years.

The core issue in this case is undeniably weighty: Does the federal criminalization of interstate handgun sales offend We the People's "inherent right of self-defense?"[3] This merits question turns upon a method question: What level of judicial scrutiny applies to laws burdening the Second Amendment? In other words, when the government abridges your individual gun-ownership rights, how generous is the constitutional strike zone?

---

[1] Robert J. Cottrol, *Taking Second Amendment Rights Seriously*, 26 HUM. RTS. 5, 5 (Fall 1999) ("[T]he Second Amendment has become the Rodney Dangerfield of the Bill of Rights . . . ."); *see* Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637, 639 (1986) (noting that, at the time, "the Second Amendment [was] not at the forefront of constitutional discussion" in "scholarly legal publications"). *But see* Glenn Harlan Reynolds, *Foreword: The Third Amendment in the 21st Century*, 82 TENN. L. REV. 491, 491 (2015) ("For many years, the Third Amendment to the Constitution has been the Rodney Dangerfield of the Bill of Rights, getting no respect.").

[2] U.S. CONST. amend. II.

[3] *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008).

No. 15-10311

My colleagues' dissents today are well written and well taken. And they themselves underscore the need for en banc resolution, not just of the ultimate "who wins?" question but of the prefatory "which test?" question.

- The panel assumed, "without deciding, that the strict, rather than intermediate, standard of scrutiny"[4] applies and concluded the ban survives.

- Several colleagues respectfully disagree and believe that, under strict scrutiny, the ban is unconstitutional.

- More fundamentally, though, these colleagues reject the application of strict scrutiny altogether and suggest that, rather than tiers of scrutiny, our constitutional inquiry should assess whether a regulation squares with "text, history, and tradition."

As Judge Jones explained five years ago, "there is currently a debate about how to assess the level of scrutiny courts apply to regulations that infringe on gun ownership."[5] The debate persists. As Justice Thomas recently lamented, "This Court has not definitively resolved the standard for evaluating Second Amendment claims."[6] Given the Supreme Court's disinclination to hear Second Amendment cases, we should settle the matter—definitively—within our circuit. Regardless of the ultimate holding on constitutionality, the scrutiny question itself merits scrutiny.

In sum, this case hits the en banc bull's-eye, posing "question[s] of exceptional importance."[7] First, this is a constitutional challenge to Congress's ban on interstate handgun sales.[8] Over the past year alone we have devoted

---

[4] *Mance v. Sessions*, 880 F.3d 183, 188 (5th Cir. 2018).

[5] *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 714 F.3d 334, 335 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc).

[6] *Silvester v. Becerra*, 138 S. Ct. 945, 947 (2018) (Thomas, J., dissenting from denial of certiorari).

[7] FED. R. APP. P. 35(a)(2).

[8] *See* 18 U.S.C. § 922(a)(3) (making it unlawful "for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector to transport into or receive in the State where he resides . . . any firearm purchased or otherwise obtained by

Case: 15-10311  Document: 00514565404  Page: 14  Date Filed: 07/20/2018
Case 4:14-cv-00539-O  Document 57  Filed 07/23/18  Page 24 of 29  PageID 687

No. 15-10311

our full court's attention to multiple cases raising nettlesome questions about the scope of various constitutional guarantees.[9] Each case cleared the "exceptional importance" hurdle and warranted our collective consideration. So too this case.[10]

---

such person outside that State"); *id.* § 922(b)(3) (making it unlawful "for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver . . . any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located").

[9] In May of last year, we heard en banc a case involving a grant of summary judgment on qualified immunity, in anticipation that the plaintiff *might* have a Fourth Amendment claim. *Melton v. Phillips*, 875 F.3d 256 (5th Cir. 2017) (en banc). Last September, we considered en banc whether the parents of a young boy shot and killed by a border patrol agent *might* have a cause of action to raise Fifth Amendment grievances on behalf of their son. *Hernandez v. Mesa*, 885 F.3d 811 (5th Cir. 2017) (en banc). And just this past January, we sat en banc to consider whether a defendant's Fourteenth Amendment rights under *Brady v. Maryland*, 373 U.S. 83 (1963), *might* be implicated by the withholding of evidence during plea negotiations. *Alvarez v. City of Brownsville*, 874 F.3d 898 (5th Cir. 2017) (granting petition for rehearing en banc). Each of these cases, like this one, "involve[d] a question of exceptional importance." FED. R. APP. P. 35(a)(2).

[10] This seems particularly true given the varying analytical approaches taken by other circuits that have examined this law. *See, e.g., Lane v. Holder*, 703 F.3d 668, 673 (4th Cir. 2012) (holding plaintiffs have no standing to challenge 18 U.S.C. § 922(b)(3) because it does "not burden the plaintiffs directly . . . because the plaintiffs are not prevented from acquiring the handguns they desire" and reasoning plaintiffs therefore "do not allege an injury in fact"); *United States v. Decastro*, 682 F.3d 160, 164 (2nd Cir. 2012) ("Because § 922(a)(3) only minimally affects the ability to acquire a firearm, it is not subject to any form of heightened scrutiny.").

For an amendment that is 227 years old, contour-setting litigation over the scope of the individual right to keep and bear arms is of relatively recent vintage. *Heller* was decided barely ten years ago, and as the Court made clear, the right is not unlimited: "It is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. So just what is prescribed and what is proscribed? When does a burden become a ban, or a regulation become a prohibition? As Justice Scalia observed pre-*Heller*, "There comes a point . . . at which the regulation of action intimately and unavoidably connected with [a right] is a regulation of [the right] itself." *Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting); *see also Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) ("Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise."). Mance and the Hansons thus raise a legitimate—and legitimately difficult—question that has been addressed in analogous constitutional contexts. *See, e.g., United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 ("It is of no moment that the statute does not impose a complete prohibition. The distinction between laws burdening and laws banning speech is but a matter of degree."). I

14

Case 4:14-cv-00539-O   Document 57   Filed 07/23/18   Page 15 of 29   PageID 658

No. 15-10311

Plus, today's case adds a crucial methodological issue, itself exceptionally important: How should judges evaluate laws that burden Americans' Second Amendment rights—tiers of scrutiny vs. "text, history, and tradition"? The Rule of Law is anchored in clear rules consistently applied. Regardless of *what* we decide, *how* we decide matters too.

Such questions en tête deserve answers en banc.

---

believe the nation's emergent Second Amendment legal framework would profit from our en banc input.

15

No. 15-10311

JAMES C. HO, Circuit Judge, joined by EDITH H. JONES, JERRY E. SMITH, JENNIFER WALKER ELROD, DON R. WILLETT, STUART KYLE DUNCAN, and KURT D. ENGELHARDT, Circuit Judges, dissenting from denial of rehearing en banc:

The Second Amendment guarantees the right of the people to keep and bear arms. For decades, the Supreme Court has referred to the Second Amendment as a fundamental civil right, comparable to other provisions of the Bill of Rights. *See, e.g., Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (describing the First, Second, Fourth, Fifth, and Sixth Amendments as the "civil-rights Amendments"); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49–50 n.10 (1961) (comparing "the commands of the First Amendment" to "the equally unqualified command of the Second Amendment"). It has reminded lower courts that fundamental constitutional rights like the Second Amendment "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008). And it has rejected attempts to disregard the Second Amendment as "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

Yet the Second Amendment continues to be treated as a "second-class" right—as at least three Justices have noted in recent years.[1]

---

[1] *See, e.g., Silvester v. Becerra*, 138 S. Ct. 945, 945 (2018) (Thomas, J., dissenting from denial of certiorari) (bemoaning "lower courts' general failure to afford the Second Amendment the respect due an enumerated constitutional right"); *Peruta v. California*, 137 S. Ct. 1995, 1999 (2017) (Thomas, J., joined by Gorsuch, J., dissenting from denial of certiorari) (lamenting "distressing trend" of "the treatment of the Second Amendment as a disfavored right"); *Friedman v. City of Highland Park*, 136 S. Ct. 447, 447 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) (criticizing "noncompliance with our Second Amendment precedents" by "several Courts of Appeals"); *Jackson v. City & Cty.*

16

No. 15-10311

So the district court deserves recognition for standing against the tide. It dutifully applied established constitutional principles and held the federal ban on interstate handgun sales invalid, ruling that the ban is not narrowly tailored to serve the Government's compelling interest in preventing the circumvention of state handgun laws. But a panel of this Court reversed.

This case warrants en banc review. It involves a question of exceptional importance—the proper scope of the Second Amendment. In fact, this is the second time in recent memory where a single vote prevented this Court from rehearing a Second Amendment case en banc. *See NRA v. ATF*, 714 F.3d 334, 335 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc). I respectfully dissent.

I.

Federal law criminalizes all interstate handgun sales, and requires anyone who wants a handgun to obtain it from an in-state dealer. 18 U.S.C. § 922(a)(3), (b)(3). As a result, anyone wishing to purchase a handgun from an out-of-state dealer must first have it transferred to an in-state dealer. *See generally Mance v. Sessions*, 880 F.3d 183, 185 (5th Cir. 2018).

The ban on interstate handgun sales demonstrably burdens the ability of countless law-abiding citizens like the Hansons to obtain a handgun.

To begin with, the ban imposes a *de facto* waiting period on interstate handgun sales. Courts have recognized that waiting periods pose a burden on constitutional rights that must be justified by a sufficient government interest. *See, e.g., Silvester*, 138 S. Ct. at 951–52 (Thomas, J., dissenting from denial of

---

*of San Francisco*, 135 S. Ct. 2799, 2799 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari) ("lower courts, including the ones here, have failed to protect [the Second Amendment right]"); *id.* at 2802 ("'A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all.'") (quoting *Heller*, 554 U.S. at 634).

17

Case: 15-10311    Document: 00514565404    Page: 18    Date Filed: 07/20/2018
Case 4:14-cv-00539-O   Document 57   Filed 07/23/18   Page 18 of 29   PageID 661

No. 15-10311

certiorari) (comparing 10-day handgun waiting period to "10-day waiting period for abortions," "10-day waiting period on the publication of racist speech," or "even a 10-minute delay of a traffic stop").[2]

The ban also imposes a *de facto* tax on interstate handgun sales, in the form of shipping costs and transfer fees. For example, in this case, the record establishes that the only dealer with a federal firearms license (FFL) in the District of Columbia imposes a $125 transfer fee. *See, e.g., Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983) (tax on paper and ink impermissibly burdens freedom of the press).

The Second Circuit discounted these burdens and concluded that the ban on interstate handgun sales "does not substantially burden [the] right to keep and bear arms." *United States v. Decastro*, 682 F.3d 160, 168 (2nd Cir. 2012).

The district court in this case disagreed, however, holding that the ban burdens Second Amendment rights and is therefore subject to strict scrutiny: "To obtain a handgun from an out-of-state FFL retailer, the federal interstate handgun transfer ban imposes substantial additional time and expense to those who desire to purchase one." 74 F. Supp. 3d 795, 807 (N.D. Tex. 2015). "Restricting the distribution channels of legal goods protected by the Constitution to a small fraction of the total number of possible retail outlets requires a compelling interest that is narrowly tailored." *Id.* The district court ultimately held that the ban violates the Second Amendment. *Id.* at 811–12.

---

[2] To illustrate his point, Justice Thomas cited, *inter alia*, a Sixth Circuit decision holding invalid "a 24-hour waiting period for abortions," 138 S. Ct. at 951 (citing *Akron Ctr. for Reproductive Health, Inc. v. Akron*, 651 F.2d 1198, 1208 (6th Cir. 1981)), a Ninth Circuit decision holding invalid another "delay" in obtaining an abortion, *id.* (citing *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 917 (9th Cir. 2014)), and a Ninth Circuit decision holding invalid a "5-day waiting period for nude-dancing licenses." *Id.* (citing *Kev, Inc. v. Kitsap Cty.*, 793 F.2d 1053, 1060 (9th Cir. 1986)). By contrast, the Ninth Circuit *upheld* a 10-day waiting period to buy a handgun. *Id.* at 945 (citing *Silvester v. Harris*, 843 F.3d 816, 828 (9th Cir. 2016)). Justice Thomas condemned this "double standard." *Id.* at 951.

No. 15-10311

On appeal, a panel of this Court reversed. Notably, the panel did not dispute that the ban demonstrably burdens Second Amendment rights. Instead, the panel assumed that, under Fifth Circuit precedent, the ban on interstate handgun sales is subject to strict scrutiny. *See NRA v. ATF*, 700 F.3d 185, 194–95 (5th Cir. 2012). But it concluded that the ban is narrowly tailored to serve a compelling interest and therefore survives strict scrutiny.[3]

## II.

Under strict scrutiny, the Government must establish that the challenged law is narrowly tailored to serve a compelling government interest. *See, e.g., Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). There are several reasons why the Government cannot carry that heavy burden in this case.

## A.

To start off with, the Government does not purport to have an interest in banning all interstate handgun sales. Rather, it asserts a more limited interest—preventing only the fraction of interstate handgun sales that would violate a legitimate state handgun law.

---

[3] As Judges Elrod and Willett note in their separate dissents, the Supreme Court in *Heller* and *McDonald* signaled that handgun laws must be tested against "text, history, and tradition," and "not by a balancing test such as strict or intermediate scrutiny." *Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). Under this approach, laws not "sufficiently rooted in text, history, or tradition are not consistent with the Second Amendment," and thus *per se* invalid. *Id.* at 1285. *See also Houston v. City of New Orleans*, 675 F.3d 441, 448–52 (5th Cir. 2012) (Elrod, J., dissenting).

On en banc rehearing, we could have considered replacing the strict scrutiny standard that the panel assumed applied under our precedents (*NRA*, 700 F.3d at 194–95) with *per se* invalidity (as well as the separate question of what standard to apply to laws rooted in text, history, or tradition, *see Heller*, 670 F.3d at 1274 & n.7, 1278 (Kavanaugh, J., dissenting)).

But the result here is the same either way: Judge Owen acknowledges that the ban on interstate handgun sales is not rooted in text, history, or tradition. 880 F.3d at 194 (Owen, J., concurring). And the ban violates strict scrutiny, for the reasons detailed in this opinion.

19

Case: 15-10311    Document: 00514565404    Page: 20    Date Filed: 07/20/2018
Case 4:14-cv-00539-O   Document 57   Filed 07/23/18   Page 20 of 29   PageID 663

No. 15-10311

In other words, the federal interstate handgun ban is a prophylactic rule: To prevent interstate sales that would violate state law, Congress has simply prohibited interstate sales altogether.

But prophylactic laws are inherently suspect under strict scrutiny. *See, e.g., FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 479 (2007) (opinion of Roberts, C.J., joined by Alito, J.) ("[A] prophylaxis-upon-prophylaxis approach to regulating expression is not consistent with strict scrutiny."); *Randall v. Sorrell*, 548 U.S. 230, 267 (2006) (Thomas, J., concurring) ("under traditional strict scrutiny, broad prophylactic [laws] . . . are unconstitutional"); *NRA*, 714 F.3d at 347 (Jones, J., dissenting from denial of rehearing en banc) ("Congress has seriously interfered with this age group's constitutional rights because of a class-based determination that applies to, at best, a tiny percentage of the lawbreakers among the class.").[4]

To take a simple example: Imagine that, to help states enforce their anti-obscenity laws, Congress outlawed the interstate sale of books. No court would uphold such a law. After all, laws that impose broad, categorical bans—rather than narrow, precise restrictions—are by definition not narrowly tailored. And that is so whether the Government bans books or handguns. *See, e.g., Sable Commc'n of Cal., Inc. v. FCC*, 492 U.S. 115, 128 (1989) ("The federal parties . . . argue that the total ban on indecent commercial telephone communications is justified because nothing less could prevent children from gaining access to such messages.   We find the argument quite unpersuasive."); *id.* at 131

---

[4] Similarly, a panel of the Sixth Circuit held a federal law unconstitutional under the Second Amendment due to over-inclusiveness, and the en banc court reached the same result on different grounds. *See Tyler v. Hillsdale Cty. Sheriff's Dep't*, 775 F.3d 308, 331–32 (6th Cir. 2014), *reh'g en banc*, 837 F.3d 678 (6th Cir. 2016).

Case: 15-10311    Document: 00514565404    Page: 21    Date Filed: 07/20/2018
Case 4:14-cv-00539-O    Document 57    Filed 07/23/18    Page 21 of 29    PageID 684

No. 15-10311

(describing ban as "another case of 'burn[ing] the house to roast the pig'")
(quoting *Butler v. Michigan*, 352 U.S. 380, 383 (1957)).

So the Government has an uphill battle to defend the prophylactic ban
on interstate handgun sales.

## B.

To overcome this burden, the Government presents one core argument:
A prophylactic ban is necessary, it says, because handgun laws are complex.
Under its view, the Government can reasonably expect dealers to learn the
laws of their own state—but not the laws of other states. The only way to
ensure compliance with all state handgun laws, then, is to forbid all interstate
handgun sales, and allow only in-state handgun sales.

Tellingly, however, the Government does not cite a single case in which
regulatory complexity justifies a prophylactic rule under strict scrutiny. To
the contrary, courts have generally rejected the notion that citizens are
incapable of learning the laws of other states—or that such inability would
justify otherwise unconstitutional laws. *See, e.g., Supreme Court v. Piper*, 470
U.S. 274, 285 & n.19 (1985) ("Nor may we assume that a nonresident lawyer—
any more than a resident—would disserve his clients by failing to familiarize
himself with the rules. . . . Because it is markedly overinclusive, the residency
requirement does not bear a substantial relationship to the State's objective.");
*cf. O'Reilly v. Bd. of Appeals*, 942 F.2d 281, 285 (4th Cir. 1991) (rejecting "[u]se
of residency . . . to determine familiarity with the geographic area to be served,"
and noting that "other similar jurisdictions use a written examination to
determine an applicant's familiarity with a specific area").[5]

---

[5] More broadly, courts routinely reject the argument that administrative difficulties
render less restrictive alternatives infeasible. *See, e.g., Gratz v. Bollinger*, 539 U.S. 244, 275
(2003) ("[T]he fact that the implementation of a program capable of providing individualized

No. 15-10311

The same logic readily applies here. To begin with: Even assuming the Government's premise that it is hard to comply with the handgun laws of all 50 states, that does not justify forbidding dealers from complying with the laws of one or more neighboring states—presumably the most likely scenario for an interstate sale. A Texas dealer near the Oklahoma border might very well be eager to master the laws of both Texas and Oklahoma.

The ban nevertheless forbids Texas dealers from serving Oklahomans. And for what reason? The Government does not contend (nor could it) that a dealer is fully capable of complying with the laws of one state, but incapable of complying with the laws of two. This alone demonstrates that a categorical ban on all interstate handgun sales is over-inclusive—it prohibits a significant number of transactions that fully comply with state law.

Moreover, this is not the only flaw in the Government's regulatory complexity theory. The Government presents no evidence that gun dealers cannot comply with the laws of multiple states. For example, the panel points to the fact that minimum age requirements vary by state. But that does not justify a categorical ban—the Government could easily provide, and dealers could easily follow, a one-page index of each state's minimum age requirement.

To be sure, there are more complex state laws than minimum age requirements—such as state laws defining prohibited purchasers in terms of mental illness or criminal history. But if in-state dealers are capable of complying with their own state's handgun laws, the Government has not explained why out-of-state dealers are incapable of doing so—for example, why

---

consideration might present administrative challenges does not render constitutional an otherwise problematic system."); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 508 (1989) ("[T]he interest in avoiding the bureaucratic effort necessary to tailor remedial relief . . . cannot justify a rigid line drawn on the basis of a suspect classification.").

Case: 15-10311    Document: 00514565404    Page: 23    Date Filed: 07/20/2018
Case 4:14-cv-00539-O    Document 57    Filed 07/23/18    Page 23 of 29    PageID 666

No. 15-10311

Texans are uniquely capable of complying with Texas law, but uniquely incapable of complying with Oklahoma law.

To borrow from Judge Owen's concurrence: "The Government has not explained how or why a state would be able to provide information such as mental health information for purposes of a transfer of a handgun by an in-state FFL but could not provide that information to an out-of-state FFL." 880 F.3d at 197 (Owen, J., concurring).

So there are plenty of less restrictive alternatives that further the Government's interest in ensuring compliance with state handgun laws, short of a categorical ban. For example, nothing prevents a state from imposing the same licensing or other requirements on out-of-state dealers that it already imposes on in-state dealers.[6]

In addition, some states require their residents to obtain a police pre-approval certification before buying a handgun. *See, e.g.*, D.C. Code § 7-2502.06(a); Haw. Rev. Stat. § 134-2(a); Mich. Comp. Laws § 28.422(1), (3); N.C. Gen. Stat. § 14-402(a). If in-state dealers can use police pre-approval to ensure compliance with state law, so can out-of-state dealers.

Similarly, Congress has established the National Instant Criminal Background Check System ("NICS") to ensure that prospective gun buyers are

---

[6] Consider, for example, what the Supreme Court has said about state alcohol regulations—namely, that states have various tools to ensure compliance with their laws by out-of-state wineries, such as licensing and other requirements. *See, e.g.*, *Granholm v. Heald*, 544 U.S. 460, 490 (2005) ("Out-of-state wineries face the loss of state and federal licenses if they fail to comply with state law."); *see also Cooper v. McBeath*, 11 F.3d 547, 554 (5th Cir. 1994) ("In this age of split-second communications by means of computer networks, fax machines, and other technological marvels, there is no shortage of less burdensome, yet still suitable, options. At first blush, interstate investigations would seem hardly more difficult than intrastate ones."). These principles readily apply here, especially considering that the Constitution allows states to prohibit the sale of alcohol, but forbids states from prohibiting the sale of handguns.

No. 15-10311

legally eligible. The district court found that NICS is sufficient to ensure compliance with state and federal law, rendering an interstate handgun sales ban unnecessary. 74 F. Supp. 3d at 810–11.

The panel disagreed, noting that "current federal laws . . . do not require all information regarding compliance with the various state and local gun control laws to be included in databases accessible by FFLs nationwide." 880 F.3d at 190.

But 36 states think that relying on NICS adequately vindicates their interests. According to an FBI report cited by the Government, 36 states— including every state in this circuit, as well as the District of Columbia—rely *solely* on NICS to run background checks. *See* FBI Criminal Justice Information Services, *National Instant Criminal Background Check System (NICS) Operations* 3 (2014), *available at* https://www.fbi.gov/about-us/cjis/nics/reports/2014-operations-report.

What's more, the fact that nearly three-quarters of states rely entirely on NICS, and not on their own databases, further demonstrates why the interstate sales ban serves little purpose: If a D.C. resident wishes to buy a handgun, the dealer will run the *same* NICS background check, regardless of whether the dealer is based in D.C., Texas, or most other states.

And in any event, even assuming the panel is correct that better information sharing would make the system more effective, that only furthers the point here: There are less restrictive alternatives to ensure compliance with state handgun laws.

Indeed, a majority of the Senate has voted to repeal the federal ban on interstate handgun sales, in favor of other regulations believed to be more effective at ensuring compliance with state handgun laws, including better information sharing—reflecting their view that the ban is not necessary to

No. 15-10311

enforce those laws. *See* Public Safety and Second Amendment Rights Protection Act of 2013 § 124, S. Amend. 715 to Safe Communities, Safe Schools Act of 2013, S. 649, 113th Cong., 1st Sess. (2013), 159 Cong. Rec. S2598, S2616 (daily ed. Apr. 11, 2013) (text of bill); *see also* 159 Cong. Rec. S2729, S2740 (daily ed. Apr. 17, 2013) (S. Amend. 715 roll call vote).[7]

### C.

Finally, the ban on interstate handgun sales is not only over-inclusive— it is under-inclusive as well: the ban does not apply to either rifles or shotguns. *See* 18 U.S.C. § 922(b)(3) (permitting interstate sale of rifles and shotguns, so long as the sale is conducted in person and complies with state law). What's

---

[7] Neither the panel nor the Government claims that better information sharing between the states and the federal government would conflict with *Printz v. United States*, 521 U.S. 898 (1997). To the contrary, as Judge Owen observed in her concurrence: "The Government has not explained how or why a state would be able to provide information such as mental health information for purposes of a transfer of a handgun by an in-state FFL but could not provide that information to an out-of-state FFL." 880 F.3d at 197 (Owen, J., concurring).

And for good reason. To begin with, *Printz* involved "the forced participation of the States' executive in the actual administration of a federal program"—not the mere "provision of information to the Federal Government," and certainly not merely providing information to the federal Government to further compliance with *state* law, as is the case here. 521 U.S. at 918. Nor did *Printz* concern "conditions upon the grant of federal funding." *Id.* at 917. Indeed, Congress already uses federal funding conditions to encourage states to share information in other contexts. *See, e.g.*, REAL ID Act of 2005 § 202(d)(12), Pub. L. No. 109-13, 119 Stat. 302, 314–15 (codified at 49 U.S.C. § 30301 note) (States shall "provide electronic access to all other States to information contained in the motor vehicle database of the State"); *id.* § 204(a), 119 Stat. at 315 (codified at 49 U.S.C. § 30301 note) ("The Secretary may make grants to a State to assist the State in conforming to the minimum standards set forth in this title."). *See also* 49 U.S.C. § 30503(a) ("Each State shall make titling information maintained by that State available for use in operating the National Motor Vehicle Title Information System.").

Finally, there is an even more fundamental reason why there is no conflict with *Printz*: None of these proposed less restrictive alternatives forces a state to do anything. The point here is simply that a state could strengthen compliance with its laws by sharing more information with the federal Government. That a state might be unwilling to do so is up to that state. But a state's unwillingness to undertake a suggested less restrictive alternative is not so much a *defense* to strict scrutiny, as it is a *violation* of it.

Case: 15-10311    Document: 00514565404    Page: 26    Date Filed: 07/20/2018
Case 4:14-cv-00539-O   Document 57   Filed 07/23/18   Page 26 of 29   PageID 669

No. 15-10311

more, federal law presumes that long-gun dealers are capable of learning and complying with the laws of all 50 states. *See id.* ("any licensed manufacturer, importer or dealer shall be presumed . . . to have had actual knowledge of the State laws and published ordinances" of the buyer's residence).

The Government contends that there is nothing wrong with under-inclusiveness, citing *Williams-Yulee v. Florida Bar,* 135 S. Ct. 1656 (2015). But *Williams-Yulee* acknowledges that under-inclusivity "raises a red flag" and can "reveal that a law does not actually advance a compelling interest." *Id.* at 1668. The Court in *Williams-Yulee* upheld a Florida law banning judicial candidates from soliciting contributions against First Amendment challenge—but only after concluding that the ban "aims squarely at the conduct most likely to undermine public confidence in the integrity of the judiciary." *Id.* Here, by contrast, it is difficult to imagine that the Government is less concerned with unlawful purchases of shotguns and rifles than it is with handguns.

Moreover, *Williams-Yulee* has been criticized for departing from established precedent, and instead applying a weakened version of narrow tailoring. *See, e.g., The Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) ("[T]he facial underinclusiveness of [the statute] raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which appellee invokes in support of affirmance."); *Citizens United v. FEC*, 558 U.S. 310, 362 (2010) ("[T]he statute is both underinclusive and overinclusive. . . . [I]f Congress had been seeking to protect dissenting shareholders, it would not have banned corporate speech in only certain media within 30 or 60 days before an election. A dissenting shareholder's interests would be implicated by speech in any media at any time.").

For example, four Justices dissented in *Williams-Yulee* for this reason. *See* 135 S. Ct. at 1680 (Scalia, J., joined by Thomas, J., dissenting) ("The state

No. 15-10311

ordinarily may not regulate one message because it harms a government
interest yet refuse to regulate other messages that impair the interest in a
comparable way. . . . The Court's decision disregards these principles."); *id.* at
1682 (Kennedy, J., dissenting); *id.* at 1685 (Alito, J., dissenting).

The Government's heavy reliance on *Williams-Yulee* thus reinforces the
concern that it is treating the Second Amendment as a second-class right. *See,
e.g.*, Noah B. Lindell, Comment, Williams-Yulee *and the Anomaly of Campaign
Finance Law*, 126 Yale L.J. 1577, 1577–78 (2017) ("As the decision filters down
into the lower courts and into other areas of law, *Williams-Yulee*'s forgiving
form of tailoring analysis could unduly dilute what should be the most
protective level of judicial scrutiny. There is already some evidence . . . of such
dilution.").

\* \* \*

No one disputes that the Government has a compelling interest in
preventing dangerous individuals from purchasing handguns. But as the
district court held, and the panel properly assumed, handgun restrictions must
be narrowly tailored to serve that interest. Law-abiding Americans should not
be conflated with dangerous criminals. Constitutional rights must not give
way to hoplophobia.

The ban on interstate handgun sales fails strict scrutiny. After all, a
categorical ban is precisely the opposite of a narrowly tailored regulation. It
applies to all citizens, not just dangerous persons. Instead of requiring citizens
to comply with state law, it forbids them from even trying. Nor has the
Government demonstrated why it needs a categorical ban to ensure compliance
with state handgun laws. Put simply, the way to require compliance with state
handgun laws is to require compliance with state handgun laws.

No. 15-10311

The Government's defense of the federal ban—that state handgun laws are too complex to obey—is not just wrong under established precedent, it is troubling for a more fundamental reason. If handgun laws are too complex for law-abiding citizens to follow, the answer is not to impose even more restrictive rules on the American people. The answer is to make the laws easier for all to understand and follow. The Government's proposed prophylaxis—to protect against the violations of the few, we must burden the constitutional rights of the many—turns the Second Amendment on its head. Our Founders crafted a Constitution to promote the liberty of the individual, not the convenience of the Government.

I would affirm the district court. I respectfully dissent.

C T J
~~ORIGINAL~~



# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

600 S. MAESTRI PLACE
NEW ORLEANS, LA 70130

July 20, 2018

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

    No. 15-10311   Fredric Mance, Jr., et al v. Jefferson
                Sessions, III, et al
                USDC No. 4:14-CV-539-*O*

Enclosed is an order entered in this case.

                                Sincerely,

                                LYLE W. CAYCE, Clerk

                                *Deborah M. Graham*
                        By: _____
                           Debbie T. Graham, Deputy Clerk

Mr. Charles Justin Cooper
Mr. Alan Gura
Mr. Sean A. Lev
Mr. William Bryan Mateja
Ms. Karen S. Mitchell
Ms. Tara S. Morrissey
Ms. Lindsey E. Powell
Mr. Michael S. Raab
Mr. Michael L. Rice
Mr. John Sorrenti
Mr. Mark Bernard Stern